```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                     MARSHALL DIVISION

 4   IMPLICIT, LLC              )(

 5                             )(    CIVIL ACTION NO.

 6                             )(    2:18-CV-53-JRG

 7   VS.                        )(    MARSHALL, TEXAS

 8                             )(

 9   NETSCOUT SYSTEMS, INC.     )(    APRIL 2, 2019

10                             )(    10:00 A.M.

11   _____

12

13   IMPLICIT, LLC              )(

14                             )(    CIVIL ACTION NO.

15                             )(    2:18-CV-54-JRG

16   VS.                        )(    MARSHALL, TEXAS

17                             )(

18   SANDVINE CORPORATION       )(    APRIL 2, 2019

19                             )(    10:00 A.M.

20                     MOTION HEARING

21         BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

22           UNITED STATES CHIEF DISTRICT JUDGE

23

24

25
```

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFF: (See Attorney Attendance Sheet docketed
                           in minutes of this hearing.)
 3

 4   FOR THE DEFENDANT: (See Attorney Attendance Sheet docketed
                           in minutes of this hearing.)
 5

 6   COURT REPORTER:       Shelly Holmes, CSR, TCRR
                           Official Reporter
 7                         United States District Court
                           Eastern District of Texas
 8                         Marshall Division
                           100 E. Houston Street
 9                         Marshall, Texas  75670
                           (903) 923-7464
10

11   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2

3    April 2, 2019

4                                                    Page

5         Appearances                                 1

6         Hearing                                     3

7         Court Reporter's Certificate               44

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          COURT SECURITY OFFICER:  All rise.

2          THE COURT:  Be seated, please.

3          Good morning, counsel.  This is the time set for a

4     hearing on a motion to compel in the Implicit versus

5     NetScout matter.  That's Case No. 2:18-CV-53, which is also

6     consolidated with Implicit versus Sandvine, which is

7     2:18-CV-54.

8          This is Plaintiff, Implicit's, motion to compel,

9     Docket 78.

10         Let me call for announcements on the record.

11         What says the Plaintiff, Implicit?

12         MR. DAVIS:  Good morning, Your Honor.  Bo Davis on

13    behalf of the Plaintiff, Implicit, and I'm ready to

14    proceed.

15         THE COURT:  All right.  What's the announcement

16    from Defendants?

17         MS. SMITH:  Good morning, Your Honor.  Melissa

18    Smith, Mr. Eric Buresh, and Mr. Mark Lang on behalf of both

19    Defendants, Sandvine and NetScout, and we're ready to

20    proceed, Your Honor.

21         THE COURT:  All right.  Thank you.

22         Before we get into the motion to compel and so I

23    don't forget it later in the morning, it's been called to

24    my attention that with regard to the upcoming claim

25    construction set for the 11th of this month before

1  Magistrate Judge Payne that the parties have not filed

2  their 4-5 claim construction charts, even though you asked

3  for and I gave you or you got an extension on that.

4          I'd like some indication from both sides as to why

5  not and -- well, let's start with why not.

6          Mr. Davis, any idea from the Plaintiff as to why

7  this didn't happen?

8          MR. DAVIS:  Your Honor, I think the delay is due

9  in part to, I think, trying to coordinate and make sure we

10  had the terms right.  But, overall, I believe it's just

11  a -- an oversight on the part of the parties.  We've been

12  working on it.  We're in the process of finalizing a draft

13  to send over to the other side.  So if anything, you know,

14  the Plaintiff usually bears the -- the burden to take the

15  first stab at this, and we were working on it.

16          THE COURT:  That stab has been worked on, but it

17  hasn't been taken?

18          MR. DAVIS:  It's -- it's -- I believe it -- it

19  should be sent over first thing this morning.  And I think

20  yesterday it fell -- fell through the cracks.  So I believe

21  the 4-5(d) chart is -- is being sent over this morning and

22  should be -- you know, we'll work with the Defendants as

23  quickly as possible to get it on file today.  And I

24  apologize for that.  There's really no excuse that I can

25  provide, Your Honor, as to why it didn't happen.  It just

1   fell through the cracks.

2          THE COURT:  All right.  Ms. Smith, do you or any

3   of your co-counsel have anything to add from the

4   Defendant's standpoint on this?

5          MS. SMITH:  No, Your Honor.  But both parties

6   allowed it to fall through the cracks, obviously.  But we

7   will turn it around just as quickly as Mr. Davis gets it to

8   us and -- and get it to Your Honor.

9          THE COURT:  All right.  Well, I'll trust that

10  that's going to happen.  I don't want Judge Payne to be

11  handicapped in any way when claim construction comes before

12  him for hearing on the 11th.  So I'll make sure he knows

13  that I've raised it with you, and I'll make sure he knows

14  that you've represented it's going to be done post haste.

15         MS. SMITH:  Understood, Your Honor.

16         THE COURT:  Okay.  Thank you.

17             Let's turn to the motion to compel.

18             Mr. Davis, this is Plaintiff's motion.  Let me

19  hear from you on this first, please.

20         MR. DAVIS:  Yes, Your Honor.  May I approach, Your

21  Honor?

22         THE COURT:  You may.

23         MR. DAVIS:  I have binders.

24         THE COURT:  Proceed when you're ready.

25         MR. DAVIS:  Thank you, Your Honor.

1          Good morning, Your Honor.  May it please the

2     Court.  Bo Davis on behalf of the Plaintiff, Implicit, LLC.

3          We filed this motion asking for the Court to enter

4     an order that Defendants, NetScout and Sandvine, produce

5     documents on products that are reasonably similar to the

6     products that are accused in this lawsuit.

7          And I understand the Court's standard for what it

8     requires to seek discovery on reasonably similar products.

9     And that's, I think, articulated well in the -- in the

10    GeoTag case, which the parties have cited here, and that

11    there's really a two-prong showing that has to be made.

12         The first is that the Defendants were on notice of

13    an infringement theory.

14         And, second, that the products that we seek

15    discovery on are reasonably similar.

16         And so I'd like to address the Court's standard

17    for reasonably similar products by walking the Court

18    through some of the evidence in the case and showing that,

19    number one, we did produce -- that we did disclose an

20    infringement theory -- a specific infringement theory to

21    the Defendants, and that the products we seek discovery on

22    are reasonably similar to -- to the products that are

23    accused.

24         And I've passed out for the Court a binder with

25    evidence in it.  And the first thing I'd like to direct the

1    Court to is Tab 2, which is the claim chart for one of the

2    patents in -- in the lawsuit, the '683 patent.  And I just

3    used the '683 patent as an exemplary -- as an exemplar

4    because I believe it's representative.  And I don't believe

5    there's any significant differences that matter for

6    purposes of this motion.

7         So using the '683 patent, what I'd like to do is

8    just walk the Court through this chart and explain where

9    we've -- the theory that we've disclosed.  And the Court

10   is -- has history with these patents, the claims at issue

11   in the case.

12        And, essentially, what the claims are talking

13   about in Claim 1 is an apparatus for receiving data for --

14   from a second apparatus, claims -- or Elements 1a on Page 2

15   of Tab 2 are the processing unit; 1b is a memory; 1b1 is

16   where we get into the meat of the claim.  And here it says

17   that we create, based on identification of information in a

18   received packet of a message, a path that includes one or

19   more data structures that indicate a sequence of routines

20   for processing packets in the message.

21        And what we've identified as the infringing

22   component or function of this element is in the -- well,

23   let me back up and just say that we -- what we've

24   identified specifically is a NetScout product called the

25   nGeniusONE Service Assurance platform.

1          And so with respect to this nGeniusONE platform,

2    what we've identified is language in public information

3    that discloses that this product does what is essentially

4    flow-based processing.  And we've highlighted some portions

5    of the publicly available information that talk about

6    flow-based processing and deep packet inspection.

7          And you can see here on Page 3, the highlighted

8    text says:  Next generation deep packet inspection engine

9    that relies on packet flow data to provide real-time

10   contextual analysis of service, network, and application

11   performance.

12         And we've highlighted numerous other places in the

13   public data for this product that we believe discloses that

14   the product is performing flow-based data processing.

15         I think it's also worth mentioning that part and

16   parcel with this notion of flow-based processing is deep

17   packet inspection or packet analysis.  And that become --

18   comes into play, I think, in the -- in the next limitation

19   when we get to the limitation that deals with TCP

20   conversion.

21         But what we've identified here is we're looking at

22   products that have a flow-based analysis, flow-based data

23   processing, deep packet inspection.

24         If we move on, Element 1b2 talks about storing the

25   created path, and there's similar language that we've

1  highlighted there.

2        And then we get down to -- on -- at the bottom of

3  Page 7, Element 1b3, which is processing subsequent packets

4  in the message.

5        THE COURT:  Let me ask you this, counsel.

6        MR. DAVIS:  Yes, Your Honor.

7        THE COURT:  You've -- you've said that you're

8  looking at products that have flow-base -- flow-based

9  analysis, flow-based data processing, and deep packet

10  inspection.

11        MR. DAVIS:  Yes, Your Honor.

12        THE COURT:  Where in that litany is layer 7

13  inspection.  And if it's not there, is that part of what

14  you're looking at, as well?

15        MR. DAVIS:  Well, layer 7, Your Honor, is the

16  application layer, and so when we get to layer 7 -- layer 7

17  doesn't really come into play until we get to this -- this

18  last element, the T -- the element that has the requirement

19  that there be a TCP conversion.  And so that's where we get

20  to application layer inspection where the claims require

21  execute a transmission control protocol to convert one or

22  more packets having a TCP format into a different format.

23        And so that element -- it doesn't say application

24  layer inspection.  We recognize that.  But when you convert

25  from TCP format into another format, you're converting from

1  the TCP layer to a higher layer which ultimately you get to

2  layer 7 which is the application layer.

3         And so when we see the words "deep packet

4  inspection," that's where, you know, we see a -- a flag for

5  potential TCP conversion.

6         And so that's what we get to on Pages 8 and 9.  We

7  have dis -- disclosure here where for this product, the

8  nGeniusONE product, there's -- there's clear disclosure in

9  the public data that -- that it -- that it appears to be

10  doing a TCP conversion.  And we know that because it says

11  TCP.

12         And right here on Page 8, to further harden

13  security, access to the system and the data is restricted

14  to only essential TCP/UDP -- UDP ports.  And while that is

15  not specifically saying we do a TCP conversion, it does --

16  it is disclosing that they work on TCP traffic.

17         And so when you combine this with the concept of

18  deep packet inspection, which we continue to highlight on

19  Page 10 where we have this graph that shows a number of

20  different layers, and at the -- at the bottom, deep-dive

21  packet analysis, what that tells us is this product is --

22  is doing TCP conversion at the application, and it's

23  looking into the application layer.  And, overall, we have

24  a pretty good idea that this is doing what we think the

25  claims are teaching.

1           And so we feel there -- therefore, we can accuse

2    this product, we can satisfy Local Patent Rule 3-1 to

3    provide a chart that specifically identifies which

4    functionality in the products is infringing on the patents.

5           And, of course, for all of these, Your Honor, we

6    relied on 3-1(g), which is the source code provision that

7    allows us to -- to amend the contentions to rely on source

8    code, which we did.

9           And so that was the next thing that I wanted to

10   show Your Honor was to match our original contentions up

11   with what we then did in our source code contentions that

12   we served on the Defendants.

13          THE COURT:  Well, let me ask you this --

14          MR. DAVIS:  Yes, Your Honor.

15          THE COURT:  -- Mr. Davis.  You're asking the Court

16   to compel the production of documents and information

17   regarding reasonably similar products.

18          MR. DAVIS:  Yes, Your Honor.

19          THE COURT:  And you say in your briefing that your

20   contentions, your 30(b)(6) notices, and your

21   interrogatories all support this and have given notice of

22   same to the Defendants.  But I don't see in your briefing

23   anywhere where you've attached your contentions, your

24   30(b)(6) notices, or your interrogatory questions and

25   answers.

1          You -- you've dropped in some quotes along the way

2     in your briefing, but you really haven't given me the

3     underlying and supporting documents to confirm your

4     representations about the notice that you've given.

5          Is there a reason that they're not part of the

6     briefing and not really before the Court?

7          MR. DAVIS:  Yes, Your Honor.

8          THE COURT:  It would be helpful if they were.

9          MR. DAVIS:  Understood, Your Honor.

10          And I believe the reason is when we were putting

11    this motion together, given that it was a -- a motion to

12    compel discovery, we were operating under Your Honor's

13    standing order with respect to the limits on pages and

14    exhibits.  And I don't -- so I think we were taking the

15    very streamlined approach to what we were putting in front

16    of Your Honor.  And perhaps we should have filed a motion

17    for leave to exceed those limits and -- and attach this

18    evidence.  And if so, then --

19          THE COURT:  Well, in hindsight, that probably

20    would have -- that probably would have been helpful to the

21    Court.  And motions for leave to exceed page limits are

22    not a -- not a rarity when there's supporting documentation

23    that's relevant.

24          But I'm not questioning the accuracy of your

25    representations.  I'm just saying I have selected quotes

1  that you've dropped into your briefing, but I don't have

2  the entirety of the supporting documents.  And I don't find

3  that the Defendants are telling me you've misquoted or

4  you've misrepresented, but, you know, if I had the totality

5  of what you're relying on before me, it would certainly

6  resolve any possible issue there.

7       MR. DAVIS:  I understand, Your Honor, and we

8  apologize for that.  The Court would have benefitted from

9  more time to -- to review all this.

10      And I do -- I do think that the fundamental

11  disagreement here is -- as I understand the Defendant's

12  position, is that they don't believe these other products

13  are reasonably similar because they were from a different

14  company, they have a different code base, and, therefore,

15  they're -- they're not reasonably similar.

16      And I -- and I feel like there's a fundamental

17  disadvantage that we're put in when we're -- when

18  essentially they're asking us to tell them something we

19  don't know, which is you have to show us how these

20  products -- these -- that you claim are reasonably similar

21  function in a manner that's similar to the products you've

22  accused when we don't have the discovery to know how these

23  product -- that the products we want to -- in discovery to

24  work.

25      And so I don't think the standard is does the code

1    work the same?  Is the code reasonably similar?  I think

2    it's proper to abstract to a functional level and say, we

3    believe these claims cover flow-based processing that, you

4    know, operates at the TCP layer and beyond.  And to

5    identify products that we have public information on, and

6    then to say, look, you have a whole bunch of products.

7          If you go to their website, there are dozens and

8    dozens of products that all seem to be related, and they've

9    got marketing names, but when you dig into them, they seem

10   to be the same thing.  And it becomes very confusing.

11         And we didn't realize until we got into the

12   deposition that some of these products were products that

13   were acquired from other companies.  But I don't think that

14   matters.

15         And I think at the end of the day, they know what

16   our infringement theory is, and we've asked them to tell us

17   which other products have similar functionality so we can

18   decide whether or not they need to be in this lawsuit; and

19   if so, then we would file a motion for leave to amend our

20   contentions and satisfy the good cause standard there,

21   and -- and move forward.

22         THE COURT:  I understand your -- what I'll call

23   chicken or the egg argument that you can't do one thing

24   until you have the other from which to base it.

25         MR. DAVIS:  Yes, Your Honor.

1          THE COURT:  I understand that.

2          MR. DAVIS:  Okay.  And so I'm -- I'm happy to

3   continue to walk through the evidence here and show Your

4   Honor where we then pointed to in the code specific

5   routines that we believe support our infringement theory.

6          But I think at the end of the day, they were on

7   notice, not only from our contentions, but throughout the

8   meet and confer process, the -- when we were told we

9   weren't going to get this discovery, we met and conferred.

10  We -- we told them what we wanted.  We served

11  interrogatories -- we served a deposition notice to try to

12  get the information.

13         We ultimately did get it through a 30(b)(6)

14  witness who said:  Yes, these other -- there are other

15  products that do what -- what you're -- what you're

16  interested in.

17         THE COURT:  That's Mr. Barrett?

18         MR. DAVIS:  Yes, Your Honor.

19         THE COURT:  Okay.

20         MR. DAVIS:  And so we -- we -- you know, we -- we

21  did that, and once we got that deposition testimony, we

22  felt like we had enough to -- to come before the Court and

23  ask for -- for relief on this.

24         And, you know, so I think we're -- I'm happy to

25  walk the Court through the rest of this and -- and show

1  where we did it and the source code for both Procera -- I'm

2  sorry, for NetScout and Sandvine.

3       THE COURT:  Let me ask you this, Mr. Davis.  It's

4  clear from the Defendant's briefing that they're relying to

5  some extent on TiVo versus Samsung, saying that the ability

6  to bring in similarly -- reasonably similar products

7  shouldn't be used as a broad-brush way to sweep in a myriad

8  of things that don't really relate.

9       MR. DAVIS:  Yes, Your Honor.

10       THE COURT:  And -- and I'm familiar with that

11  case.  I'm familiar with the language used in the

12  contentions there, but I'd be interested in your response

13  to that, whether you think it's applicable or not, and if

14  you think it's distinguishable, which I think you probably

15  do, tell me why you think it's distinguishable.

16       MR. DAVIS:  Well, I do think it is

17  distinguishable, Your Honor, because we are in this

18  situation asking for products that do operate in a

19  reasonably similar manner.  They were on notice of how they

20  operated.  And, frankly, we couldn't tell from the publicly

21  available information that they were -- that they were

22  doing what we thought they might be doing.

23       And so I think we're, you know, in a different

24  situation where -- than TiVo or even the GeoTag case where

25  there were facts in those cases that -- especially in the

1  GeoTag case where, you know, the Plaintiff was trying to

2  add a product that it had accused against other Defendants

3  that was publicly available that there really was no good

4  reason why they couldn't have added it before.  I don't

5  think we're in that situation.

6        And I don't think we're trying to -- you know,

7  we're not -- our understanding is that if the Court allows

8  discovery into these products, we still then have to move

9  to compel -- or move for leave to amend our contentions.

10 So we then have to satisfy the good cause standard.

11       We're happy to, you know, address that now, but I

12 think it's -- we're going to be in a situation where --

13       THE COURT:  I think it's premature to address that

14 now.

15       MR. DAVIS:  Thank you, Your Honor.  So I --

16       THE COURT:  Let me ask you this, Mr. Davis.

17       MR. DAVIS:  Yes.

18       THE COURT:  Part of your motion seeks relief with

19 regard to production of financial data, but I'm told that

20 Defendants have subsequently produced certain financial

21 data.  Is this a live issue, or is this basically mooted at

22 this point?

23       MR. DAVIS:  I believe it's a live issue, Your

24 Honor, because we have asked for affirmative

25 representations that the data we've got -- we've received

1   is the only data.  And we have not received an unequivocal

2   answer to that.

3           And I -- during the meet and confer that we had

4   prior to this hearing, you know, I think we were going to

5   go -- both sides were going to go back, take a look at

6   what's been produced, and evaluate where we were on that.

7   We did that.

8           THE COURT:  Well, I gather that any additional

9   financial information that's been produced relate to

10  specifically accused products?

11          MR. DAVIS:  Well, that -- that is certainly true,

12  Your Honor.  It -- it does relate to -- the only financial

13  information we've received relates to specifically accused

14  products.  And if Your Honor --

15          THE COURT:  Let me finish, Mr. Davis.

16          MR. DAVIS:  Yes.  I'm sorry, Your Honor.

17          THE COURT:  Don't cut me off, please.

18          MR. DAVIS:  I'm sorry.

19          THE COURT:  I mean, if the Court finds your

20  arguments meritorious and orders additional production

21  along the lines you've asked to be compelled, then I assume

22  once that's produced from an operations and functionality

23  standpoint, then they'll need to be a subsequent but

24  companion production of financial data once that's done, as

25  well, and those additional products are sorted out?

1          MR. DAVIS:  That's correct, Your Honor.

2          THE COURT:  So -- okay.  What else do you have for

3     me?

4          MR. DAVIS:  I just would -- if I could point Your

5     Honor to Tab 10.

6          THE COURT:  Okay.

7          MR. DAVIS:  This is -- this is for NetScout the

8     financial production.  It's a one-page document that

9     summarizes at the level you see here sales for financial

10    years '15 through '19.

11         And I will note, Your Honor, for the record that

12    this is attorneys' eyes only.  And we will -- would like to

13    seal this portion of the transcript, but it's a one-page

14    document.  And we've been --

15         THE COURT:  Well, if you're going to go into the

16    specifics of what's set forth here, then the proper method

17    would be for you to ask the Court to seal the courtroom

18    before you go into those specifics.  If you're just going

19    to describe what I see on the page before me from a high

20    level and not get into the confidential particulars, then

21    there's no need to -- to seal or later redact.

22         MR. DAVIS:  Thank you, Your Honor.  I believe we

23    can -- we can go with the latter.

24         THE COURT:  Okay.

25         MR. DAVIS:  So with that said, you know, this is

1  what we've received, and we express severe concern about

2  this level of production to the Defendants that -- that

3  this is insufficient level of granularity of financial data

4  to enable us to put together an infringement report on

5  damages.

6          And the response that -- our understanding of the

7  position -- of Defendant's position is, well, we've asked

8  for financial information from the client, and this is what

9  we've received.

10          And we've asked them to push harder on their

11  client because this can't be all there is.  And so in

12  reviewing their production, their subsequent productions

13  from the date that this was produced, which was in January,

14  we don't see any more granular data in their production.

15  And I'm happy to be corrected on this.  There's no more

16  granular data than this one-page summary.

17          In my experience in patent cases when we receive

18  the core financial data, it's a -- it's a spreadsheet that,

19  you know, if you were to print it out, would go on for

20  hundreds of pages, if not more.

21          And so, you know, we're -- so I do believe that

22  the -- the financial production is -- is still an issue,

23  and I believe that -- well, one other point that I would

24  like to make, Your Honor, just on the -- the reasonably

25  similar products before I sit down is just that I believe

1  those products are going to be relevant for an independent

2  basis, and that's going to be related to damages and even

3  potentially non-infringing alternatives.

4        And so, you know, to the extent that we've sought

5  discovery about the functionality of these other products,

6  how they work, what their pricing information is, their

7  finance -- financials are on the other products, we do

8  think that they're potentially relevant to -- to damages

9  and should be produced for those reasons, especially to the

10  extent that Defendants would -- would argue or rely on any

11  of those other products if they have the same functionality

12  as non-infringing alternatives.

13        So that was just one point I wanted to make to

14  circle back to the reasonably similar products issue.

15        THE COURT:  All right.  What else?

16        MR. DAVIS:  With that, Your Honor, I don't have --

17  unless you have some more questions, that's all I have.

18        THE COURT:  Let me hear from the Defendants in

19  response, please.

20        MR. BURESH:  Good morning, Your Honor.

21        THE COURT:  Good morning.

22        MR. BURESH:  Eric Buresh on behalf of Defendants.

23  Do you have a preference, Your Honor, on which issue to

24  discuss first?

25        THE COURT:  Not really.  Let's -- let's -- why

1    don't we take up the similarly functioning products, and

2    then we'll talk about the financial data side of it.

3          MR. BURESH:  Thank you, Your Honor.

4          With respect to the reasonably similar products

5    issue, I would call it the non-accused products issue.  And

6    the reason I -- I say that is because I -- I believe the --

7    the inception of this issue and -- and the focal point of

8    this issue has to be on the infringement contentions.

9          And not only what was disclosed but also the role

10   they play in the case.

11         During Plaintiff's argument, two cases were

12   mentioned, GeoTag and TiVo.  Both were your cases, so I

13   assume you're familiar with them.

14         Before I get to TiVo, which I think is the most

15   related case here, I'm going to note in -- in GeoTag and

16   really in both cases, the issues were before the Court on a

17   motion to compel discovery.  The question in both cases

18   was:  Do the Plaintiff in those respective cases get

19   discovery into a product that was not identified in the

20   infringement contentions?

21         So when Mr. Davis argues the chicken and egg that

22   Your Honor referred to, I don't believe that's the right

23   question, because it's -- it's sorted out in the case law.

24         If you identify in your -- in your infringement

25   contentions products that you want to pursue, you can take

1   discovery into those products.  If you don't identify them

2   and you want to rely on reasonably similar language in your

3   infringement contentions, then, according to GeoTag, there

4   are questions that must be answered by the Plaintiff before

5   you get to take that discovery, one of which is simply are

6   they products that operate in a manner that is reasonably

7   similar to the theory of infringement in your infringement

8   contentions?

9          The thing I wanted to note about the GeoTag case

10  before we get into the -- the real substance of that is

11  that the first question you asked, Your Honor, of GeoTag

12  was for an explanation for why the products they were now

13  seeking discovery on were not in the infringement

14  contentions.  And I think that's an important question in

15  this case, as well.

16         Since the -- since the briefing on this motion

17  closed, Your Honor, Implicit filed -- and this is with

18  respect to Defendant, Sandvine, which is not applicable to

19  NetScout.  But with respect to Sandvine, Implicit filed a

20  second lawsuit on March 19th, specifically identifying

21  PacketLogic as a -- as a product that's at issue in that

22  case.  The docket number on that is 2:19-CV-41.

23         And I think that's interesting that -- that they

24  accuse it of infringement in a second lawsuit and did not

25  identify it in the original contentions in this case.

1          Also interesting is that that complaint referenced

2     a notice letter sent by Implicit in December of 2014 to

3     Procera Networks, which was the precursor that originally

4     was the PacketLogic company.  They provided -- Implicit

5     provided Procera with a notice letter dated December 19th,

6     2014, specifically accusing PacketLogic of infringement.

7          So Implicit was aware of PacketLogic.  Implicit

8     thought PacketLogic was subject to allegations of

9     infringement, and PacketLogic was not identified in the

10    infringement contentions in this case.  That's a problem.

11         With respect to NetScout -- could I turn on the

12    ELMO, please?

13         THE COURT:  Let me ask you this, counsel.

14         MR. BURESH:  Yes, Your Honor.

15         THE COURT:  What I hear you arguing -- and correct

16    me if I'm wrong, but what I hear you arguing is that when a

17    Plaintiff files suit and presents initial infringement

18    contentions based on what's available in the public domain

19    and then says something like together with other reasonably

20    similar products that do A, B, and C, which is effectively

21    what we have here, what you're telling me is Plaintiff

22    should know what those reasonably similar products are and

23    should accuse them with specificity in their initial

24    contentions, and they shouldn't come to us to tell them

25    what is reasonably similar based on the same operability or

 1   functionality.  And because they didn't do that, the door

 2   is closed, and they don't get any discovery on those

 3   additional products?  Is that really your argument?

 4          MR. BURESH:  It's finer -- it's a finer point than

 5   that, but that is very close to the analysis in -- in TiVo

 6   versus Samsung.

 7          THE COURT:  Well, in TiVo versus Samsung, they

 8   accuse certain DVRs, and then said other DVRs having the

 9   same or similar functionality.  That's a pretty broad

10   brush.

11          Here, we're talking about specific products that

12   have been accused, together with products that perform

13   certain specific applications and steps.  That's much more

14   so than just saying other DVRs that have similar

15   functionality.  I mean, you've -- you've gotten more notice

16   here than the Defendants got in the TiVo case.  I think --

17   at least it's my opinion, you've gotten more notice.

18          This is not a scatter shot and anything else

19   that's similar, which is really what happened in TiVo.

20   Here, you've got gotten specific products, together with

21   other similar products that do A, B, C, and D.  So you've

22   gotten a lot more specificity, and you've been given a much

23   more effective notice on the front end here than the

24   Defendants got in the TiVo case.

25          And, to me, that's -- that's a point that has some

1  difference and some -- some weight to it.

2        MR. BURESH:  Your Honor, in the infringement

3  contentions, the product identification was the nGeniusONE

4  Service platform -- I'm going to speak in terms of

5  NetScout -- and then the language in the infringement

6  contentions is Implicit seeks discovery from Sandvine as to

7  all reasonably similar products.  So that's with reference

8  back to the nGeniusONE -- nGeniusONE products that are

9  reasonably similar to the nGeniusONE, including all

10 Sandvine products that perform application layer

11 inspection, layer 7 inspection, deep packet inspection, or

12 a similar process.

13       I would argue, Your Honor, that that is the exact

14 same -- in this context of this market space, that is the

15 exact same thing as saying DVR functionality, the reason

16 being, deep packet inspection is simply saying I have a

17 network product that looks below layer 4 in a packet.

18 That's -- that's all it's saying.

19       And what we're talking about there, Your Honor,

20 and I'm going to get into specifics here, routers do deep

21 packet inspection.  Firewalls do deep packet inspection.

22 Network analytics products like the ones that were actually

23 accused or specifically identified do deep packet

24 inspection.  Network diagnostic products that you can plug

25 into a network to figure out which blade on a server is

 1   malfunctioning, those do deep packet inspection.  Virtually

 2   everything that plugs into a network and does anything with

 3   packets does deep packet inspection.

 4        THE COURT:  Well, let me ask you this.  Given

 5   that -- given that representation, why didn't both sides

 6   get together and you say, Plaintiffs, what you've asked for

 7   is not precise enough, it's too broad a net, it captures or

 8   potentially captures a lot of things that are not a part of

 9   what you're targeting here?  If you'll give me more refined

10   descriptors, then we'll try to produce these additional

11   data points on reasonably similar products with more

12   clarity?

13        And -- and I assume you're going to tell me you

14   did that and Plaintiff wouldn't comply.  Plaintiff's going

15   to tell me you didn't do it, and that's why we're here

16   today.  But, you know, what you're telling me is, they

17   didn't tell me enough, and that's why I'm here.

18        Well, my question is:  Why didn't -- why didn't

19   you ask them to tell you enough?  And why didn't they

20   respond?  And why didn't this get worked out?  And why am I

21   sitting here taking my time where both sides are dug in

22   with one saying they won't tell us what's reasonably

23   similar and the other one says they won't tell us what

24   reasonably similar means?  Can you answer that question?

25        MR. BURESH:  I can, Your Honor, to the best of my

1  ability.

2       THE COURT:  We can all only answer to the best of

3  our ability, counsel.

4       MR. BURESH:  At the time of the infringement

5  contentions, there was not an issue.  And -- and I say that

6  because, you know, there's two prongs under -- under the

7  GeoTag and also the TiVo case.

8       The first one is a specific theory of

9  infringement.  We've never really contested that because

10 these contentions are -- are -- they do provide a theory of

11 infringement.

12       And if I can take you back to Tab 2 of Plaintiff's

13 binder.

14       THE COURT:  All right.

15       MR. BURESH:  And turn to Page 3 where, as

16 Mr. Davis said, you start getting into the meat of the

17 contentions.

18       When you walk through the -- the substance of

19 their contentions, you're going to see this concept of ASI

20 technology in virtually every element of their claim and

21 highlighted.  ASI technology is -- is what NetScout called

22 adaptive services intelligence technology.  That's

23 NetScout's patented next generation deep packet inspection

24 engine, et cetera.

25       If you turn the pages, you're going to see ASI

1    technology over and over as you go through these

2    contentions.  And that makes sense in the context of -- of

3    these claims.  We understood why they were accusing the ASI

4    technology.  That is network analytics.  It is -- it is

5    what -- when you -- when you look at these patents talking

6    about creating paths, Your Honor may remember the

7    distinction between dynamic path creation and static path

8    creation from an earlier Markman hearing.

9          The reason why they're pursuing this adaptive

10   services technology is that it's their position that that

11   is the dynamic aspect, that you can dynamically make

12   adjustments and create paths.

13         We see that over and over again in their

14   infringement contentions and similar -- similar contentions

15   against Sandvine.  And that tells us, okay, we're dealing

16   with network analytics.  We're dealing with this type of

17   service intelligence.

18         What we did, Your Honor, at that point, we didn't

19   draw any hard lines.  They identified the nGeniusONE.  But

20   we knew at NetScout that there was InfiniStream product

21   lines that used ASI.  We knew there were applications that

22   used data that were supplied by ASI engines.

23         We provided -- literally if you -- if you bucket

24   anything that touches ASI, irrespective of whether the

25   Plaintiff has specifically identified those products, we

1  provided discovery into it because that's what we were on

2  notice of.  And that was not disputed.  It was not fought

3  about.  We just did it voluntarily.

4       You wait four and a half months into the case, and

5  we get a 30(b)(6) notice from Implicit.  And now we have a

6  definition of accused functionality where they have

7  literally gone through -- if I could put this up on the

8  ELMO.

9       This is a printout of NetScout's website from

10 February of '04, 2018, and the reason I captured that data

11 is that's around the date of the complaint.

12      What they did four and a half months into

13 discovery is to go through this page of the website and

14 laundry list all of these products, and say we want

15 discovery and a 30(b)(6) deponent into all of them.

16      If we look in the upper left-hand corner, you see

17 core offerings.  One is the nGeniusONE, and I also

18 mentioned InfiniStream under the monitoring platforms and

19 the ISNG platform.  Those all roll up.  They use ASI data.

20 We provided discovery into, like I said, anything that

21 uses, generates, works with ASI data.  We did that.

22      You also see a core product offering Arbor.

23 That's one of them that we're calling a non-accused

24 product.  It's not listed in -- in the infringement

25 contentions, and it doesn't do even the same things.  It

1    doesn't do network analytics.  It's a security product.

2    It's a firewall, if you will.

3           What Arbor does is, is it helps people remedy

4    distributive denial of service attacks.  Has nothing to do

5    with ASI.

6           Four and a half months into a case, if I now have

7    to start going through discovery on a completely separate

8    product line, completely unrelated, doesn't even do the

9    same things, I'm talking different code, different

10   witnesses, different document production, different

11   business units, it's all different.

12          Why when I look at contentions, Your Honor, that

13   identify nGeniusONE and they talk about extensively ASI

14   data and ASI technology in the context of network

15   analytics, why would I be on notice that I need to start

16   producing firewall information, DVOS information.

17          THE COURT:  Then -- then tell me why NetScout's

18   30(b)(6) witness, Mr. Barrett, testified there were certain

19   non-accused products that perform the core functions

20   identified in the accused products?  Why is your 30(b)(6)

21   witness saying there are other products out there?

22          MR. BURESH:  Oh, he didn't say that.  The core --

23   he very specifically said:  These other products do not do

24   the core functionality identified in your infringement

25   contentions.  The questions he was being asked is:  Do you

1  have other products that utilize deep packet inspection?

2         And his answer across the board would have to be

3  yes to that.  Virtually every one of these products uses

4  deep packet inspection.

5         That's not the right question.  Even under the

6  standard in -- in GeoTag and -- and TiVo, the question is:

7  Does it operate in a reasonably similar manner to the

8  theory of infringement identified in the infringement

9  contentions for the listed product?

10         None of these other products do ASI.  None of

11  these other products that they're trying to pursue even do

12  the same type of network analytics.  They're completely

13  different product lines.

14         THE COURT:  Well, it seems to me that what you're

15  telling me is Plaintiffs should be limiting their inquiry

16  to other products that do ASI, and Plaintiff hasn't told me

17  that's the focus of our inquiry.

18         Plaintiffs use the language that's in and

19  associated with their initial contentions about the app --

20  application layer inspection, layer 7 inspection, deep

21  packet inspection, et cetera.  And I understand that what

22  we're getting down to, which is usually what we get down to

23  is the Defendant telling me that's too broad a brush.  And

24  the Defendant -- Plaintiff telling me, no, it's not.  And I

25  don't -- I won't know until I see.  And that's where these

1    kind of arguments usually end up.

2          It may well be that based on tying future or

3    similarly situated products -- reasonably similar products

4    to ASI, that you've done what you need to do, but the --

5    the tie to ASI seems to be a matter of your creation and

6    your understanding.  I'm not hearing that from Plaintiff.

7          Now, if Plaintiff agrees that the ASI

8    functionality is the common thread and that the application

9    layer inspection -- layer 7 inspection, deep packet, et

10   cetera, if that's a broad enough -- or an overly broad

11   enough pathway that's going to bring in routers and other

12   things that aren't conceivably a part of the targeted

13   accused products, that's another thing.

14         But, I mean, what I -- what the Court is often

15   confronted with are two different sets of criteria, one

16   broader than the other, and that's where these -- that's

17   where these problems arise from, and that's where the

18   discussions and agreements seem to break down.

19         You know, in your view of what the case should be,

20   perhaps it is, that it should be only limited to products

21   that operate under the ASI technology.

22         Again, that's your side of the story, and I'm not

23   hearing that from the other side.

24         MR. BURESH:  And -- were you done?  I don't mean

25   to --

1          THE COURT:  Yeah.  Yeah, I am.  I mean, I'd like
2    you to address that -- that disconnect between both sides
3    to the extent you can.
4          MR. BURESH:  Your Honor, I -- I mean this with the
5    utmost respect, I'm going to quote back your language from
6    TiVo, because I think it's -- it's highly relevant.
7          The -- and you said, referring to the 3-1
8    contentions:  This disclosure is intended to put Defendants
9    on reasonable notice of what products are accused.  And you
10   were referring to the specific listing of products.
11         This is about why Plaintiff did not list these
12   other products that were publicly available.  Why are they
13   not listed in the infringement contentions?
14         You go on to say:  TiVo expects Samsung to locate
15   remaining Samsung products that might be implicated by
16   TiVo's infringement theory.  However, it is TiVo, not
17   Samsung, who knows best what its infringement theory is.
18   Samsung was not properly on notice that a previously
19   unnamed product might be implicated based on the original
20   contentions.  TiVo cannot simply rely on, quote, same or
21   similar functionality language to sweep in additional
22   products that have not been identified with sufficient
23   specificity in the original contentions.
24         And I believe the question that comes out of that,
25   Your Honor -- out of that discussion is do the infringement

1  contentions put the Defendant on notice, not forcing us to

2  guess about what's at issue in the case, but do they put us

3  on notice of other specific products that may be

4  implicated?

5          THE COURT:  I think that's clearly the question.

6  The -- the answer to that question lies in the language

7  that Plaintiffs have used in their initial contentions

8  naming, you know, nGeniusONE for NetScout and NAVL for

9  Sandvine, together with reasonably similar products,

10  including products that perform application layer

11  inspection, layer 7 inspection, deep packet inspection, or

12  a similar process.

13          That's certainly more description and more

14  targeted focusing than DVRs with similar functionality.

15  That's what we had in TiVo.  Is it enough to put you on

16  reasonable notice with regard to what the Plaintiff is

17  asking for now, and that's -- that's the ultimate question.

18          MR. BURESH:  It is, and -- and --

19          THE COURT:  And you're telling me it's not, and

20  Plaintiff is telling me it is.

21          MR. BURESH:  But what I'm telling you, Your Honor,

22  is -- and I believe what -- what you may be doing -- I

23  don't want to put words in your mouth, but you focused in

24  on application layer inspection and deep packet inspection,

25  and you're saying you could have guessed that they wanted

1  anything that had deep packet inspection, and, therefore,

2  you're on notice of anything that has deep packet

3  inspection.  But those are qualifiers to reasonably similar

4  products, to the one that was identified, nGeniusONE.  This

5  is their language.

6       They seek discovery as to all reasonably similar

7  products, including -- and then they go on and provide

8  qualifiers for what that might be.  Were we on notice that

9  a firewall product is reasonably similar to a network

10  analytics product?

11       THE COURT:  Well, the problem here, counsel, is

12  that Defendants always want me to hold Plaintiffs to a

13  standard of naming with specificity precise products and

14  holding you to that list.

15       And I regularly hear that any other description in

16  the term -- in the nature of a catch-all based on similar

17  functionality with some fair description of that

18  functionality is overly broad, and the Plaintiffs should

19  have named those specific products.

20       And I hear from Plaintiffs that the catch-all

21  should cover the universe.  And even as in TiVo, if it just

22  says similar functionality without any other clarification

23  or -- or information, that's enough to open the door to

24  whatever you can find.  And both views are wrong.

25       The initial contentions are targeted to put the

1  Defendant on reasonable notice, and that's reasonable.

2  It's not perfect notice.  And the Plaintiffs have got an

3  obligation to go as far there as they can reasonably go

4  with the publicly available information they have and not

5  just throw out a product together with anything else that

6  might function like it.

7          And so there's a middle point in my view between

8  what both sides go to their respective corners and argue

9  about.  And that's the kind of approach that I think both

10  GeoTag and Net -- and TiVo support.

11          And in TiVo, it wasn't enough.  In other cases, it

12  was.  And it depends on the particularity of the initial

13  contentions.  And at the end of the day, I've got to decide

14  did Plaintiff meet their minimum burden to put you on

15  reasonable notice to go beyond the specific products that

16  they've identified and get into those potentially

17  additionally infringing products.

18          And I will just tell both of you, arguing to me

19  that your end point on the spectrum is right and the other

20  person's end point on the spectrum is wrong is not going to

21  move the ball in a productive way.  Show me that these

22  initial contentions fall short of reasonably notifying you

23  based on what Plaintiff had to work with from in the public

24  domain at the time and that there is no reasonable basis

25  that you should have been on notice that these type

1   products today would have been captured by those initial

2   contentions, not holding them to just the -- the specific

3   products they identified.

4           And don't come in here, Plaintiff, and tell me

5   just because you said together with anything else that

6   operates or functions in the same way, you have a blank

7   check to go anywhere you want to go, because those are both

8   losing arguments.

9           So let's get to the middle, and let's talk about

10  what's reasonable here, not what both of you want to tell

11  me from your diametrically opposed end points on the

12  spectrum, because that's what I'm hearing, and that

13  doesn't -- that doesn't solve our problem.

14          And I don't have all day to coax you out of your

15  respective extreme positions toward some point of

16  reasonable middle ground.  And that's being as candid with

17  both sides as I know how to be.

18          So based on that high-level overview of how the

19  Court's going to approach this, let me hear whatever else

20  you've got to tell me from the Defendant's side and then

21  move on and address the financial side because this half a

22  page of one sheet of paper doesn't look like it could

23  reasonably be a fair disclosure of adequate financial

24  information as to the products that we know about today,

25  not -- not particularly -- not potentially future products,

1   all right?

2          MR. BURESH:  Your Honor, with respect to the --

3   with respect to the reasonably similar or the non-accused

4   products issue --

5          THE COURT:  I mean, you've argued to me in your

6   briefing that additional products made by somebody else

7   that you later acquired can't possibly be reasonably

8   similar.

9          To be -- to be honest with you, that's a

10  non-starter.  They can be.  It doesn't matter who built

11  them.  When you acquired them, they have a certain

12  functionality.  And if that functionality is within the

13  reasonable scope of what Plaintiffs put you on notice of,

14  it doesn't matter whether you originated them, or they came

15  from someplace else, and you acquired them.  That -- that

16  argument is not going to -- not going to help your cause.

17         MR. BURESH:  In all candor, what I'm looking at

18  as -- as a -- a middle ground, there are -- so what we

19  provided, and we did go, as I said, beyond the specific

20  product listings.  We -- considerably with respect to both

21  of the Defendants.  So we didn't do the bright line that I

22  think you're talking polar -- the polar extreme position

23  that you see from some Defendants.

24         THE COURT:  You went as far as you were

25  comfortable, and you stopped.  That's what happened.

1          MR. BURESH:  We went as far as --

2          THE COURT:  And the Plaintiff wasn't comfortable

3   with as far as you went, and the Plaintiff's is telling me

4   they need more.

5          I tell you what I'm going to do, counsel.  You're

6   fortunate to be here on a day when I don't have a

7   jam-packed schedule.  I'm going to recess for 30 minutes.

8   And at 11:30, I'm going to be back on the bench.  And I

9   want you to meet either here or in a conference room, and I

10  want you to try really hard to solve this problem in light

11  of the guidance and the comments that I've given you from

12  the bench.  And then I want to see if we still have an

13  issue to fight about.  Hopefully, we don't.

14         In the worst case scenario, it ought to be a whole

15  lot closer than it is right now.  I'll be back at 11:30.

16  You've got 35 minutes.

17         The Court stands in recess.

18         COURT SECURITY OFFICER:  All rise.

19         (Recess.)

20         COURT SECURITY OFFICER:  All rise.

21         THE COURT:  Be seated, please.

22         All right.  Counsel, you've been meeting and

23  conferring for the last 30 or 35 minutes.  Let me know

24  where you are.

25         MR. DAVIS:  Bo Davis on behalf of the Plaintiff.

1          Your Honor, we met and conferred during the break,

2     and the parties have reached an agreement that will moot

3     the motion to compel.

4          The terms of the agreement are that the Defendant

5     will produce source code and financials as to certain other

6     products that the parties have agreed to.

7          Plaintiff, Implicit, will then serve proposed

8     amended infringement -- source code-level of infringement

9     contentions, after which the parties will meet and confer

10    on a motion for leave to amend the contentions and any

11    other impact on the case that such a motion might have.

12    That's the agreement of the parties, Your Honor.

13         THE COURT:  All right.  Let me hear confirmation

14    from Defendants that that, in fact, as recited in the

15    record, accurately reflects the agreement of both sides.

16         MR. BURESH:  This is Eric Buresh, Your Honor, and

17    it does.

18         THE COURT:  All right.  Mr. Davis, this is your

19    motion.  You indicated that this agreement moots it.  For

20    purposes of the record, I can deny it as moot, based on the

21    parties' agreement, or you can withdraw it.  Do you have a

22    preference?

23         MR. DAVIS:  We prefer to withdraw it, Your Honor.

24         THE COURT:  Okay.  Then I'll look for an unopposed

25    motion to withdraw the motion to compel shortly, and I'll

1  assume the parties are going to proceed forward working

2  together pursuant to the agreement that's been announced

3  into the record.

4          Counsel, I think -- I think this is a better

5  result than might otherwise have been achieved.  I

6  appreciate your constructive efforts this morning while you

7  were here together.

8          I always find when lawyers are sitting down

9  face-to-face, things get done more efficiently than when

10  you're a name at the end of an email chain.  So thank you

11  for being here.

12          That will complete the hearing.  The motion to

13  compel is withdrawn.  And you're excused.

14          COURT SECURITY OFFICER:  All rise.

15          (Hearing concluded.)

16

17

18

19

20

21

22

23

24

25

1                          <u>CERTIFICATION</u>

2

3          I HEREBY CERTIFY that the foregoing is a true and

4    correct transcript from the stenographic notes of the

5    proceedings in the above-entitled matter to the best of my

6    ability.

7

8

9    <u>/S/ Shelly Holmes          </u>              <u>4/15/19     </u>
     SHELLY HOLMES, CSR, TCRR                  Date
10   OFFICIAL REPORTER
     State of Texas No.: 7804
11   Expiration Date: 12/31/20

12

13

14

15

16

17

18

19

20

21

22

23

24

25