```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE EASTERN DISTRICT OF TEXAS

 3                      MARSHALL DIVISION

 4

 5    IMPLICIT, LLC              )(

 6                               )(  CIVIL DOCKET NO.

 7                               )(  2:18-CV-0053-JRG

 8    Vs.                        )(  MARSHALL, TEXAS

 9                               )(

10    NETSCOUT SYSTEMS, INC.     )(

11                               )(  APRIL 11, 2019

12

13

14                      MARKMAN HEARING

15            BEFORE THE HONORABLE ROY S. PAYNE

16             UNITED STATES MAGISTRATE JUDGE

17

18    APPEARANCES:

19    FOR THE PLAINTIFF:  (See sign-in sheets docketed in
                            minutes of this hearing.)
20

21    FOR THE DEFENDANT:  (See sign-in sheets docketed in
                            minutes of this hearing.)
22

23    COURT REPORTER:  Ms. Tammy L. Goolsby, CSR

24    Proceedings taken by Machine Stenotype; transcript was
      produced by a Computer
25
```

```
1                           I N D E X

2

3    APRIL 11, 2019:

4                                               PAGE

5    Appearances                                  1

6    Hearing                                      3

7    Court Reporter's Certificate                91

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    P R O C E E D I N G S
2              COURT SECURITY OFFICER:  All rise.
3              THE COURT:  Good morning.  Please be seated.
4              For the record, we're here for the claim
5    construction hearing in Implicit, LLC., versus NetScout and
6    Implicit versus Sandvine Corporation, which are Case
7    No. 2:18-53 and 54 respectively.
8              Would counsel state their appearance for the
9    record?
10             MR. DAVIS:  Good morning, Your Honor.  Bo
11   Davis and Christian Hurt on behalf of the Plaintiff
12   Implicit --
13             MR. HURT:  Good morning, Your Honor.
14             MR. DAVIS:  -- and we're ready to proceed.
15             THE COURT:  Thank you, Mr. Davis.
16             MR. LAMB:  Good morning, Your Honor.  Bobby
17   Lamb and Eric Buresh for the Defendants, and we are ready to
18   proceed.
19             MR. BURESH:  Good morning, Your Honor.
20             THE COURT:  Good morning.
21             MR. BURESH:  And this is our technical
22   advisor, Ms. Betterton.
23             THE COURT:  Very good.  Thank you, Mr. Lamb.
24             I will also note for the record that earlier
25   this morning we distributed to counsel for both sides a set
```

1    of preliminary constructions of the disputed terms.

2              The purpose of issuing those preliminary

3    constructions is not to deter either side from advocating for

4    whatever positions they think are correct for the disputed

5    terms; rather, the purpose is to let counsel know where the

6    Court is after the initial review of the briefs and the

7    record and to allow you to focus your arguments where you

8    think the Court may have most missed the mark.

9              I do reserve the right to amend these

10   preliminary constructions, and not uncommonly do change them

11   based on the arguments received at this hearing, so I hope

12   they'll be received in that spirit.

13             I would like to hear the arguments on a

14   term-by-term basis, but I'm happy to have them presented in

15   whatever order counsel think is most efficient or to group

16   them if counsel prefer to do that.

17             So having said that, I'll turn it over first

18   to counsel for Plaintiff, Mr. Davis.

19             MR. DAVIS:   Thank you, Your Honor.  Bo Davis

20   on behalf of the Plaintiff.

21             Prior to the hearing, Mr. Buresh and I met and

22   conferred and discussed an order for the terms.  I believe

23   we're going to follow the order that the Court has laid out

24   in its preliminary constructions.

25             But we've also discussed an order of argument,

1    and for the first few terms, I believe A through E, Mr.

2    Buresh is going to go first, and I'll respond, and then for

3    the remainder of the terms, we'll go first.  I just wanted to

4    let the Court know how we intend to proceed.

5                    THE COURT:  All right.  Thank you, Mr. Davis.

6                    And, Mr. Buresh, I'll turn it over to you.

7                    MR. BURESH:  Yes, thank you, Your Honor.  Your

8    Honor, Eric Buresh on behalf of the Defendants NetScout and

9    Sandvine.

10                    I'm going to begin with sequence of routines,

11    which is item A on the preliminary construction list, and you

12    should have a hard copy of the slide presentation I'm going

13    to walk through here.

14                    THE COURT:  I do.  Thank you.

15                    MR. BURESH:  I appreciate the Court's

16    preliminary constructions.  It is helpful to target the

17    issues that I believe are most important for discussion

18    today.

19                    I'm going to begin on slide two, which is just

20    the competing constructions; and the Plaintiff's construction

21    is, as I'm sure you're aware, an existing construction that

22    stemmed originally from F5 Networks litigation out in the

23    Northern District of California and was adopted by -- with

24    slight modification by agreement of the parties in two cases

25    in this Court, Trend Micro and Palo Alto Networks, so I'll

1    call that the existing construction.  And then, of course, on

2    the right -- right-hand side is the Defendant's proposal.

3              In the Court's preliminary construction, you

4    have proposed to modify the existing construction that was

5    proposed by Plaintiff by removing the word identified and

6    leaving the word configured.

7              And I want to begin by saying that I think we

8    will hear from Implicit that these words selection, you can

9    put in identified, you can put in configured, selected.  They

10   really all mean the same thing in the context of this

11   construction, and it really boils down to a word choice, and

12   I think that is fundamentally incorrect.

13             I think there are major substantive

14   distinctions between those two constructions, and before I

15   get to that, I want to put into the Court's mind a picture of

16   what we're talking about here.

17             And if you think in terms of a tree, you have

18   a trunk, a major branch, and then you start having smaller

19   branches as you go out, and you can equate that to a packet

20   processing pad.

21             In other words, most packets will travel on

22   ethernet, so that would be the trunk, and then as you begin

23   to see more variation among packets, you have IP.  You may

24   have you UDP or you may have TCP packets.  You then have

25   application layer data on top of that.  You begin to form a

1    tree.  Okay?  And all packet process systems in some form or

2    another will have that tree.

3                    And in these claims and in these patents, and

4    particularly in these constructions, you see a -- you see a

5    break point there before a packet of message is received.  So

6    you have a timeline before and you have a timeline after, and

7    on both sides of that you're going to have a tree.

8                    But the fundamental question in these patents

9    based on the prosecution history is in one context you have a

10   tree that is fixed, it's finite, it's pre-coded, it's

11   pre-loaded, whatever word you want to use for that.  You have

12   a tree.  And when a packet comes in to the processing system,

13   what you're doing is selecting which branch you're going to

14   follow.

15                   So you're going to go trunk and then branch,

16   branch, branch, and you're going to have a path.  So you're

17   selecting ultimately those branches that are going to follow

18   in the tree, but those branches all existed, okay, before the

19   packet was ever received.

20                   Now, in some systems if you receive a packet

21   and you don't have a branch for that particular type of

22   packet, the system can't do anything with the packet.  It is

23   just called unidentified and moves on.  Okay?  Because the

24   system is fixed, is finite.  Okay?

25                   Before the packet is received, that tree is

1    defined, and if you don't have a branch for a particular type

2    of packet, you can't do anything with it.

3              In the system of the asserted patents, you can

4    go on the other side of the line.  You can go to after the

5    packet's received, and you can have new branches.  You can

6    extend branches.  You can do things that weren't capable of

7    being done before.  It's a dynamic system.

8              And that distinction fundamentally is at the

9    crux of this Mosberger disclaimer, which I'll just call it

10   the Mosberger disclaimer.  That is the distinction.  Is it a

11   static system that you're selecting from existing branches or

12   is it a dynamic system that can be added to and extended.

13   Prosecute packets that previously before the packet was

14   received could not have been processed.

15             And in this construction, why I say it's not a

16   word choice, when you look at that dividing line, the prior

17   to in the Plaintiff's construction, the before in the

18   Defendant's construction, when you look at that dividing

19   line, it's modifying different things.  Okay?  And the

20   existing Plaintiff's construction, it is modified when the

21   path is identified or the ordered arrangement is identified.

22   Okay?

23             That's what it's looking at, when it's

24   identified, when it's configured, when it's selected, but

25   it's looking at I received a packet, and now I'm going to

1    identify the branch I'm going to use.  It could be an

2    existing branch, and that's a problem because that's exactly

3    what Mosberger was.  It had a fixed tree, and you were

4    selecting the branch you were going to use.

5                So what this -- in the Plaintiff's -- in the

6    existing construction, that dividing line is modifying

7    fundamentally the wrong thing.  In the Defendant's

8    construction, the dividing line focuses on when were the

9    paths created.  Were they created before and possible and in

10   existence before the packet was received or are they only

11   created after?

12               Okay.  That's the right dividing line.  Is it

13   static.  They were created before, or is the system capable

14   of dynamically adding so that they were created after.

15   That's the right dividing line, and the Defendant's

16   construction reflects that while the existing construction in

17   many interpretations the words that you're putting in there

18   does not.

19               THE COURT:  You know, this is, as I understand

20   it, a disclaimer argument; right?

21               MR. BURESH:  It is, Your Honor.

22               THE COURT:  So it's not based so much on what

23   Mosberger does.  It's based on what the patentee represented

24   the distinction between Mosberger and his invention was;

25   right?

1          MR. BURESH:  Correct, Your Honor.

2          THE COURT:  And the -- what I'm looking at is

3     the patentee's statement during the prosecution history where

4     he said that the Mosberger system configures paths, and then

5     there is a parenthetical before receiving, and so that's what

6     he is disclaiming, I think, which is exactly the language

7     that I put in this preliminary construction.

8          Why should we use created, which is not what

9     the patentee used?

10         MR. BURESH:  Your Honor, this is -- really the

11    next point of my argument is what is Mosberger and how did --

12    you're absolutely right, how did the patentee describe it.

13         THE COURT:  Okay.

14         MR. BURESH:  I'm tempted to lay some

15    background before I answer your question directly.

16         THE COURT:  Which is fine, but what I am

17    focused on is what the patentee said about Mosberger more

18    than what Mosberger is.

19         MR. BURESH:  Okay.  I'll give you the punch

20    line, and then I'll back up and build some framework around

21    it.

22         THE COURT:  All right.

23         MR. BURESH:  If we could turn to slide 11 of

24    Defendant's presentation, this is when Implicit began the

25    process of precisely defining the operation of Mosberger and

1    got into -- this extended over a series of prosecutions, a

2    series of post-grant proceedings, when they started getting

3    precise about what Mosberger did or how it functioned in

4    order to distinguish it.  Those are the descriptions that the

5    Defendant's have literally incorporated into their

6    construction.

7              And on slide 11, I -- I have -- we start at

8    the bottom one, Mosberger teaches that when a message is

9    received, a path is selected or found from a set of possible

10   paths, which were created and pre-defined before the message

11   was even received.  That's exactly how they distinguished it.

12             And in that same page, they make an important

13   additional distinction that this set of paths is finite.

14   Mosberger does not teach to create new paths after

15   initialization.  Okay?

16             So it says what Mosberger does and it says

17   what it doesn't do, and when I was talking about the dividing

18   line, look at the terminology used.  The paths were created

19   before and merely is selected after, and Mosberger does not

20   create after.

21             That is precisely the dividing line between

22   what the patents have -- or what the patents cover and what

23   Mosberger was, and it is in terms of when are the paths

24   created and asks the question is it created before or is it

25   created after.

1                If we can turn to slide 12, and I -- I point

2      this out simply to say this was towards the end now, and

3      we're actually in the prosecution of the '683 patent, the

4      asserted patents in this case.  And they take out of post

5      grant proceeding that fine tuned argument that I just noted,

6      and they incorporate the exact same discussion in the

7      prosecution of the '683 patent.

8                Mosberger teaches that when a message is

9      received, a path is selected or found or picked from a set of

10     possible paths, which were created before the message was

11     received.  And, again, importantly the set of paths is

12     finite.  Mosberger does not teach creation of new paths after

13     initialization.

14               So we see the same exact language repetitively

15     being incorporated to make this distinction, and that is

16     literally -- if we turn to the next slide -- with the

17     distinction of the Court's prior construction, the existing

18     construction, used the word arrangements versus paths.  When

19     you take that into account, it is literally the exact same

20     language that we are proposing to incorporate.

21               So we have the patentee stating not only what

22     Mosberger is, but what Mosberger isn't, and the distinction

23     is totally 100 percent around when were the paths created.

24     It is not about when they were selected because Mosberger

25     dynamically selected after a packet was received, but it did

1      not dynamically create after the packet is received.

2                      And so now I'm going to take just a couple of

3      minutes, having shown the Court kind of, as I said, the punch

4      line, let me just back up and build that foundation for you

5      just a little bit.

6                      If I could ask the Court to turn to slide

7      three of Defendant's presentation, this was an early

8      technical description of -- by Implicit of Mosberger, and

9      they incorporated this chart of Mosberger into the -- their

10     statements, and it is, as I -- as I described, a tree, a very

11     simple tree, but a tree with options.

12                     And how they describe the processing in

13     Mosberger, the choice -- I'm sorry.  The only choice for the

14     example module is to select from amongst several possible

15     pre-defined paths thus dynamic routing.  That's a word used

16     in Mosberger.  They called it dynamic routing.  Dynamic

17     routing, as described in the context of the paths in

18     Mosberger, is essentially a series of if then computer

19     instructions.  Okay?

20                     So as we go through our tree, we have

21     pre-existing logic in Mosberger that allows for the dynamic

22     selection of paths, but that is not the invention of the

23     asserted patents because, again, those paths in code in logic

24     pre-existed.  They were pre-created.  They were not

25     dynamically created after received the first packet.

1                    So if the Court's construction allows for

2      selection to be covered or identification to be covered or

3      configuring in the sense that I'm figuring out which path to

4      follow, and all of that is based on existing paths, you have

5      just allowed a construction that reads directly on to

6      Mosberger, and that fundamentally is the problem.

7                    Let me highlight it in broader strokes here.

8      Again, this is coming out of Implicit's re-examination

9      statements.  This goes to the fundamental difference.  It's

10     the difference between a dynamic system in the '163 patent,

11     which is the parent patent of the asserted patents.

12                   So between a dynamic system and a static,

13     inflexible system, Mosberger, that merely selects at run time

14     previously created paths.  So, again, static versus dynamic.

15     When a packet is received or refixed and finite and

16     inflexible or can be dynamically altered, the available

17     paths, and if it's fixed and I'm merely selecting, merely

18     identifying, merely configuring, from the existing paths --

19                   THE COURT:  Tell me about how configuring

20     carries that implication that it's -- would be -- that it

21     would cover merely selecting something that was

22     pre-configured or existing, because I -- I understand that

23     identified is susceptible to that.

24                   MR. BURESH:  So here I'm showing a slide, and

25     this is taken from the Plaintiff's reply brief in this

1    proceeding, so the litigation arguments here.

2                    And this is -- this is Implicit saying that

3    Mosberger, quote, pre-identified, pre-selected,

4    pre-determined, and pre-configured its paths at build time.

5    That's their argument.

6                    THE COURT:  Uh-huh.

7                    MR. BURESH:  Now, we know with absolute

8    certainty -- right below I have preliminary amendment from

9    the '683 patent -- that Mosberger selected -- by Implicit's

10   own words selected the paths.  They were not pre-selected.

11   It selected the paths after a packet is received.  We know

12   that with a hundred percent certainty, and we know with a

13   hundred percent certainty that Implicit is going to treat

14   pre-selected in exactly the same way as pre-configured.

15                   Now, in your mind, Your Honor, you may think

16   of configured as I'm dynamically configuring something new

17   that wasn't capable of existing -- or being used before.

18   That may be what you're thinking, but that is not what

19   Implicit is thinking.

20                   And it is not ultimately up for debate because

21   if you're using configured in terms of selected, you are

22   reading the Court's construction or proposed preliminary

23   construction directly on to Mosberger.

24                   THE COURT:  And what is the indication that

25   configured is equivalent to selected?

1          MR. BURESH:  I don't believe that configured

2    is equivalent to selected in my understanding of the word,

3    and I think in your understanding of the word.

4          My point is the jury doesn't have any

5    necessary understanding, and we are seeing that if we put

6    just one word into the preliminary construction or the final

7    construction, if we try to put one word in to capture the

8    concept of the distinction that was being made with

9    Mosberger, it is subject to manipulation.

10         And fundamentally, unless you say that

11   configuring is about or related to creating new paths that

12   weren't possible before, that are only dynamically possible

13   after the packet is received, the Court simply has not

14   captured the heart and the very essence of the disclaimer.

15         THE COURT:  I don't understand it to mean that

16   it's a path that wasn't possible before, and is that what

17   you're really arguing, that it was not possible before or

18   just that it had not been created before?

19         MR. BURESH:  That, Your Honor, is the same

20   thing, first of all; and, secondly, it's exactly how Implicit

21   has described it.

22         If I could turn to -- your attention to slide

23   eight, on the bottom quote on slide eight, we've seen this

24   before coming out of the '683 preliminary amendment.

25   Mosberger teaches that when a message is received, a path is

1      selected or found or picked from a set of possible paths.

2      How do we know they were possible?  Because they were created

3      before the message was received.

4                  THE COURT:  Well, it's not just that they were

5      possible.  It's that they were created before.

6                  MR. BURESH:  That's what I'm saying.  They are

7      possible because they were created before.

8                  THE COURT:  All right.  I -- I'm just

9      concerned that you're injecting another limitation that I

10     don't fully understand that it could be something that wasn't

11     possible before as opposed to something that hadn't been

12     created before.

13                 But -- but I understand that's not part of

14     your argument.  You're just focused on whether it was created

15     before or after receiving; is that right?

16                 MR. BURESH:  That is correct, Your Honor,

17     whether it's created before or created after.  But I would

18     note, as Implicit did, during the prosecution, and I just

19     want to make sure we're understanding each other.

20                 If it's created before -- if a path is created

21     before the packet is received, then it is possible to be

22     utilized.  If a path doesn't exist before the packet is

23     received, by definition it's not possible at that point in

24     time.

25                 THE COURT:  Well, it's not possible to use it.

```
1    It is possible to create it, obviously.

2               MR. BURESH:  Dynamically, correct.

3               THE COURT:  Okay.  All right.  I think I'm --

4    all right.  I think I'm following you.

5               MR. BURESH:  I'm looking at slide five now,

6    just to kind of reinforce this concept that I -- that we've

7    been talking about.

8                    This is in the context of -- of, again,

9    Mosberger and they described it as a purpose built stack.

10   What that means is it's only able to handle packets or types

11   of data that match the specific implementation of the system.

12   Okay?  If a particular system implementation was not

13   pre-figured to handle certain types of data, it couldn't

14   process that data.  Okay?

15                   So in these Mosberger-type systems, it's

16   fixed.  It's non-dynamic, so if you receive a packet that you

17   don't have a branch for, you're done.  You say it's

18   unidentified and you move on.

19                   Again, in the asserted patents, you can

20   dynamically create new options or new paths or new branches

21   in the tree example, but that flexibility, that ability is

22   again the focal point.  I have just an example of what this

23   would look like.  You take the Mosberger tree, and you

24   receive a packet that you can't process.

25                   Now we're going to talk about what would be
```

1    dynamic, the invention of the asserted patents.  If you can

2    create after the packet is received a new connection, for

3    example, between ARP and TCP, or you can create a new

4    protocol for a new type of packet that you hadn't anticipated

5    before and create a path to that, if you are doing those

6    types of things after you received a packet, you have dynamic

7    creation.

8                 If you are fixed and merely selecting from an

9    existing tree structure, you are Mosberger, and we have to

10   make sure that the construction is not amenable to covering

11   that situation because that is precisely, again, what was

12   disclaimed.

13                On slide eight, we've looked at this briefly,

14   and I'm going to highlight this again.  When you look in the

15   context of prosecution, it's this before or after.  Are we

16   creating after or are we creating before?  If we're creating

17   before and selecting or finding or picking, it's out of

18   bounds.

19                And I created on slide ten, again, just to

20   make sure we are on the same page, if you're -- if we're

21   using the word identify, configured, after receiving first

22   packet, the problem is that Implicit can with a straight face

23   use that terminology and say I'm identifying, I'm configuring

24   paths based upon I have an existing tree, and I'm going A, D,

25   L, Q for a particular patent.  I've configured that

1    organization.  I've identified that organization.

2              That's selecting from an existing path, but

3    arguably, in Implicit's mind at least, that's within the

4    scope of those words.  Also within the scope of those words

5    could be dynamically creating new paths.  Okay?

6              So you can say I'm configuring a new path and

7    have it to mean I'm creating a new path that didn't exist

8    before.  This whole donut is within those words, and the

9    problem is that the center of the donut is disclaimed.  We

10   have to make sure that's disclaimed.

11             And I don't think, in my opinion, Your Honor,

12   that putting in one word like identify or one word like

13   configured resolves the disclaimer.  I don't think there's

14   any one word that you can plug in there to do that.

15             And when I come back to -- I'll close on this.

16   When I come back to slides 11 and 12, I have, we have, the

17   Court has precise language repetitively used by Implicit that

18   was very targeted to the Mosberger disclaimer to accurately

19   describe it, and I query why we would not use that language

20   as opposed to trying to pick one single word that can be

21   subject to manipulation, why don't we use the precise

22   language that Implicit used?

23             And I'll close on that, Your Honor.

24             THE COURT:  Why doesn't the word create

25   capture your argument?

1          MR. BURESH:  Candidly, Your Honor, it's a --

2     it's a step closer.  I mean, I think we're becoming -- we're

3     steps closer to precise.

4          I still remain concerned that when I look at

5     my existing tree and I say A, L, Q, Z is my path, I am still

6     concerned that that is amenable to Implicit arguing to a jury

7     that I didn't know A, L, Q, Z before.  I've created that

8     organization, even though what that means to you and me is

9     I'm just selecting my branch.

10          I am -- I am concerned that that word as a

11     single word that Implicit is capable of simply standing in

12     front of a jury and saying, the organization of A, L, Q, Z

13     was created after a packet is received, and, therefore, it's

14     within the scope of those claims, when we know with a hundred

15     percent certainty it is not.  It is Mosberger.

16          THE COURT:  Well, what the proposed language

17     would be is not that it was configured, created, whatever the

18     verb is, after.  Is that it was not configured created before

19     receiving.

20          MR. BURESH:  Correct.  So in my example, a

21     packet comes in, and -- and no system in the world is going

22     to be able to pick a path to follow, and I can state that.  I

23     don't believe I'm overstating.

24          No system in the world will be able to

25     identify a path processing a packet until packet's received

1    because you simply -- you don't know what the protocol of the

2    packet is at any layer.  Okay?

3              So stick with me here.  After a packet is

4    received, you start looking at the layers of the packet, and

5    you identify I need branch A, I need branch L, I need branch

6    P, I need branch Q.  Okay?  That's identifying.  It's

7    selecting an order of the paths, but all those paths were

8    pre-existing, and all I'm doing is selecting them, and,

9    again, that's Mosberger.

10             So you -- you and I might use the word create

11   to mean it didn't exist and I'm creating something new, but

12   I'm very concerned that Implicit will take that word create

13   and just say I'm creating this particular sequence.  Call it

14   sequencing.

15             It's why I come back to in the construction at

16   the minimum we need to talk about creation, and we need to

17   talk about -- if you don't want to use the word possible,

18   talk in terms of existing.

19             If we're selecting from what existed before

20   the packet received, it is out of bounds.  If we are creating

21   something that didn't exist when the packet received was

22   received, it's in bounds because that fundamentally is the

23   difference between static and dynamic.

24             THE COURT:  All right.

25             MR. BURESH:  Thank you, Your Honor.

1          THE COURT:  Thank you, Mr. Buresh.

2          MR. DAVIS:  May it please the Court, Bo Davis

3    for Implicit.

4          I think, Your Honor, that as I was listening

5    to Mr. Buresh argue and talk about this concern that we are

6    reading the claims on Mosberger, we are accusing Mosberger, I

7    couldn't help but hear him change his words between we are

8    not just talking about what was created, but we're talking

9    about what did we know, what did we -- what could have

10   existed.

11         And I don't know that -- well, I'm a little

12   confused about exactly what -- what their position is on

13   that, but I think Your Honor started to hit on the fact that

14   a possible arrangement is not something that should be

15   excluded from the claims simply because it's possible.

16         The question is was it created and was it

17   identified, was it configured.  Those are the issues that I

18   think make the distinction between the Implicit system and

19   the Mosberger system.

20         And so I think Mr. Buresh did not back down

21   from this notion that he wants to keep this concept of a

22   possible arrangement in his construction, and, therefore,

23   outside the scope of the claims, and I think the reason he

24   wants that is because it's a non-infringement position.

25         It's not because of Mosberger, because we

1    distinguish Mosberger on a basis that there were possible

2    arrangements in Mosberger.  The fact is that in Mosberger,

3    that possible arrangement was actually created, was actually

4    configured.

5              And the whole point of the patents is that

6    they're -- that if you're trying to statically configure

7    every possible path for every possible type of data that you

8    may receive before you receive it, the overhead of doing that

9    is too high.

10             So the system says -- so the invention says

11   we're not going to pre-configure paths.  We're not going to

12   pre-configure the sequences of routines.  We're going to

13   dynamically do it after we receive the first packet of a

14   message and we look at it.

15             So, you know, I think the -- we've been

16   accused of trying to manipulate the prior construction.

17   We've been accused of trying to take advantage of them, and

18   we don't know where it's coming from.  We expressed this in

19   our brief.  We had a meet and confer exchange earlier this

20   week where we're -- we don't know what they're talking about.

21   We think it's clear.

22             We think that we know from the prior

23   constructions from Judge Illston and Judge Gilstrap, which,

24   by the way, I think Mr. Buresh misspoke.  The two prior

25   constructions from the Eastern District of Texas were not

1     agreed to.

2                    Judge Gilstrap actually analyzed in the Trend

3     case the issue of the disclaimer, circumscribed the scope of

4     the disclaimer consistent with what Judge Illston had

5     previously -- previously held, so it wasn't simply by

6     agreement.  In the PAN case, the parties did agree to the

7     construction because we felt like it was clear.

8                    And I know that one of the concerns that

9     Mr. Buresh has and the Defendants have is that similar to the

10    Defendant in PAN that we're going to get down the road and

11    they're going to say, well, you know, we're -- we're moving

12    for summary judgment and we don't think we infringe.  We

13    don't think we infringe because we think we operate like

14    Mosberger.

15                   Well, Judge, that's a -- that's a fact

16    question.  That's not a question about what is the scope of

17    the claims.  That's a question about is their system

18    pre-configured or is it not pre-configured?  But as far as

19    Implicit is concerned, we're not trying to argue, and I don't

20    think we've alleged, you know, any -- in any of our papers in

21    this case that the Defendant's system operates in a

22    pre-configured manner.  I mean, I know we have not done that.

23                   And, you know, typically in these -- in claim

24    construction hearings where the Defendants are worried about

25    some infringement issue, they want to essentially pre-try the

1    ultimate fact question, the ultimate infringement issue.

2              You know, you'll see citations to infringement

3    contentions.  There's citations to nothing in this case.  All

4    we have is Defendant's attorney argument, Mr. Buresh's

5    argument, that this is what Implicit is trying to do.  We've

6    told him numerous times this is not what we're trying to do.

7              But if -- if that is how their system works,

8    this is not the forum to decide how their system works and

9    how it doesn't work, and all this discussion of Mosberger has

10   become a proxy for that issue.

11             And so it's -- it's -- and I think Your Honor

12   has hit the nail on the head when you -- when you asked him

13   about this issue of possible arrangements, and I think

14   there's a further flavor to that, and I didn't hear Mr.

15   Buresh argue this, and I haven't seen it in their papers.  I

16   don't think there's any dispute that part of the path can be

17   based upon a pre-sequenced or pre-configured set of routines.

18             I believe that both Judge Illston and Judge

19   Gilstrap have expressly held that the path may be in part

20   created from pre-configured routines.  What's disclaimed is

21   an entire path that is not pre-configured, so I just want to

22   put that out there.

23             I don't believe Mr. Buresh is arguing that

24   because I think he understands that.  But it -- you know, so

25   we get into a scenario where their construction has said,

```
 1   well, if it's a possible arrangement, you know, that's not

 2   covered either.

 3              I don't -- I don't know of any scenario where

 4   a sequence -- a sequence of routines is not possible.  The

 5   computers have to be programmed to be able to understand the

 6   packet.

 7              THE COURT:  I will agree that I'm not

 8   comfortable with the term possible being a limitation, but

 9   what do you say to whether -- does it matter to you whether

10   the term is configured or created in terms of it being a path

11   that was not created before receiving the first packet?

12              MR. DAVIS:  Whether the word created could be

13   used?

14              THE COURT:  Uh-huh.

15              MR. DAVIS:  Does it matter to me whether the

16   term created could be --

17              THE COURT:  Do you see -- do you have an

18   objection that you can articulate to a construction that

19   instead of saying was not identified, i.e. configured, says

20   was not created?

21              MR. DAVIS:  I do, Your Honor.  I -- I think

22   that configured is the proper word because that's the word

23   that is -- that is used repeatedly throughout the

24   specification and the file history, so --

25              THE COURT:  Well, apparently in the file
```

```
1    history the patentee also used the word created --

2                   MR. DAVIS:  That is -- that is correct.

3                   THE COURT:  -- in distinguishing Mosberger.

4                   MR. DAVIS:  And I believe the word selected

5    was used.  The word identified was used.  All of these words

6    were used because I don't think the point is -- and, again, I

7    think we said this in our brief.

8                   I don't know that -- that whatever

9    significance the Defendants attribute to the difference

10   between something being pre-identified or pre-selected.  We

11   think it's clear that we know what Mosberger did.  We know we

12   disclaimed that, and, I mean, we're -- whether we switch --

13   whether we use one word versus another is really not the

14   issue.

15                  The issue is, is the path, is the sequence of

16   routines pre-identified, is it pre-configured, is it

17   pre-created.  I -- I don't know what -- you know, what

18   technical significance there would be between something being

19   pre-configured versus pre-created.  I -- I don't know.

20                  So, I mean, do I have an objection to using

21   the word created?  I don't think so, but I do know that the

22   word configured is -- is a -- is an appropriate term.

23                  THE COURT:  Well, --

24                  MR. DAVIS:  And I don't see any reason to use

25   the word created versus configured when that -- I don't even
```

 1    really think that's the Defendant's issue.

 2                    THE COURT:  All right, sir.  Unfortunately,

 3    the patentee used a whole lot of words in distinguishing

 4    Mosberger, and I -- I don't want to give the jury, you know,

 5    a page on the distinction.

 6                    I tried to capture the essence of it and

 7    something relatively concise, and I will agree that

 8    identified, I think in the ordinary understanding of that

 9    word, is not sufficient to capture the disclaimer.  But

10    I'm -- I also don't want to say that the patentee disclaimed

11    all possible paths because it doesn't make a lot of sense to

12    me and I'm not sure where it goes.

13                    MR. DAVIS:  Well, I -- I think when you -- I

14    agree, Your Honor, and I think configuring a path, the word

15    configured is adequate to identify what it is we're talking

16    about, and I -- I haven't heard the Defendants argue that the

17    word configure is -- is the issue.

18                    What they've said is we're worried that

19    Implicit is going to -- well, the premise of their argument

20    is we work like Mosberger, and we're worried that you're

21    going to come in and just select a pre-identified,

22    pre-configured path, just like Mosberger.

23                    I just don't see how that -- there's any real

24    risk of that that would justify departing from the prior

25    construction.  I don't see how the word configured, as

1    opposed to created, addresses that issue at all.  Whether

2    it's pre-configured or pre-created is -- is going to

3    foreclose the issue that they're worried about, so I just --

4    I'm not sure what the issue is.

5                    And, I mean, unless the Court -- unless the

6    Court has some other questions for me, I'll stop there.

7                    THE COURT:  All right.

8                    MR. DAVIS:  Thank you, Your Honor.

9                    THE COURT:  Thank you, Mr. Davis.

10                   Mr. Buresh, if you want to respond, feel free.

11                   MR. BURESH:  Briefly, Your Honor.

12                   I think we all know the purpose we're here

13   for, and the first step in the process is just to get the

14   right answer.  You haven't heard me talk about our systems.

15   That will come later, but I do want to get the right answer

16   with respect to what the Mosberger disclaimer is, and I think

17   we all do.

18                   Separate and apart from what Implicit might

19   do, it is also important that the words that go to the jury

20   are clear, that they clearly articulate the disclaimer.  I

21   think we can all agree on that as well, because a juror can

22   be confused by poor language, even if it's not what Implicit

23   is arguing, so precision is important.

24                   I understand the Court is hung up or does not

25   view the word possible the way I do, and that's -- that's

1    fine, so I would -- I would say we're -- we're nibbling

2    around the edges of the right construction, and -- and

3    perhaps we can move in that direction.

4              I believe we've seen created is a viable word

5    to use to describe what happens at the point of either before

6    or after the packet arrives.  If you're in -- if you've

7    created it before in a static system, you dynamically create

8    it after the packet arrives.  That word is fine.

9              The key concept, though, and the reason I keep

10   saying don't take one word in isolation, I think you have to

11   have this concept of selection from those created paths.  I

12   think you have to -- let's take finite out of it.  Let's take

13   possible out of it.  But we have to have this concept of are

14   we selecting from what was created before or are we creating

15   after?

16             Because I've said this before.  I don't think

17   one word gets you there.  I don't think the word identify get

18   you there by itself.  I don't think configure gets you there

19   by itself.  I don't think create by itself gets you there

20   because you can -- in any three of those contexts, you can

21   still say I've created the organization, even though I'm just

22   picking from an existing structure.

23             So I think that concept -- and I would propose

24   if we -- if we plug in a set of arrangements that is not

25   selected -- I'm sorry.  Where's the construction?  An ordered

1   arrangement of two or more software routines that was not

2   selected from a finite set of arrangements created before.

3             That takes all the possible finite ambiguity

4   that I think that the Court is experiencing out of that, and

5   we are still capturing this idea that if it's selected from

6   something created before is out of bounds.

7             That is a fair characterization of Mosberger,

8   and I believe without any ambiguities in it, and it would

9   alleviate the concern of what has previously been attempted

10  with these one word selections.

11            Thank you, Your Honor.

12            THE COURT:  All right.  Thank you, Mr. Buresh.

13            Mr. Davis?

14            MR. DAVIS:  Your Honor, we do not agree to

15  that proposed modification of the -- of the construction

16  selected from a set of arrangements created before.

17            Again, I just -- I don't know how that's --

18  how that's different from configured, but what I do know is

19  that it sounds a lot like possible arrangements.  Even though

20  he has used the word created, you know, I -- I'm not sure

21  that saying, well -- again, we're talking about creating

22  paths.  The claims are talking about creating a path, a

23  particular path or a particular message.

24            So if -- if the path had been created before,

25  if it had been created before the arrival of the packet of a

1    particular message or a different message if it had been

2    created before in a -- in some test environment, I mean, I

3    just -- I just don't know what -- how you say something was

4    created -- I mean, created in any possible scenario before.

5    I mean, I don't -- at some point it becomes, you know,

6    just -- it's -- it's too hypothetical.

7              What we're talking about is a particular path

8    that is created after the receipt of the first message, the

9    first packet of a message, one or more packets of a message

10   comes in.  We use those packets to create the path.  If that

11   happens afterwards, you're within the scope of the claims.

12             So, you know, I -- I don't know that that

13   construction adds any clarity.  I don't think it adds

14   anything to the issue.  I think it's -- it's -- it just

15   creates more verbiage, so we object to it.

16             THE COURT:  Okay.

17             MR. DAVIS:  Thank you, Your Honor.

18             THE COURT:  Thank you, Mr. Davis.

19             All right.  Let's move on to the next term.

20   Frankly, the list of conversion routines term appeared to me

21   to have the same issues as the term we just argued.  If there

22   is additional argument on that, I'll be happy to hear it.

23             MR. BURESH:  Your Honor, I think this can be

24   more brief.  I agree with you.  Predominantly the issue is

25   rolled up into the sequence of routines term.  There's just

1    one additional issue on this one.

2              Can I have the Elmo, please?  I don't know if

3    you can see my chicken scratch in here, but it's the -- the

4    words that is for changing the form of the data.  Do you see

5    that?

6              And then this is page eight from Plaintiff's

7    opening claim construction brief where you'll see that

8    they've agreed that that language isn't necessary and that

9    they would accept our language on this term, other than with

10   respect to the sequence of routines dispute.

11             So we would simply ask that subject to the

12   Court's ruling on sequence of routines that the language,

13   quote, that is for changing the form of data and be removed

14   from the Court's preliminary construction.

15             And just briefly, the reason for that is that

16   claim ten of the '683 patent otherwise talks about conversion

17   routines that are converting from one format to another

18   format, and it was our concern that if we have this changing

19   the form of the data in there, that would unnecessarily

20   confuse the analysis with respect to other very similar claim

21   language.

22             MR. DAVIS:  Your Honor, my -- my understanding

23   from Mr. Buresh is that he's concerned that this construction

24   is going to somehow vitiate other claim language, and I don't

25   think it does.  We're fine with the Court's construction and

```
 1    ask that it be adopted.

 2                    Thank you, Your Honor.

 3                    THE COURT:  Are you also in agreement with not

 4    using for changing the form of data as your brief indicates?

 5                    MR. DAVIS:  I think -- I think we are, Judge.

 6    We're fine using either one.  We don't appreciate any

 7    significant difference between the two, so if that -- if that

 8    removes a dispute, we're happy to -- happy to agree to that.

 9                    THE COURT:  Okay.  I just wanted to make sure

10    I understood your position.  Thank you.

11                    All right.  Mr. Buresh?

12                    MR. BURESH:  Your Honor, we move next to state

13    information.  Jump to slide 28, which covers that point,

14    slide 28 of Defendant's presentation.

15                    The dispute between the parties on this

16    particular claim limitation, Your Honor, is whether the state

17    information needs to be maintained for all packets at the

18    message or not.

19                    Court's preliminary construction indicated --

20    preliminarily indicated that it would not find that

21    requirement.  This is something we have argued as a

22    disclaimer, and I want to show you the -- the substance of

23    that -- of that argument.

24                    We turn to slide 29.  This is not where the

25    disclaimer came from.  This is just the specification of the
```

1    '683 patent, which is exemplary of the other specifications,

2    and I want to show you simply that the concept that the state

3    information is maintained for all packets of the message is

4    consistent with the specification.  This is column three,

5    line one through nine in the highlighted verbiage.

6                THE COURT:  Let me see.  Maybe then I'm

7    understanding.  By maintained, do you mean applied?  In other

8    words, not that it is stored or somehow kept in a way that is

9    related to, but do you mean that it is maintained meaning

10   held constant or what is --

11               MR. BURESH:  The state --

12               THE COURT:  -- what is the concept?

13               MR. BURESH:  The state information will evolve

14   as the processing goes on, but the state information that

15   evolves needs to be maintained for the entirety of the

16   message and used consistently to process the message.

17               THE COURT:  I don't think there's any dispute

18   that all the packets are governed by the state information of

19   the message that they're a part of.

20               MR. BURESH:  I think there is that dispute.  I

21   think that the dispute is precisely in some systems -- and --

22   and we'll see this on the next slide.

23               In some systems, state information is

24   temporarily maintained and then discarded at either regular

25   intervals, or random intervals in some systems.  So if the --

1   the state information is discarded, i.e. not maintained, some

2   systems that we'll see in a moment call it flushed.

3             THE COURT:  Well, I'm not saying that there

4   are no differences in the industry.  I'm just saying that I

5   think that it's fairly clear that this -- the claimed system

6   is going to apply the same state information to all the

7   packets of given message.  But I -- I was just not sure what

8   you're proposing by maintained.

9             MR. BURESH:  I am proposing quite literally

10   that the state information that is generated in order to

11   process a message must be stored and utilized throughout the

12   duration of the message for all packets of the message.

13             I'm not sure if we're talking past each other,

14   but perhaps the next slide where they discuss this in the

15   prosecution would help.

16             THE COURT:  All right.

17             MR. BURESH:  And this is, again, where we

18   contend that the disclaimer arises from, and it's in the

19   distinction between what they -- they bold as hard state, and

20   if you look down further at the highlighting at the bottom of

21   this paragraph, they use the term soft state.  Okay?  So soft

22   state is state that can be discarded, regenerated, or

23   replaced as needed.

24             We talk in other terms of -- of flushing state

25   information as you proceed through processing of a particular

 1    message, and what they're claiming in the '163 patent, which

 2    is, again, the parent of all these patents, is hard state.

 3    It uses hard state.

 4              Hard state is required to correct function and

 5    cannot be flushed randomly without regard to processing the

 6    entire message.  In other words, it is inextricably

 7    intertwined with the message and must be maintained for the

 8    duration of the entire message.  If it is discarded before

 9    the entire message is processed, all mid-message processing

10    would fall apart and the system would be useless.

11              So in their invention, the state

12    information -- I mean, this is -- it doesn't get much more

13    unequivocal than this.  If you don't maintain the state

14    information for the entirety of the message, the system

15    cannot process and becomes useless.

16              That's an unequivocal statement that we're

17    limiting our patent to hard state and distinguishing it from

18    something that uses this -- this discardable, replaceable

19    soft state.  And in our proposal, Your Honor, we're -- we are

20    capturing that concept, and the Plaintiff's proposal does

21    not.

22              So while you might assume in these patents

23    that state information is maintained, I believe it's

24    important to say so because it's a very clear requirement of

25    this technology.

1    I'll leave it at that unless you have further

2    questions, Your Honor.

3    THE COURT:  No, not at this moment.  Thank

4    you.

5    MR. DAVIS:  Your Honor, the only thing I'll

6    just point out is that the claim language is clear on its

7    face.  We know that what's required is that the sessions --

8    in claim five of the '683, for example, that sessions specify

9    state information and that the state information is specific

10   to the message.  We know that state information is associated

11   with the message.

12   They've argued disclaimer, but we don't think

13   that there is -- that there is a clear and unambiguous

14   disclaimer that requires this language.  We know that the

15   specification simply identifies state information associated

16   with the message.  We know that you have to retain state

17   information and that if contains state information as an

18   instance or session of the conversion routine.

19   And when we get to the portions of the -- of

20   the file history that they're relying on, we see statements

21   about certain types of wrappers and how they maintain state,

22   but there's -- there's no need to import that limitation into

23   the claims, and so we've -- for those reasons, we ask the

24   Court to maintain its preliminary construction, with which we

25   agree.

```
1                    THE COURT:  What do you have to say about the
2     passage from the inter partes re-exam that the Defendant's
3     are pointing to in their slide 30?
4                    MR. DAVIS:  Your Honor, that's already --
5     already in the claims.  I mean, the claims require that you
6     maintain state for the message.  That portion of the re-exam
7     does not say -- or of the statement in the file history says
8     simply that.
9                    Looking at Defendant's slide 30, it is
10    inextricably intertwined with the message and must be
11    maintained for the duration of the entire message.  That's --
12    we already know that from the claims, that the state
13    information must be available for the message, but what it
14    doesn't say is that you must maintain state for all packets.
15                   THE COURT:  All right.
16                   MR. DAVIS:  Thank you, Your Honor.
17                   THE COURT:  Thank you.
18                   MR. BURESH:  Your Honor, very briefly, just to
19    clarify the issue on that point.
20                   We haven't -- I mean, the -- the claims say
21    what the claims say, and specifically claim five says that
22    state information is specific to a message.  That doesn't
23    really answer the question.
24                   And in the context of -- I think Mr. --
25    Mr. Davis' argument is effectively don't read a limitation
```

1    into the claim.  Well, that's the essence of what a

2    disclaimer is.  You don't see it on the face of the claim,

3    but because the distinctions they've made in the prosecution

4    history --

5              THE COURT:  How is this a disclaimer?  What

6    was the patentee trying to get around?

7              MR. BURESH:  So in this particular context, it

8    was a prior art reference called Decasper, which, if you

9    review the context of this exhibit, Decasper was a router,

10   and routers -- one of the distinctions they made over routers

11   is that routers use soft state information, which is

12   discardable.

13             Routers don't need to maintain state for the

14   entirety of a message, and they are very firmly saying we are

15   not like Decasper because we use hard state, and hard state

16   is -- is information -- state information that is maintained

17   for the duration of the entire message.

18             That's a distinction they're drawing, and,

19   again, it's -- there's nothing ambiguous about this.  In

20   fact, when you talk about unequivocality, when you say your

21   system is useless if you don't do this, it doesn't get much

22   more unequivocal than that.

23             And if I can switch to the Elmo briefly?  This

24   is the -- this is the preceding -- this is the preceding

25   paragraph of that same exhibit, Your Honor.  So for the

1   record we're talking about the '163 inter partes re-exam,

2   which is Exhibit 20 to our brief.

3           In the -- in the preceding paragraph, you'll

4   see right here they're talking about the '163 patent at

5   column three, lines two through seven, and they say the

6   conversion system routes all packets of message through the

7   same session of each conversion routine so that the same

8   state or instance information can be used by all the packets

9   of the message.

10          So they're pointing to the specification and

11  saying this is the very fundamental nature of our invention

12  and then proceed to the portion that I just discussed with

13  you, which is distinguishing their hard state, which is

14  maintained for the entirety of the message versus routers

15  like Decasper's soft state.

16          So they're saying point to our specification.

17  We have disclosure of maintaining state information for all

18  packets of the message, and then we distinguish right here

19  Decasper based upon hard state versus soft state, and that's

20  applied universally to the context of the patents, so that's

21  a disclaimer.

22          THE COURT:  All right.

23          MR. DAVIS:  Your Honor, just briefly.

24          The passage that Mr. Buresh just pointed to

25  said maintaining state so that the state information can be

```
1    used by all packets.  It was a permissive statement.  It was

2    not a basis to distinguish over a router that doesn't

3    maintain state information that could be used by all packets

4    of a message.

5              So that's all I have on that, Your Honor.

6              THE COURT:  All right.  I will consider that

7    issue further.

8              MR. BURESH:  Defendant's computer, please.

9    Thank you.

10             The next term D from the preliminary

11   constructions is process subsequent packets in the message

12   using the sequence of routines indicated in the stored path.

13             This one from the briefing has been -- well,

14   frankly, it's been confusing to me from the start, and I

15   suspect it is to you as well.  I don't disagree that

16   processing packets is applying one or more routines to a

17   packet.  I mean, it's -- obviously you're going to apply

18   routines to a packet to process a packet.

19             My problem with this is if we -- if we take

20   that claim limitation, process subsequent packets using the

21   sequence indicated in the path, and we put that in front of a

22   jury for these types of claim limitations, and all they look

23   at then is apply one or more routines of a -- to a packet,

24   where at least one such routine is a conversion routine, it

25   might lead the jury to eliminate from the claims the
```

1    requirement that the subsequent processing -- or the --

2    excuse me -- the processing of subsequent packets must be

3    done by the routines in the stored path.

4              That whole concept of I've created a path,

5    I've stored a path, and then I use that path to process

6    subsequent packets, that use of the subsequent --

7    subsequently stored paths I feel is lost in this

8    construction, and I'm -- I'm concerned about that.

9              THE COURT:  And where do you find that

10   requirement in the claim language?

11             MR. BURESH:  I can -- literally on slide 32,

12   I've just -- and forward, 33, et cetera -- I won't do all of

13   these, but the point is I've taken the independent claims --

14   the first independent claim from each patent just to show

15   this concept.

16             And if we look at a high level, as you start

17   down past the memory limitation, you see create a path is

18   your first limitation.  Store the created path is your second

19   primary limitation, and then process subsequent packets in

20   the message using the sequence of routines indicated in the

21   stored path.

22             So it's not just using any old routines.  It's

23   not using any old one or more conversion routines either.

24   It's using the routines indicated in the stored path, and if

25   we lose that concept, we have fundamentally lost what I think

1    is one of the most fundamental pieces of this invention.

2                    THE COURT:  Well, did you propose this term

3    for construction?

4                    MR. BURESH:  I did not.  I think that this

5    term is -- is plain and ordinary, but when I saw Plaintiff

6    proposing a construction that effectively reads out the rest

7    of these claim limitations, I said, hey, if you want to do

8    that construction, then we need the Court to clarify that.

9    You still have to do the prosecuting steps that were

10   indicated in the path.

11                   My preference would be no construction on this

12   term at all.  I don't -- I don't think this construction

13   advances anything, and I think it creates confusion, but if

14   you want to construe this term as proposed in your

15   preliminary, then there has some to be some corresponding

16   construction to make sure the jury doesn't get confused and

17   read out what I've highlighted as this limitation.

18                   THE COURT:  All right.

19                   MR. DAVIS:  Your Honor, we're double checking,

20   but we're pretty sure that this is a term that Defendants

21   proposed.  But, regardless, our construction is the

22   construction that was agreed to in the PAN case, slide 50.

23                   I'm happy to address the Defendant's proposal

24   here, but this -- this notion of not really construing the

25   term, but simply adding this negative statement about what it

1    doesn't include is -- you know, is -- is I think problematic

2    to begin with.

3              I'm happy to show the Court how this

4    construction is not supported by any of the intrinsic

5    evidence, claims, the specification.

6              THE COURT:  Well, is there anything in the

7    disputed term that you think requires construction?

8              MR. DAVIS:  I would have to look at that, Your

9    Honor, but I believe it -- my recollection is that we had

10   proposed plain meaning or we -- we didn't even propose this

11   term, so if we're --

12             THE COURT:  Nobody is --

13             MR. DAVIS:  If nobody is taking credit for

14   this one, maybe we need to meet and confer on this and figure

15   out where we are.

16             THE COURT:  Well, why don't we skip this one

17   for now, and when we take a break, you can look at it

18   further, and we will as well, but -- so we -- let me see.

19   That would put us to E.  Is that where we were switching

20   over?

21             MR. DAVIS:  No.

22             THE COURT:  All right.

23             MR. BURESH:  That's the last one of mine, Your

24   Honor.

25             THE COURT:  All right.  Why don't we see if we

1    can go ahead and take that up and then we'll break.

2              MR. BURESH:  Okay.  If I could turn to slide

3    37 of the Defendant's slides?  The actual construction here

4    on -- reflected on slide 37 was Judge Gilstrap's prior

5    construction in the Palo Alto Networks case.

6              The issue that has come up with Plaintiff's

7    counter-construction is whether it's effectively singular or

8    plural.  Do we need to have a packet used to create the path

9    or more or received packets used to create the path, and I --

10   my argument is -- is simply in the context of the claim

11   language.  And this comes -- that specific language comes out

12   of claim nine, but it defines the antecedent basis in claim

13   one.

14             You have a couple of things in here that

15   trigger the idea that it needs to be singular versus -- and

16   I -- I agree I'm not getting -- interested in being

17   bludgeoned under the presumption that if you have that -- the

18   word in here it can be -- it can be plural.

19             But I recognize that there are cases where if

20   the claims require it to be singular, it should be singular,

21   despite that presumption.  I think this is one of those

22   cases.

23             So you receive a packet of a message, create a

24   path based on information in that packet, store the path, and

25   then process subsequent packets using the sequence of

 1    routines.

 2                    So you start to see there's -- there's a break

 3    point between the received packet and subsequent packets, and

 4    the jury needs to be able to delineate between those two,

 5    between the packet that's received and used to create the

 6    path and then what becomes subsequent packets.  If we're

 7    talking about multiple packets that are used to create the

 8    path, which -- where do we transition to subsequent.

 9                    And then when you go to claim nine, again, we

10    have this timing notion in here that it's -- it's done prior

11    to receiving the packet of the message.  So, again, if

12    we're -- if we're looking at a point in time when we receive

13    the packet of the message, how are we going to find that

14    point in time if we're talking about multiple packets?

15                    It creates a problem of how, you know, our

16    experts in the first instance and the jury in the second

17    instance can determine whether that type of limitation is

18    satisfied where you have these timing issues and subsequent

19    packets that are defined by that timing issue.

20                    Where is the time if we are looking at

21    multiple packets?  Is it the first one, the second one, the

22    third one, the last one?  How do we know that, which is why I

23    believe this claim and the way it's constructed requires us

24    to look at a packet, a singular packet of the message, and --

25    and base our determination off of that.

```
 1                    THE COURT:  All right.  Thank you.

 2                    MR. DAVIS:  Your Honor, I don't -- I don't

 3   have anything further on this -- on this term.  Unless the

 4   Court has some questions for Plaintiff, we'll rest on our

 5   briefs on this one.

 6                    THE COURT:  All right.

 7                    MR. DAVIS:  Thank you, Your Honor.

 8                    THE COURT:  Then we'll take the morning recess

 9   now and then come back and continue.  Thank you.

10                    COURT SECURITY OFFICER:  All rise.

11                         (Recess taken.)

12                    COURT SECURITY OFFICER:  All rise.

13                    THE COURT:  Thank you.  Please be seated.

14                    Before we move on, have counsel determined

15   whether either side is requesting construction of that D

16   term, the process or processing packets?

17                    MR. DAVIS:  Yes, Your Honor.  We met and

18   conferred, and I believe the parties are in agreement to pull

19   this term off the table for consideration and just not have

20   the Court construe it.

21                    THE COURT:  In other words, meaning that it

22   would just have its plain and ordinary meaning?

23                    MR. DAVIS:  Correct, Your Honor.

24                    THE COURT:  All right.

25                    MR. BURESH:  Defendants agree.
```

1                      THE COURT:  Very good.  Thank you.

2                      So that takes us to the terms that I've

3       identified as the F terms.

4                      MR. HURT:  That is correct, Your Honor.

5       Christian Hurt on behalf of the Plaintiff.  May it please the

6       Court.

7                      There are two issues, I believe, with the

8       Defendant's construction, which it appears the Court has

9       adopted, and it has to do with what does it means to convert

10      a packet from one format to another format, and the claims

11      only mention conversion.  They don't have a specific way and

12      are not limited to a specific way of converting.

13                     Now, the Defendant's construction really is one of

14      three ways to convert, either take the header off, add a

15      header on, or swap them out, but the claims -- the

16      independent claims don't speak to that, and as was at issue

17      in the Palo Alto Networks case, there are dependent claims

18      that specifically talk about removal, indicating that

19      independent claims are broader than removal.

20                     Now, the Defendant's will say, well, they could be

21      adding or swapping, but the problem with that is adding and

22      swapping aren't disclosed in any claims, and they're not

23      expressly disclosed anywhere in the specification.

24                     And, indeed, this expressed removal is mentioned in

25      the claims a number of times, and here's what the Defendants

1    are trying to put in the claims that convert from TCP to

2    another format when you convert up is removal of the first

3    header, removal of the second header.

4            This is in the Defendant's brief that to get to

5    TCP, you need to do these removals.  This is already in claim

6    24, and claim one and claim 16 just simply say that you

7    convert from TCP to another format.  And, again, as Judge

8    Gilstrap found in the Palo Alto Networks case, the

9    specification doesn't actually use the word removal outside

10   of the claims.  There's no discussion of addition, and there

11   is no discussion of swapping.

12           So then the question is, well, what do we actual

13   actually have in the specification that talks about

14   converting, and we have this embodiment in column 14 that we

15   call the single copy embodiment, and this is where a

16   reference pointer is advanced.

17           And under the Defendant's construction, as they

18   understand it in their brief, this embodiment is read out of

19   the patent.  It's read out of every claim, and instead the

20   claims only cover removal, adding, and swapping, none of

21   which are in any embodiment specifically, and in this

22   embodiment, the patent tells you that instead of passing the

23   packet itself.

24           So instead of sending the full packet over and

25   physically taking off each header, instead there's a

```
 1    reference to the packet, this arrow that's the pointer, and

 2    the conversion routine.  That's what does the conversion

 3    advances that the reference to the net header.

 4              So in this example, we're at ethernet, is the

 5    header that the packet's pointing to.  It does the

 6    conversion.  We're now at the IP header.  That in the system

 7    is what is now the header of interest or what could be

 8    considered the outermost header.  We then do this again and

 9    we're at TCP.

10              The Defendants are reading this embodiment out of

11    the patent and in favor of two embodiments that aren't even

12    expressly disclosed, but this embodiment shows that to do the

13    conversion you advance a reference pointer.

14              Now, the Defendants will say, well, there's no

15    discussion that this is actually a format conversion, but

16    what is discussed is that the conversion routines use this

17    pointer.  Those are the routines that do the conversion.

18              Now, the Defendants will say, but the patent also

19    says that those routines can do stuff other than conversion,

20    like routing and other things.  Fair point, but here it says

21    these -- that this pointer is passed to each conversion

22    routine.  That's right in column 14, each conversion routine.

23              And so whether we're talking about a flavor of

24    conversion routine that may not actually convert or the ones

25    that do, this pointer is passed to all of them, and this
```

1    embodiment shows that advancing this reference pointer, it

2    performs that conversion of the broader independent claims.

3         Now, in the Palo Alto Networks case, there was a

4    dispute about removal, and we asserted that this embodiment

5    covered removal, and Judge Gilstrap said, no, it doesn't

6    because it doesn't talk about removal.

7         And one of the things the Court said is the plain

8    and ordinary meaning of removal is actually modifying the

9    header, the actual modification, and that we have dependent

10   claims specifically drawn to that that have broader

11   independent claims.

12        So the Court was not reading this embodiment out of

13   the broader independent claims.  Under the Defendant's

14   construction, it would, and under law that goes back to the

15   Electronics and beyond, you really need some clear evidence

16   to do that.

17        Now, the construction that reads out embodiments

18   highly disfavored, and to do so, you need something that's

19   highly persuasive, especially when it's in favor of covering

20   embodiments that aren't expressly disclosed in the patent.

21        So what's the evidence that the Defendants point to

22   to try to clear that bar?  Well, the first piece of it are

23   technical tutorials from prior cases where our inventor tried

24   to teach the Court about the technology, used the words

25   removing headers as you went up the stack.  That's not the

1    type of clear evidence that you would need to exclude that

2    embodiment.

3         Or the brief that we filed in a prior case that

4    involved the parent patent where we generally described the

5    technical background as removal going up the stack, again,

6    that's not the clear type of evidence that's required to read

7    out column 14.

8         Or maybe Mr. Balassanian's testimony where no one

9    pointed to the patent, but said, hey, can you distinguish a

10   TCP packet from an IP packet for me?  And he said, sure, a

11   TCP packet has an IP header at its outermost layer.  A TCP

12   packet has a TCP header at its outermost layer.

13        There's nothing in there that disclaims advancing a

14   reference to make the conversion.  There's nothing in there

15   about limiting these claims to a type of construction.  All

16   it mentions is the outermost layer which you're interested in

17   is TCP header or IP header, and that's what the embodiment in

18   column 14 talks about.

19        So what else do we have?  Well, we've got

20   prosecution history from a parent patent where Implicit

21   stated in general that whether a packet is an IP format is

22   determined by the structure of its header.  That's not

23   disputed.  IP packets have IP headers.

24        Whether it's an IP packet or not, it has to meet

25   the standard IP protocol for a header.  This doesn't talk

1   about how you do the conversion.

2           Same thing, Dr. Ng's declaration in that same

3   prosecution.  The packet that has an outermost header with

4   the structure shown in figure one is by definition an IP

5   patent.  That's not disputed.  If a packet has this header,

6   it's an IP packet.

7           This doesn't talk about, well, how do you convert

8   them from IP to TCP and are you limited to taking the IP

9   header off, and that's what the Defendants are construing

10  that term to mean when the patent discloses that the way you

11  can get there is by moving a reference pointer forward.

12          There's nothing in here about conversion or a

13  specific type of conversion or a specific way of conversion.

14  Simply that IP packets have got an IP header on them.  That's

15  an undisputed point.

16          So what else?  We have the Decasper statements in

17  the '638 patent, so now we've moved from briefs from prior

18  cases, prosecution history from other patents, to now we're

19  actually talking about this patent, and it says here executes

20  the TC protocol, operates on a packet whose outermost header

21  is TCP.

22          Okay.  That does not talk about removing the IP

23  header or limiting it to one type of conversion.  It's about

24  the header you're interested in where that pointer is, or if

25  you've done removal the physical outermost is a TCP header.

1          There's nothing in here that limits converting a

2    format to adding headers, pulling them off, or switching out

3    the bits.  There's nothing that disclaims or talks about the

4    embodiment in column 14, and there's nothing that limits it

5    to a specific type of conversion.

6          THE COURT:  Well, you're saying that if

7    there's a pointer pointing at a header that's not the

8    outermost header, that it thereby becomes the outermost

9    hearer?

10          MR. HURT:  I think that's the way to read

11    column 14 when you're speaking of -- when you're thinking

12    about formats is the outermost header is where I'm going to

13    read to do the processing I need to do, and that can be --

14    and the embodiment of figure 14 where that is is determined

15    by a reference pointer.

16          So we're talking about a string of zeroes and

17    ones, and what the Defendants want is you start clearing out

18    the zeroes and ones to move forward, and what we're

19    suggesting is you can do that, but you can also actually move

20    a reference to tell you, hey, the starting point to look at

21    is at this location right here when you're -- when you're

22    doing the packet process.

23          THE COURT:  And what can you point me to that

24    would show that use of that pointer makes that header the

25    outermost header?

1          MR. HURT:  I think it's this passage in the

2    specification here talking about conversion.  So there is not

3    a discussion of the outermost header in any of the claims.

4    There's no discussion of removing an outermost header in the

5    specification.

6          There is discussion of removing the outermost

7    header in dependent claims, but this section here is talking

8    about doing -- conversion routines do the conversion, and

9    those routines can advance the reference past the header

10   information for the protocol so that the reference is at the

11   next header, and so the next header is what would become, and

12   what is for this analysis, the header of interest or, if the

13   Court would want, the outermost header, so it's --

14          THE COURT:  I understand.  I'm trying to

15   figure out if there's something that makes it clear that the

16   use of that reference would cause something to be understood

17   to be the outermost header because in the prosecution history

18   there's discussion of the outermost header.

19          MR. HURT:  That's correct.  The term outermost

20   header is used in the prosecution history, but we're talking

21   about converting a packet's formats, and this section says

22   you're converting the format by moving the reference pointer,

23   and the outermost header is the header that you're interested

24   in to figure out where you're at in the protocol stack.

25          So you can either -- if you're going up the

1    stack from receiving data on the wire all the way up to the

2    application, you can actually physically remove each header

3    or you can just move that reference pointer as you're doing

4    the processing.

5              And that highlights one of the other issues

6    with the Defendant's proposed construction is at some point,

7    if you go back -- let me go back to the slide.  At some

8    point, it says another type of header structure, so moving

9    from an IP structure to a TCP structure.

10             You know, if you think of this as a candy that

11   has multiple wrappers on it, at some point you've taken all

12   the wrappers off.  There's no more wrapper that's left.

13   You're in the middle of the data layer, and this

14   construction, it's a little unclear what it means to convert

15   to another type of header structure.

16             When I think of a layer seven stream, the

17   chocolate in the middle of the candy, that is a particular

18   format that this construction seems to at least leave some

19   lack of clarity on whether that would be covered or not.

20             THE COURT:  Do you have any suggestion as to a

21   construction that would be truer to the meaning?

22             MR. HURT:  Sure.  I -- I think the -- a

23   construction that's truer to the meaning, it's really the --

24   well, there's no -- I guess I would say this:  There's no

25   proposed construction by the Defendants that says what it

```
1    means to convert something.

2                    And that's really, I think, where the fight

3    is, is how you do a conversion and is it limited in this way

4    of adding, changing, or removing headers.  So I would say the

5    language is -- is pretty clear already about switching

6    formats, converting from one -- or having TCP format to a

7    different format.

8                    I think one way to capture that is maybe

9    convert the -- you know, convert the -- I want to say header

10   of interest or location of interest from one place in the

11   packet to another, which would cover removal, adding,

12   changing, and would also cover that pointer embodiment.

13                   THE COURT:  Do you dispute that where the

14   claim says different format that we're talking about a

15   different header structure?

16                   MR. HURT:  I think on that issue the claims

17   are silent on it.  I agree that a format is something like an

18   IP format, a TCP format.  The format typically is described

19   by a header structure, like an IP header structure has a

20   certain structure.

21                   A TCP has another structure, but I don't think

22   it's always the case necessarily that a format is going to be

23   really drawn by a header structure.  It's -- it's the way

24   that the data is -- is looked at is really, I think, what it

25   is.
```

1            So the lower layer, you see it in one format,

2    and then as you move to the next header, you're looking --

3    you're taking these headers off and processing the data on

4    the -- on the way up.

5            THE COURT:  All right.

6            MR. HURT:  Unless the Court has further

7    questions, I'll let opposing counsel respond.

8            THE COURT:  Thank you, Mr. Hurt.

9            MR. BURESH:  Your Honor, Eric Buresh on behalf

10   of Defendants again.

11           On this particular issue, Plaintiff's counsel

12   has really focused on and said multiple times that we have

13   limited conversion to removing a packet's outermost header,

14   and, I mean, we're not even construing the word convert.

15           I mean, if you look at the claim language,

16   it's convert one or more packets having a TCP format into a

17   different format, and our construction is convert, and then

18   what we are doing is explaining what a format is.

19           That is, we're simply asking the question what

20   is a packet's format because I don't believe that is

21   something that's plain and ordinary to a juror, and it needs

22   to be explained because of exactly the types of arguments

23   we're hearing here today.

24           So this example packet is out of Implicit's

25   reply brief at page eight.  It's -- it's their depiction, and

1    you see a packet that has ethernet IP, TCP application data

2    and then a footer and arrows pointing to various of the

3    layers, and the question is what is this packet's format?

4    It's -- it's one packet.

5              In these claims we know that we have to

6    convert the format of a packet from one format to another

7    format.  So how is the jury going to know if that's been

8    done?

9              The first step is you've got to know the

10   packet's format at the point in time before the conversion so

11   you can compare it to the packet's format at the point in

12   time after the conversion.  So what is this packet's format?

13   We have arrows pointing to ethernet IP.  We have arrows

14   pointing to TCP.  What's this packet's format?

15             Well, to literally everyone prior to this

16   litigation, including textbook authors and everybody else, to

17   define what the format of the packet is, you look at the

18   outermost header.

19             This is an ethernet packet.  I can tell you

20   that with certainty.  I can point to the IP header, and it's

21   still an ethernet packet.  I haven't done anything to the

22   packet.

23             I can point to the TCP header and read that

24   TCP data, and it's still an ethernet packet because I haven't

25   done anything to the packet.  I've looked at data in a

 1   different layer, but the packet is the packet.  It's still an

 2   ethernet packet.

 3             So we're -- what we're positing is this is

 4   just a definitional issue to -- according to what one of

 5   ordinary skill in the art would understand a packet's format

 6   to be, which is why we focused on in the prosecution history

 7   the inner partes re-examination.

 8             We went to what Implicit contended was a

 9   person of ordinary skill in the art, Dr. Ng -- I'm just going

10   to go with Dr. Ng because I don't know how to pronounce that,

11   but -- and this was his declaration.  He says a packet that

12   has an outermost header with a structure shown in figure two

13   is by definition an IP version for a packet.

14             So you look at the outermost header to

15   determine the format of a packet.  That is only the structure

16   of the outermost header determines whether the packet is an

17   IP version four packet or whether it employs some other

18   protocol, so that's their expert saying what is commonly

19   understood at any rate.

20             My next slide, slide 18, I just encourage the

21   Court to look again at our response brief at pages 13 to 15

22   where we've walked through all the different types of

23   extrinsic evidence we could reasonably point to.

24             We have textbooks saying the format of a

25   packet is the outermost header.  We have deposition testimony

1    from the inventor saying the outermost header of the packet

2    defines the packet's format.  We have prior claim

3    construction tutorials from Implicit's prior lawyers saying

4    that the outermost header of a packet defines a packet's

5    format.

6                There hasn't been any disagreement on what

7    is -- is and was commonly understood in the art.  It's just

8    definitional.  If you're asking what is a packet's format, it

9    is the outermost header.

10               At slide 19, that exact distinction was relied

11   upon multiple times by Implicit to distinguish prior art.

12   I'm going to focus on one.  It was the Decasper reference,

13   which we've discussed earlier this morning.

14               It was a router, and Decasper had what was

15   called a TCP plug-in.  In other words, it could advance its

16   look at a packet to look at TCP data, and it was doing it for

17   the purpose of -- of monitoring TCP -- what's the right word?

18   Congestion.  Thank you.  It was monitoring TCP congestion.

19               So it looked at the TCP data, and -- and the

20   argument by the examiner was, hey, that's -- executing TCP,

21   that's converting to TCP, and Implicit was very clear, now,

22   wait a minute, the packet's format is determined by the

23   outermost header.

24               So in Decasper, the packet was always -- and

25   had always had an outermost header that was the IP header.

1    So even though you -- Decasper could look at the TCP layer

2    and look at data in the TCP layer, it was not converting into

3    a different format because it was always IP packets.

4         Okay.  So that, again, the question is what's

5    the outermost header of the packet?  If it's IP headers, then

6    it doesn't matter if you are looking at TCP data.  If your IP

7    header is the outermost header, then that's the format, and

8    you haven't converted anything.

9         Now, Your Honor, before I get into the

10   substance of this slide, I wanted to note in Defendant's

11   slide dec at the back there is an additional exhibit that was

12   not submitted in the briefing, and I want permission to do so

13   before I introduce this exhibit.

14        The exhibit was identified on the extrinsic

15   evidence listing that we provided to Plaintiffs, and it is

16   directly responsive to arguments in Implicit's reply brief.

17        THE COURT:  Is there objection to it?

18        MR. DAVIS:  We don't know what it is.  We

19   don't have a copy of it, Your Honor.  If we can get a copy of

20   it, we can look at it.

21        MR. BURESH:  It is in your binder.  It is a

22   copy of the expert report of Dr. Kevin Almeroth in the Palo

23   Alto case.

24        THE COURT:  Well, you can proceed and talk

25   about it.

```
1              MR. BURESH:  Okay.  In the reply brief,

2    Plaintiff -- and this wasn't so clear in the opening brief,

3    but here in the reply brief, they came out and made a very

4    explicit argument that passing this pointer that they're now

5    talking about this morning, passing the pointer from ethernet

6    to IP converts to the IP header.

7              So the -- and then they say this converts the

8    packet from ethernet to IP because the header of interest has

9    advanced to the IP header.  The next conversion routine

10   advances the reference to the TCP header three, which

11   converts the packet from IP to TCP.  That's their argument

12   now.

13             When we look at the expert report from their

14   expert, Dr. Almeroth, who is the only identified expert in

15   this case as well from a technical standpoint, he was facing

16   the Decasper issue as well, the same Decasper issue that was

17   in the prosecution history.

18             And he explained in the context of Decasper

19   looking at TCP, he said, for example, in order to read TCP

20   header information from within a TCP header of a TCP packet

21   that is itself encapsulated in an IP packet, a system need

22   not necessarily convert the packet from IP format to TCP

23   format.  Instead, a system could simply advance a memory

24   pointer past the IP header to the TCP header.  In other

25   words, you don't need to convert.  You can just pass a
```

1    pointer over and look at the TCP data.

2                    Well, colloquially speaking, no kidding.

3    That's exactly what they've been saying with respect to

4    Decasper for several years, that it looks at TCP data by

5    putting a pointer to the TCP data, but that's not converting

6    because it's still an IP packet.

7                    Now you have their expert in the Palo Alto

8    case saying exactly the same thing and distinguishing

9    Decasper on that basis, and that's in contrast to now arguing

10   in context of claim construction that passing a header

11   somehow changes the outermost header of a packet.  It

12   doesn't.  The outermost header stays with it unless you do

13   something to the outermost header.

14                   Now, again, we're not limiting it, and the

15   patent hasn't limited it, to removing the outermost header.

16   There is -- and I would -- Plaintiff's counsel said there's

17   no discussion of adding outermost headers.  I would disagree

18   with that.

19                   In column one at line 35 of the asserted

20   patents, it says the computer system may convert compressed

21   data into a TCP format and then into an IP format.  The IP

22   formated data may be converted into a transmission format,

23   such as ethernet format.

24                   The point of that is you're now building a

25   packet in the context, so you're adding outermost headers.

1   You're going from IP -- from TCP, you're adding an IP header.

2   It's now an IP packet in IP format.  You then add an ethernet

3   header, and it becomes an ethernet packet in ethernet format.

4   Okay?

5           So you can do it by adding.  You can do it by

6   removing.  You can do it by -- we've given examples in the

7   briefing by swapping UDP for TCP or swapping IP version four

8   for IP version six, but you need to be doing something to the

9   outermost header because by definition the outermost header

10  is the format of the packet.

11          Plaintiff's counsel spent -- and I think the

12  anchor for their argument comes from column 14, which I have

13  on slide 21 of Defendant's presentation, and they focus on

14  the sentence that says these routines can advance the

15  reference past the header information for the protocol so the

16  reference is positioned at the next header.

17          Sure they can.  They can advance a pointer.

18  This is not saying they've done conversion.  You can advance

19  a pointer to route data.  You can advance a pointer to

20  compress data.  You can advance a pointer to encrypt data.

21  You can advance a pointer for multiple different reasons, and

22  as you see in the highlighted line here, a conversion routine

23  may be used for routing a message and may perform no

24  conversion of the message.

25          It's not just that they can do other things.

1    In this description in this paragraph, conversion routines

2    aren't necessarily doing conversion.  Okay?  So when you say

3    we're advancing a reference, it never says they advance a

4    reference in order to convert it.

5                    It simply does not say that, and that is

6    inconsistent with all of the intrinsic evidence we've looked

7    at, including definitional statements, including distinctions

8    over the prior art.

9                    Unless Your Honor has any questions, I'll stop

10   at that.

11                   THE COURT:  All right.  Thank you, Mr. Buresh.

12                   MR. HURT:  I'd like to start, Your Honor,

13   where counsel left off and said that column one discloses

14   adding.  That sentence, that part of the specification,

15   simply says you convert from TCP to IP to ethernet.  It

16   doesn't limit it to how you do it.

17                   Counsel also agrees and did not dispute that

18   their construction does read column 14 out of the patent, and

19   it's based on the belief that the conversion routine, which

20   does conversion, the only thing in the patent that does

21   format conversion is a conversion routine.

22                   Now, another part of the specification says

23   sometimes they don't have to do conversion or maybe they can

24   do other things, but the only thing that does conversion is

25   the conversion routine, and this part of the specification

1    says that you give that conversion routine a reference

2    pointer to advance the header information for the protocol so

3    the reference is positioned then after it's advanced to the

4    next header.

5             That is a form of protocol conversion.

6    There's nothing in the prosecution history that disclaimed

7    this.  Counsel didn't argue disclaimer.  They're arguing that

8    these statements somehow reflect the plain and ordinary

9    meaning of these claims.

10            But when the Court looks at the claims, they

11   do not require a specific type of conversion.  Then those

12   that do require removing the outermost header, the

13   implication is that the independent claims are broader, and

14   this disclosure in the specification tells you how they're

15   broader.  Now, it may also encompass adding, but there is no

16   expressed disclosure of adding in the patent anywhere.

17            We would object, Your Honor, to Dr. Almeroth's

18   report.  This was sprung on us today, but even counsel's

19   statement about Dr. Almeroth's report is not completely

20   accurate.  If I can have the Elmo, please?

21            Counsel mentioned that this part of the report

22   had to do with Decasper and distinguishing Decasper on the

23   basis of conversion.  This is the section, that there are

24   just issues with Dr. Russ's invalidity report, doesn't

25   mention any particular reference.  It doesn't mention

1    Decasper.  It doesn't mention what Decasper allegedly does or

2    doesn't do.

3              This is what they've highlighted, that you can

4    move a reference pointer to -- a system need not necessarily

5    convert from IP to TCP.  It could advance a memory pointer

6    past the IP header to the TCP header.  So in this instance,

7    what's -- it may not be necessarily conversion.

8              But more to the point, none of this is in the

9    patent anywhere.  None of this is in the intrinsic record,

10   and another expert is free to disagree with this as part of

11   their invalidity analysis.

12             What is in the patent is the disclosure in

13   column 14 of advancing the reference pointer with a

14   conversion routine.  This doesn't mention conversion

15   routines.  This doesn't mention conversion.

16             The patent, when it talks about conversion

17   routines and passing the reference to the conversion routine,

18   is in the context of advancing that reference pointer, and

19   the conversion routines do conversions.  That's what they do.

20             THE COURT:  Well, --

21             MR. HURT:  Yes, Your Honor.

22             THE COURT:  -- in that same paragraph, which

23   you're looking at in column 14, where it's talking about

24   advancing the reference, it also says that it may perform no

25   conversion of the message.

```
 1                    You just said conversion routines convert the

 2       message.  That's what they do.  Doesn't this passage say that

 3       the conversion routine may be used for routing a message and

 4       may perform no conversion of the message?

 5                    MR. HURT:  That's correct.  I believe -- if I

 6       wasn't clear, I'll mention it.

 7                    Conversion routines, they may not necessarily

 8       need to convert the message; but in the patent when we're

 9       talking about converting, the conversion routines are the

10       only thing that can convert the format of the packet.

11       There's no other software anywhere in the purpose -- for that

12       purpose, and the main point of those routines is to perform

13       conversion.

14                    So Your Honor is correct.  We may be talking

15       about there might be two classes of conversion routines,

16       those that do conversion and perhaps those that don't, but

17       this passage says that each of them receive this reference

18       and to move it forward as part of their processing.

19                    So whether we're talking about a flavor that

20       does conversion or a flavor that does not do conversion, each

21       of them you can have access to this reference pointer and

22       advance it forward, but that's --

23                    THE COURT:  Isn't the question whether

24       advancing the reference pointer converts the format?

25                    MR. HURT:  That -- that is correct, and this
```

1    is the disclosure of that in -- in the patent itself.  There

2    is no disclosure, as Judge Gilstrap concluded, expressly of

3    removal.  There's no expressed disclosure of adding.  There's

4    no disclosure of swapping.

5                 This is the disclosure we have about what the

6    conversion routines do with regard to the packet.  This is

7    what we have, and it advances that pointer from each layer

8    header to get you to the next one.  I mean, this is how many

9    products generally operate when they do conversion.

10                And that's -- that's -- and this is why that

11   passage is in the patent because it's discussing instead of

12   physically removing each layer, I can move the reference

13   pointer, and I don't have to keep multiple copies of the

14   packet to do the processing on.  I mean, that's the point,

15   and so this is the converting that's disclosed.

16                The Defendant's construction, under their

17   view, would read this out of the patent, and notably they

18   haven't pointed, Your Honor, to any claim element that would

19   actually -- that this would cover.  So if it's not

20   converting, they haven't pointed to what it is in any of

21   these other claims, and so it wouldn't be covered by the

22   patent.

23                And under law flowing from Electronics

24   forward, you've got to have something really clear to exclude

25   that.  The evidence the Defendant's point to doesn't rise to

1    the disclaimer.  They don't even argue disclaimer, and for

2    that reason, Plaintiff respectfully request that the Court

3    reject their construction.

4              Unless the Court has any further questions,

5    I'll yield that topic.

6              THE COURT:  Thank you, Mr. Hurt.

7              MR. BURESH:  Very briefly, Your Honor.

8              Where I started, I think, is, again, just to

9    reiterate the construction we're seeking and that is

10   reflected in the preliminary construction by the Court is

11   that the format of a packet is represented or is it's

12   outermost header.  That's the construction.

13             The question that I think the Plaintiffs --

14   I'm not -- I think they're saying plain and ordinary as if

15   everybody knows what the format of a packet is, even though

16   we're here debating that, and then talk a lot about pointers.

17             It's still the outermost header of a packet is

18   its format.  That doesn't really alter the fundamental issue,

19   and I come to the -- what I consider the lynch pen of

20   their -- their argument, whatever the issue is, it's column

21   14 that, as Your Honor noted, it says the conversion routines

22   may perform no conversion of the message.  Great.  They can

23   do other things.

24             In this last paragraph of the patent, you

25   might note that.  That's fine.  This paragraph literally

1     doesn't even mention the word format.  I mean, we're not

2     talking about changing the format of a patent in this -- in

3     this paragraph whatsoever.  Those words aren't even there.

4           So whatever they're talking about when they

5     advance the reference pointer is consistent with the idea

6     that you can do these types of things without performing

7     conversion of the message.

8           It's -- they accuse us of reading out an

9     embodiment.  Our construction just doesn't have anything to

10    do with this embodiment.  This embodiment is not talking

11    about converting format.  Format isn't even mentioned here.

12          So to say we're reading it out by applying

13    what they -- what Implicit has previously and consistently

14    and universally agreed is the right definition of a format,

15    i.e. the outermost header of the packet, it just doesn't make

16    any sense.  It's not -- we're hot reading out an embodiment.

17    That embodiment similarly is not relevant to changing a

18    packet's format.

19          Thank you, Your Honor.

20          THE COURT:  All right.  Thank you.

21          We'll move on to the next set of terms.

22          MR. HURT:  Your Honor, may I make one final

23    point before we move on?

24          THE COURT:  Yes.

25          MR. HURT:  In column 14, the -- if I can have

1    the Elmo, please?

2            The end of this sentence mentions after the

3    demux process, the reference can be reset to the point of the

4    first header for processing by the conversion routines in

5    sequence.

6            In the patent, the demux process is the end of

7    the conversion, so this implies that moving that reference

8    pointer is doing a conversion by saying after the demux

9    process.

10           THE COURT:  All right.

11           MR. HURT:  So that's my only point, Your

12   Honor.

13           MR. BURESH:  Your Honor, may I -- may I

14   respond to that briefly?

15           THE COURT:  If you promise that it's brief,

16   you may.

17           MR. BURESH:  I can -- I can do it in 30

18   seconds or less.

19           THE COURT:  Go ahead.

20           MR. BURESH:  Thank you, Your Honor.

21           Your Honor, I'm going -- to keep it to 30

22   seconds, if you review these patents the demux process is not

23   the conversion process.  The demux process is how this patent

24   talks about identifying the sequence of routines that will be

25   used to process the packet.

1          So you can advance references to help you find

2     the path forward.  It doesn't have anything to do with

3     actually doing the conversions.  It's fundamentally why they

4     continue to be wrong about this paragraph.

5               THE COURT:  All right.

6               MR. HURT:  So in the second part of this

7     construction, for executing TCP, executing transmission

8     control protocol, I think we've probably beaten the outermost

9     header to death by now.  If Your Honor wants to hear more

10    argument on that issue, I can; but, otherwise, I'd like to

11    talk about the second issue of end points.

12              THE COURT:  I understand that the arguments

13    from the last issue carry over.

14              MR. HURT:  Correct, correct.  And if Your

15    Honor doesn't have any more questions about that, I'll keep

16    going forward.

17              THE COURT:  Okay.

18              MR. HURT:  So we do agree with Your Honor's

19    construction that executing TCP is not limited to end points.

20    That construction is not in the preliminary construction.

21              The Defendants wanted that in, that where the

22    processing was done at the end point of the connection, and

23    here the claims themselves don't mention end points anywhere.

24    It just says execute a transmission control protocol, and it

25    tells you what to do with that.

1             You do the conversion to move it from a TCP

2    format to another format.  It doesn't limit you to where

3    you've got to execute the protocol or the -- to do the

4    conversion.  It just says execute the protocol to do the

5    conversion, and the patent itself is agnostic as to whether

6    you do this at an end point or not.

7             And so figure four is one of the flow charts

8    from the patent, and there's a lot of going on here, and I'll

9    try to explain it pretty simply, but each of these green

10   arrows is the path.  The packet comes in here at the bottom

11   of the queue, and then it goes up.  And each of these orange

12   triangles are the path entries for the path that packet is

13   going to take, and it goes up first through ethernet, then

14   IP, then TCP.

15            And the point here that I think is fairly

16   important is you do not have to use the whole protocol

17   because the patent talks about using protocol edges, and

18   that's what's highlighted here in yellow.  It looks like it's

19   physically the edge of each of those boxes, and the patent

20   tells you all you have to do is enough to do the conversion.

21            Now, the Defendant's initially had the

22   position that to execute TCP you had to implement pretty much

23   the whole specification.  They have since dropped that.  That

24   was in a number of terms that never made it into the briefing

25   and were not in the four five chart.

1          But this part of the patent tells you it's not

2    limited to end points because while TCP may be an end point

3    to end point connection, if you're in the middle and you want

4    to essentially, you know, be a phone tap between those two

5    and listen to the conversation, you just have to go up to TCP

6    and you just have to do the conversion.

7          You don't need to manage the traffic flow like

8    an end point does.  You don't have to initiate the session.

9    You don't have to do any of that.  You've just got to get to

10   that middle point so I can sniff what's getting sent between

11   the two end points.

12          And so the patent really doesn't mention end

13   points.  It's agnostic to end points, and this disclosure of

14   edges of only using enough of what you need to do the

15   conversion suggests and shows that it's not limited to end

16   points.

17          So what do the Defendants have on this?  This

18   is the June 6th, 2013, preliminary amendment.  This is where

19   pretty much all their evidence is from.  There's no

20   limitation in the spec on end points.  There's a disclosure

21   that is end point agnostic and broader, so we're again at

22   this level of where's the clear and unmistakable disclaimer.

23          This deals with Decasper.  Eight pages

24   Implicit spent talking about Decasper.  Only two footnotes

25   even mention anything close to end points.  So the reason

1   that the Decasper, which is a router, as counsel mentioned,

2   did not anticipate the claims is because it was stuck at the

3   IP level.  It never went above IP.

4              Now, that doesn't have to do with whether it's

5   an end point or not.  It just was stuck at what's called

6   layer three IP, and that's the statement here, which is you

7   look at Decasper's figure on the left.  It just shows  that

8   these writers did not execute any other type of networking

9   protocols other than IP.  Nothing about end points.  Nothing

10  saying my claims are about end points.  Nothing limiting in

11  that regard.

12             Same thing with the figure on the right.  The

13  patentee says, well, if you look at the figure on the right

14  of figure one, same problem.  It does -- all it discloses is

15  an architecture that doesn't do anything other than IP, and

16  our patents are about you've got to at least get to that TCP

17  layer, and that's what these routers didn't do, and there's

18  on and on.

19             In fact, Decasper's core is called an IP core.

20  That further tells you that it's just at the IP level.  It's

21  just at layer three.  It doesn't go higher than that.  Again,

22  the method of mapping a packet plug-in requires the presence

23  of the IP header and follows that they operate an IP packet.

24  It doesn't go beyond IP.

25             Given the use of header information, this is

1    all about IP packets.  Nothing in Decasper contemplates that

2    you can process a non-IP packet such as TCP and they don't

3    convert packets into TCP format.  That's what this was about,

4    and that's -- that -- that was the discussion was that

5    Decasper is a router at IP.  Claims require that you have to

6    be at TCP.

7            So the Defendants point to two footnotes to

8    try to read in this end point limitation, and the first deals

9    with that Decasper itself mentions research projects that are

10   on end systems and that Decasper is different than those end

11   systems, but that's about what the Decasper reference is

12   distinguishes itself from.

13           There's nothing in here about my claims are in

14   systems.  My patent is in systems.  My patent is limited to

15   end systems, and it would seem kind of odd if that were the

16   intent given that Decasper itself talks about prior art end

17   systems.  Why would the patentee then say, I'm an end system.

18           Same thing with four.  And this is, I think,

19   really where the Defendants hone in, is footnote four, and a

20   20-page response.  It says it is well known that the

21   transmission control protocol is implemented at the end

22   points of a connection, and that's true.

23           A transmission control protocol can be between

24   two end points.  That's the host and the other host, but it

25   doesn't say our patent is limited to those ends points.  It

1    just says that Decasper is a router and has an IP router

2    architecture that can't get you to the end point level.

3              It can't go beyond layer three.  It actually

4    can't listen in on the conversation.  That's what these

5    patents are about.  You try to listen in on the conversations

6    whether you're one telephone, the other telephone, or you're

7    a tap in the wire.

8              And so accordingly the fact that Decasper can

9    monitor TCP statistics doesn't actually mean that it's doing

10   any type of TCP conversion, and those statistics are not an

11   implementation of TCP.  They're not an execution of TCP.

12   That's the distinction.  There's nothing in here that says my

13   claims are end points.  My patent's end points.  The standard

14   for disclaimer is clear and unmistakable.  That doesn't

15   happen.

16             So the Defendant's have two other places they

17   point, and this isn't from the '163 patent.  It's from the

18   parented patent, and during the re-examination, the patentee

19   said the difference between routers and end points is

20   significant because Decasper and Kerr -- Kerr is another

21   router -- function at the router level, and the '163

22   technology functions at the end point level.

23             Even this doesn't say the '163 technology is

24   an end point.  What it says is we can get to the application

25   layer like the end points do.  Where we don't have to be the

1    two ends of the conversation, we can get in the middle and

2    listen to it so we're at their level.  It does not say that

3    we are an end point.

4              And I think that that's -- when you're under

5    the rubric of clear and unmistakable disclaimer, especially

6    carrying it from a parent patent that doesn't even have the

7    TCP language in it, this just does not meet that bar.

8              And, similarly, there's one other statement

9    they point to from this patent that talks about operating at

10   the TCP level, getting to that level, and that's the

11   distinctions that were discussed when addressing the Decasper

12   reference, not that our patent is an end point or is limited

13   to end points.  It's about the ability to process and go up

14   and actually see that the TCP level and higher is not about

15   where you do it.

16             So unless the Court has any questions, I'll

17   let my opposing counsel respond.

18             THE COURT:  All right.  Thank you, Mr. Hurt.

19             MR. BURESH:  Your Honor, in your initial

20   comments to Plaintiff's counsel on this term, you noted some

21   similarities with the prior issue, and there certainly are

22   some similarities in that the format of the packet that's

23   being considered here is defined by the outermost header.

24   That's a consistent thing between these two terms.

25             But I did want to note that when it comes to

1    this specific term, executing a transmission control

2    protocol, there's additional evidence that should be

3    considered by the Court.

4              And I'm sure it will be.  I just wanted to

5    point this out, that when it comes to this specific term,

6    executing the TCP protocol in the prosecution history, the

7    patentee did provide a definitional statement.  Executes the

8    TCP protocol, i.e., operates on a packet whose outermost

9    header is a TCP header.  In other words, that is, as this

10   Court is aware, when you use the term i.e., it is considered

11   definitional in the context of patent prosecution.

12             And I would direct the Court's attention to a

13   prior case by Your Honor.  It was Rembrandt Wireless versus

14   Electronics.  The citation for your reference is 2014 WestLaw

15   3385125, and the issue was also confirmed on appeal at 853 F

16   3rd 1370, simply noting what I just said, that if you use

17   these types of definitional statements, you've provided a

18   definition for a term and you've provided notice to the

19   public that that is how you intend that term as a patentee to

20   be applied.

21             So that's our construction.  Executes a TCP

22   protocol means operates on a packet whose outermost header is

23   a TCP header.

24             We do have a separate concept of is it -- is

25   it an operation that is done at an end point level or on an

1    end -- at the end point of a connection, and that's a

2    separate issue, and we believe that this is also supported by

3    the claims themselves in addition to the prosecution history.

4              And when you start at the claim level, the

5    patentee here decided to craft their claims in terms of a

6    specific protocol, the TCP protocol.  They then note, which

7    is entirely accurate, in the prosecution history that it is

8    well known that the transmission control protocol is

9    implemented at the end points of a connection.  That's just

10   what TCP is.

11             If we're talking about executing TCP, we are

12   talking about executing a protocol that is implemented at the

13   end points of a level of a connection by technical

14   understanding and persons of ordinary skill in the art.

15   That's just what TCP is.

16             THE COURT:  That doesn't tell me that it's

17   implemented only there.

18             MR. BURESH:  This statement does not say it is

19   implemented only at end points, that's correct, but the

20   takeaway of this -- this statement in context is exactly

21   that, that TCP is implemented at the end points of a -- of a

22   connection, and Decasper, on the other hand, is a router

23   architecture.

24             THE COURT:  There are a lot of differences

25   between Decasper and the patented technology, but do you have

1    anything that would show clearly that TCP is, according to

2    the patentee, implemented only at the end points?

3                    MR. BURESH:  According to the patentee, and we

4    cited here as well on this page, the RFC 793 that defines

5    what TCP is, that end -- that the TCP RFC is stated that TCP

6    is a host-to-host protocol between hoses ID end points.  That

7    is at its fundamental essence what TCP is, and that's the

8    distinctions being drawn by the patentee.

9                    If we look at slide 27 -- we've discussed this

10   slide before.  I'm not going to spend a ton of time here, but

11   the Decasper plug-ins, the TCP plug-in, according to the

12   applicants, did not operate on the packets having a TCP

13   format.  And the reason for that was two-fold; one, it was a

14   router and, two, because they were IP headers throughout the

15   processing path of Decasper.

16                   Those are the distinctions that were being

17   made by the applicant to distinguish Decasper, and I think

18   it's -- it's premised on the fact of claiming TCP.

19                   If there are no questions, that's all I have

20   on that issue.

21                   THE COURT:  All right.  Thank you, Mr. Buresh.

22                   Anything further on that, Mr. Hurt?

23                   MR. HURT:  No, Your Honor.

24                   THE COURT:  This term that we have identified

25   on our preliminary construction as G(5), it was difficult to

1    tell from the briefing whether that was intended by the

2    Defendants to be included in this group of terms.

3              MR. BURESH:  Your Honor, we did drop that one,

4    claim ten in the '683 patent, from the list that would be

5    included in that term.

6              THE COURT:  All right.  So we don't need to

7    address G(5) then.

8              MR. BURESH:  That's correct, Your Honor.

9              THE COURT:  Okay.  Thank you.

10             All right.  Is there anything else that either

11   side wants to take up?

12             MR. DAVIS:  Nothing from the Plaintiff, Your

13   Honor.

14             MR. BURESH:  Your Honor, I did have one point

15   of clarification, and this may be something if we can

16   finalize with perhaps the Court's guidance on this.

17             We had -- claims 24 and 27 have language

18   removing an outermost header, and we had asked that the Court

19   apply the prior instruction from Judge Gilstrap that those

20   claims did not encompass moving a reference or pointer.

21             I think Plaintiff agrees with that as correct.

22   It's just a question of whether we reflect it in the Court's

23   order in the jury charge or how that would best be

24   articulated.

25             THE COURT:  When you say that you had asked,

```
 1    where -- where are you referring to?
 2                    MR. BURESH:  Your Honor, I'm referring
 3    specifically to page 15 of our brief, and it's the last
 4    paragraph in the convert one or more packets limitation, so
 5    it's right before subheading C.
 6                    THE COURT:  That is a reference to a term that
 7    was not identified as a disputed term?
 8                    MR. BURESH:  It was identified in the -- in
 9    the chart, Your Honor.
10                    THE COURT:  Are you saying it's in the 45D
11    chart?
12                    MR. BURESH:  Correct.
13                    THE COURT:  All right.
14                    MR. BURESH:  It's page 14 of the 45D chart,
15    Your Honor.
16                    THE COURT:  Mr. Hurt, do you have a response
17    to that?
18                    MR. HURT:  Yes, I do, if I may have the Elmo.
19                    So this term, Your Honor, was not really
20    briefed, and we had reached out to Defendants to meet and
21    confer on this prior to the hearing.  There really isn't, as
22    I can see, a claim scope issue.
23                    The issue is that in the Palo Alto Networks
24    case, Judge Gilstrap rejected the Plaintiff's construction
25    that removing a header could include advancing that reference
```

1    pointer, and he held so in the order, and we wanted exactly

2    what the Court held before, which was plain meaning.

3            And this is on page 28 of the Palo Alto

4    Networks order where the Court says, you know, the Court

5    rejects the Plaintiff's construction that this particular

6    term removing a header could encompass moving a reference or

7    a pointer and no further construction is necessary, and what

8    ultimately went into the order was plain meaning, was just

9    that the term had its plain meaning, and that's exactly what

10   we're proposing.

11           And so I don't believe there's a claim scope

12   fight here except the Defendants want this to be, I guess,

13   expressly in the construction, even though it's not going to

14   define what the word is.  It's going to define what it does

15   not cover, and that just seems not to be the purpose of

16   providing the jury with the constructions.

17           And I'm sure if there's an allegation that

18   Plaintiff has accused moving a reference pointer as removal,

19   we'll end up hearing about it before this case goes to trial,

20   so that -- that -- I don't believe there's really a dispute

21   about this.  I don't know why the Defendants want to put it

22   in the jury charge.  We offered this exact resolution last

23   week, and -- and they didn't agree with it.

24           THE COURT:  When you say you had offered this

25   resolution, you mean just a plain meaning construction?

```
 1                   MR. HURT:  Correct.

 2                   THE COURT:  All right.  Thank you, Mr. Hurt.

 3                   MR. BURESH:  Your Honor, may I clarify my

 4      position on that?

 5                   THE COURT:  Yes.

 6                   MR. BURESH:  I simply want to make sure that

 7      the prior instruction is reflected in the Court's claim

 8      construction order as well so that it applies to this case as

 9      opposed to not applying to this case only having been

10      resolved in the Palo Alto Networks case.

11                   So I'm not looking for something in the jury

12      charge.  Plain and ordinary is fine I would just like a note

13      from the Court that, as in Palo Alto Networks, moving a

14      reference or pointer doesn't satisfy this claim limitation.

15                   THE COURT:  Has there been any argument so far

16      in this case that you believe would indicate that the

17      Plaintiffs are taking that position in this case?

18                   MR. BURESH:  I have not seen anything, Your

19      Honor.

20                   THE COURT:  All right.  Well, I think that

21      Plaintiff is on the record acknowledging what was applied in

22      the previous case, so that -- in the event a dispute arises,

23      we have the resolution of it there.

24                   MR. BURESH:  Yes, Your Honor.

25                   MR. HURT:  I believe so.  Thank you.
```

1                    THE COURT:  Okay.  Thank you, and we are

2     adjourned.

3                    COURT SECURITY OFFICER:  All rise.

1                       CERTIFICATION

2          I HEREBY CERTIFY that the foregoing is a true and

3      correct transcript from the stenographic notes of the

4      proceedings in the above-entitled matter to the best of my

5      ability.

6

7      _____          Date 5/19/19
       Tammy L. Goolsby, CSR
8      Deputy Official Court Reporter
       State of Texas No.:  3101
9      Expiration Date:  7/31/21

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25