**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| IMPLICIT, LLC, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 2:18-cv-53-JRG |
| | § | LEAD CASE |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| NETSCOUT SYSTEMS, INC., | § | |
| | § | |
| *Defendant.* | § | |

| | | |
|---|---|---|
| IMPLICIT, LLC, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 2:18-cv-54-JRG |
| | § | MEMBER CASE |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| SANDVINE CORPORATION, | § | |
| | § | |
| *Defendant.* | § | |

**DEFENDANTS NETSCOUT SYSTEM, INC. AND SANDVINE CORPORATION'S
MOTION TO EXCLUDE DR. KEITH UGONE'S REASONABLE ROYALTY
CALCULATION AND OPINIONS REGARDING DAMAGES**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................... 1

II.     LAW APPLICABLE TO EXPERT TESTIMONY .......................................................... 1

III.    ARGUMENT .................................................................................................................. 3

    1.    THE ███████████ ███ ██████████ SETTLEMENT AGREEMENTS ARE NOT
COMPARABLE. ...................................................................................................................... 3

    2.    DR. UGONE'S "APPORTIONMENT FACTOR" IS UNRELIABLE BECAUSE IT RELIES
EXCLUSIVELY ON A TECHNICAL ASSESSMENT AND LACKS ANY INDEPENDENT ECONOMIC
ANALYSIS ............................................................................................................................ 10

    3.    DR. UGONE IMPROPERLY CONSTRUCTS TWO SEPARATE HYPOTHETICAL NEGOTIATIONS
PER DEFENDANT. ................................................................................................................. 12

    4.    DR. UGONE IMPROPERLY INCLUDES REVENUE FROM NON-ACCUSED PRODUCTS AND
SERVICES IN ROYALTY BASE ................................................................................................ 14

IV.     CONCLUSION ............................................................................................................. 15

■■■■■■■■■■■■■■■■■■■■■■■■■■■

## I.      INTRODUCTION

The Court should exclude the opinions of Implicit's damages expert, Dr. Keith Ugone, because his analysis lacks reliability in numerous respects that, both individually and taken together, should preclude presentation of his opinions to a jury. First, Dr. Ugone relies on multiple settlement agreements without apportioning any value attributable to an array of unasserted patents and concludes, based solely on the testimony of Implicit's owner, that none of the unasserted patents had any value in the settlement agreements. Second, Dr. Ugone provides no economic apportionment analysis to account for any value of the unpatented features in the Accused Products,  relying instead on a technical assessment by a technical expert. Third, Dr. Ugone forms a majority of his royalty base from revenue associated with unpatented products and subscription services, despite admitting that he performed no convoyed sales analysis. Finally, Dr. Ugone improperly conducts two hypothetical negotiations for each Defendant and conducts the negotiation with the wrong parties, which renders unreliable his entire hypothetical negotiation construct. Each of these errors alone renders Dr. Ugone's analysis unreliable.  Taken together, they represent a multi-faceted lack of reliability in his overall opinions and, therefore, Dr. Ugone's testimony should be excluded.

## II.     LAW APPLICABLE TO EXPERT TESTIMONY

Expert testimony is admissible under the Federal Rule of Evidence 702 only if "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." The offering party bears the burden of proving admissibility of expert testimony by a preponderance of the evidence. *Boujaily v. United States*, 483 U.S. 171 (1987); *Johnson v. Arkema, Inc.* 685 F.3d 452, 459 (5th Cir. 2012).  District courts are charged to act as "gatekeepers" in order

to ensure that all "evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993). Reliable testimony is that which is "grounded in the methods and procedures of science and . . . [is] more than unsupported speculation or subjective belief.'" *Johnson*, 685 F.3d at 459 (quoting *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668).

Settlement agreements, and expert opinions that rely on them, are subject to general and longstanding disapproval as a basis for determining a reasonable royalty. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) ("The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of *Georgia-Pacific*, the premise of which assumes a voluntary agreement will be reached between a willing licensor and a willing licensee …."); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1079 (Fed. Cir. 1983). Nevertheless, the Federal Circuit has recognized limited circumstances where settlement agreements might be probative if they are comparable. *See ResQNet, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870-72 (Fed. Cir. 2010) (noting that an agreement with a running royalty was the most reliable license in the record); *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369-70 (Fed. Cir. 2017) (noting that a settlement agreement entered into after trial can be probative but are unreliable when "they cover technology either not the same as or not comparable to the patented technology at issue in the later suit," or when they "cover the patented technology plus other technologies."); *ResQNet*, 594 F.3d at 872-73 (noting that "the trial court should not rely on unrelated licenses to increase the reasonable royalty rate above rates more clearly linked to the economic demand for the claimed technology."); *see also Eidos Display, LLC v. Chi Mei Innolux Corp.*, No. 6:11-CV-00201, 2017 WL 1322550 at *4 (E.D. Tex.  Apr. 6, 2017). Thus, where settlement agreements are not comparable, they should be excluded from a reasonable royalty analysis. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d

███████████████████████████████████████

1292, 1317 (Fed. Cir. 2011) (noting that "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue."). Opinion testimony based on non-comparable settlement agreements should be excluded as unreliable and unhelpful. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) (expert testimony can be "both powerful and quite misleading" and, thus, district courts are tasked with the duty to act as gatekeepers by admitting expert testimony only if it "both rests on a reliable foundation and is relevant to the task at hand."); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012); *DataQuill Ltd. v. High Tech Computer Corp.*, 887 F.Supp.2d 999, 1022 (S.D.Cal.2011); *Eidos Display*, 2017 WL 1322550 at *4-5 (granting *Daubert* motion and excluding opinions based on an unreliable settlement agreement).

In addition, absent an exception such as the entire market value rule or convoyed sales, the royalty base in a patent case should not include sales of non-accused products or services. *See*, *e.g.*, 35 U.S.C. § 284 (a reasonable royalty is "for the use made of the invention by the infringer…."); *see AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1343 (Fed. Cir. 2015) ("The royalty base for reasonable royalty damages cannot include activities that do not constitute infringement.").

## III.   ARGUMENT

    **1.   The ███████████████████████ Settlement Agreements Are Not Comparable.**

The ██████████████████████████████████ settlements (collectively, "Settlement Agreements") are not comparable to a hypothetical negotiation between the parties in these cases. *See generally,* Ex. 1-2, *Ugone NetScout Report*; Ex. 3-4, *Ugone Sandvine Report*; Ex. 5, ████ *Settlement Agreement*; Ex. 6, ██████ *Settlement Agreement*; Ex. 7, ██████ *Settlement Agreement*; Ex. 8, ███████ *Settlement Agreement*.  The fundamental reason that the Settlement Agreements are not comparable is that Dr. Ugone admittedly did not perform any attribution

███████████████████████████████████████

analysis to account for the value of non-asserted U.S. and foreign patents and patent applications that are included in those Settlement Agreements, but that would not be considered during the hypothetical negotiation.  Dr. Ugone attributed no value to these non-asserted patents and patent applications based solely on statements of Mr. Balassanian, Impicit's sole owner and manager, that all non-asserted patents and patent applications held no value.  This unreliable methodology shirks the requirement for economic adjustments to otherwise non-comparable agreements before using them as a basis for determining a reasonable royalty.

      a.  *Dr. Ugone did not Perform any Attribution Analysis for Non-Asserted Foreign and U.S. Patents*

Dr. Ugone admittedly did not conduct any analysis to determine the value of the non-asserted foreign and U.S. Patents and applications not asserted in this case but included in the Settlement Agreements.[1] Instead, he relied solely on Mr. Balassanian's unilateral, self-serving, and uncorroborated belief that the non-asserted patents had no value in the Settlement Agreements. Reliance on these uncorroborated statements alone renders Dr. Ugone's opinions unreliable.

The Federal Circuit noted in *Prism* that where a settlement agreement includes more patents than the lawsuit, "***evidence was needed*** that reasonably addresses what bearing the amounts in that Agreement had on the value of the particular patent at issue." *Prism*, 849 F.3d at 1371.  In that case, it was appropriate to consider the settlement agreement because the patentee "supplied such evidence, including what the [] Settlement Agreement itself says about attributing amounts

---

[1] The Settlement Agreements are all structured very similarly. The ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████████████████████████

to particular patents and, more reliably, creditable expert evidence about how the other Agreement-covered patents relate to [settling party's] business operations." *See id.*; *see also, e.g., LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 2:06-CV-348-TJW-CE, 2011 WL 7563818, at *3 (E.D. Tex. Jan. 7, 2011) ("where a license covers a portfolio of patents or includes other intellectual property or services, Plaintiff must present evidence sufficient to allow the jury to weigh the economic value of the patented feature against the economic value of the features and services covered by the license agreement."); *DataQuill*, 887 F. Supp. 2d at 1023 (noting that an agreement that covers "hundreds of patents covering a broad range of inventions" was "'radically different from the hypothetical agreement under consideration'" for two patents).

Here, there is no evidence that reasonably addresses what value the Settlement Agreements place on the three asserted patents in this case out of the over 80 patents and applications included in many of the Settlement Agreements.  Dr. Ugone does no analysis to determine the value of these non-asserted patents. By way of example[2], Dr. Ugone acknowledges that ██████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████.[3]  Dr. Ugone admittedly performed no analysis whatsoever that would attribute value to the 82 non-asserted patents and applications:

████████████████████████████████████████████████████ ██████████ ██████████████████████████████████████████

---

[2] Dr. Ugone's analysis of each of the Settlement Agreements does not vary widely, thus the █████ is used as an example.  Defendants refer the Court to the footnotes for corresponding citations for support relating to the ████████████████████ Settlement Agreements.  In addition, Dr. Ugone confirmed that his answers to questions relating to the Settlement Agreements would be the same for purposes of Sandvine and NetScout. Ex. 9, *Ugone Sandvine Dep. Tr.* at 8:5-9, 9:13-17, 10:5-9, 59:12-61:12.
[3] Ex. 10, *Ugone NetScout Dep. Tr.* at 146:1-7 (████████ 194:4-13, 194:4-195:4 (████████ 221:6-222:1 (█████



Ex. 10, *Ugone NetScout Dep. Tr*. at 105:24-106:10; 107:18-23.[4]



*Id.* at 101:6-15.

Put another way, Dr. Ugone attributed 100% of the value of the ▮▮▮ agreement to the three patents asserted in this case. *Id.* at 84:4-8 (recognizing that he attributed "essentially all" of the $100,000 amount to the three patents asserted against NetScout).  Even patent families that were actually asserted against ▮▮▮ (but not asserted against NetScout or Sandvine) did not add any value to the ▮▮▮ settlement agreement according to Dr. Ugone.[5] Ex. 1, *Ugone NetScout Report*, Table 6 (p. 52); Ex. 10, *Ugone NetScout Dep. Tr*. at 86:12-88:10, 92:21-94:5; 95:11-16.[6] Apparently, Implicit was asserting valueless patents in the ▮▮▮ litigation. Nor did Dr. Ugone perform any analysis as to the value of ▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮▮▮

---

[4] The same is true of the other Settlement Agreements.  Ex. 10, *Ugone NetScout Dep. Tr*. at 148:3-12 (▮▮▮▮ 198:14-200:14; (▮▮▮ 224:1-8 (▮

[5] *See also* Ex. 10, *Ugone NetScout Dep. Tr*. at 146:13-147:25, 148:16-149:7, 163:8-24 (▮▮▮▮▮ 223:24-224:6, 226:1-228:5 (▮▮▮ *see also, e.g.*, *Ugone NetScout Report*, Table 6, p. 52 (▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

[6] Ex. 10, *Ugone NetScout Dep. Tr*. at 147:9-148:2 (▮▮▮▮ 221:7-21 (▮

[7] Dr. Ugone acknowledges that the hypothetical negotiation in this case would not include any additional foreign and U.S. patents and applications included in the Settlement Agreements other than those asserted in this case.  Ex. 10, *Ugone NetScout Dep. Tr*. at 32:20-33:7.



Ex. 10, *Ugone NetScout Dep. Tr.* at 101:6-23.[8] Even further, Dr. Ugone did not account for the possibility that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 92:1-4.[9]

Put simply, it is Dr. Ugone's opinion that the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the only value came from the asserted patents. *Id.* at 105:2-9; 106:7-14, 115:3-10. This conclusion was not the result of any economic analysis. *Id.* at 107:24-108:4. Indeed, Dr. Ugone acknowledged that he did not independently determine the value of non-asserted patents in the ▮▮▮▮ Settlement Agreement. *Id.* at 109:5-9.[10]

Instead, Dr. Ugone dismisses the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as having no value because it is his understanding that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1 (*NetScout Report*), ¶77; pp. 62 (▮▮▮▮ 64 (▮▮▮▮ 65 (▮▮▮▮ 66 (▮▮▮▮ Ex. 2 (*Sandvine Report*), ¶83, pp. 64 (▮▮▮▮ 66 (▮▮▮▮ 67 (▮▮▮▮ *see also* Ex. 10, *Ugone NetScout Dep. Tr.* at 93:10-14.  The entire basis for this understanding Edward Balassanian, Implicit's owner and manager.[11]

[8] *Id.* at 154:3-7, 156:19-23 (▮▮▮▮ 199:10-19 (▮▮▮▮ 224:1-8, 225:11-25 (▮▮▮▮
[9] *Id.* at 152:11-23 (▮▮▮▮ 201:15-18 (▮▮▮▮ 224:20-225:7 (▮▮▮▮
[10] *Id.* at 159:12-160:9 (▮▮▮▮ 199:10-200:13 (▮▮▮▮ 224:1-8 (▮▮▮▮
[11] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 10, *Ugone NetScout Dep. Tr.* at 214:10-21, 203:20-206:8.

7



Ex. 10, *Ugone NetScout Dep. Tr.* at 105:2-9.[12] ███████████████████

███████████████████████████████████████████████████████

███████████ *Id.* at 115:22-25.

Dr. Ugone did not perform any independent or economic analysis of the value the non-asserted patents:

*Id.* at 109:5-9; *see also id.* at 116:24-117:3 ██████████████████████

███████████████████████████████████████████████████████

██████████████).[13] Thus, with no factual underpinnings or analysis, Dr. Ugone concludes

that ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████s.  Self-serving statements from the Plaintiff's sole owner cannot serve as a reliable basis to

conclude that the parties to these settlement agreements attributed *no value* to any non-asserted

patents.[14]   *See* Ex. 11, *Packet Intelligence v. Sandvine Corp.*, Case No. 2:16-cv-230-JRG, Dkt.

---

[12] *Id.* at 157:2-14, 160:10-13 (███████ 197:9-18 (██████ 222:13-19 (███████
[13] *Id.* at 155:14-156:18 (███████ 201:24-202:12 (██████ 224:1-8 (█████
[14] Assuming non-asserted IP has no value is not the only assumption Dr. Ugone is making at Mr. Balassanian's urging. For example, ████████████████████████████████████
████████████████ Ex. 1, *Ugone NetScout Report*, p. 59. ███████████████████
███████████████████████████████████. Ex. 10, *Ugone NetScout Dep. Tr.* at 235:2-4, 235:20-23. Dr. Ugone does not appear to have even questioned Mr. Balassanian regarding the discrepancy. *Id.* at 241:8-15.

████████████████████████████████████████████

301 (Aug. 19, 2017 Pre-Trial Hearing Tr.) at 49:1-9 (striking damages expert's opinion that the value of non-asserted patents were subsumed by the patents-in-suit "based on discussions with [Plaintiff's] general counsel, [because] that methodology is not acceptably credible … [and] not sufficient to pass the Court's gatekeeping role.").  Dr. Ugone's above failures render his opinions unreliable and unhelpful to a jury.[15]

> b.   *Dr. Ugone did not Perform any Analysis of the Settlement Agreements Relating to the Context of the Litigation*

The Settlement Agreements are also not comparable because Dr. Ugone failed to account for the litigation circumstances that are very different from the hypothetical negotiation—namely, how the litigation context would have affected the value of the Settlement Agreements.  The Federal Circuit has explained that the litigation context of a settlement agreement is important in determining its probative value. *See Prism*, 849 F.3d at 1369. For instance, where the value of patented technology was at issue in an earlier case, a settlement agreement can be "especially probative if reached after the litigation was far enough along that the issue was already well explored and well tested." *See id.* Thus, a settlement agreement was useful where it "was entered into, not just after all discovery was complete, but after the entire trial was finished, except for closing arguments and jury deliberations." *See id.* at 1371. Because of the timing of settlement there, the assessment of the likely outcome was reliable, and most of the litigation costs were sunk, and the risk of enhanced damages was clarified. *See id.*

In fact, Dr. Ugone readily acknowledges that he did not take into account in his analysis

---

[15] Dr. Ugone should also be precluded from testifying about agreements that even he agrees are not comparable. For NetScout, Dr. Ugone claims that the ██████████████████████████ agreements are comparable. For Sandvine, Dr. Ugone claims that ████████████████████████ are comparable. Dr. Ugone should not be allowed to testify about ███████████████ ████████████ Defendants will separately move *in limine* to prevent non-comparable licenses from coming into evidence.

███████████████████████████████████████████████

the litigation context of any of the Settlement Agreements, such as the stage of litigation, "the cost

of the predicted judgment, 'its probability,' and 'costs of further litigation'," or whether enhanced

damages were at issue. *See, e.g.,* Ex. 10, *Ugone NetScout Dep. Tr.* at 117:4-25; 118:24-119:5 ("█

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████.").[16]  In all, Dr. Ugone did not consider the

circumstances mandated by *Prism. See Prism*, 849 F.3d at 1369-71. He did not conduct any

analysis as to how the stage of litigation may have affected the value of the Settlement Agreements.

*Id.*  For this additional reason, Dr. Ugone's reliance on the Settlement Agreements is unreliable.

### 2. Dr. Ugone's "Apportionment Factor" Is Unreliable Because It Relies Exclusively On A Technical Assessment And Lacks Any Independent Economic Analysis

Dr. Ugone applied a "apportionment factor" of 50% to NetScout's nGeniusONE and

GeoProbe product line revenue, 67% to NetScout's Arbor product line revenue and Sandvine's

PTS and PacketLogic product line revenue, and 75% to Sandvine's NAVL product line revenue.

Ex. 1, *Ugone Netscout Report*, ¶ 127; Ex. 3, *Ugone Sandvine Report*, ¶ 138.  Dr. Ugone adopted

these percentages directly from Implicit's technical expert, Dr. Almeroth, who purports to have

analyzed the "technical importance, expressed as a percentage, of [Defendants'] alleged

infringement to its Accused Products as a whole." Ex. 1, *Ugone Netscout Report*, at ¶ 126; Ex. 3,

*Ugone Sandvine Report*, at ¶ 137. Dr. Ugone testified that he relied exclusively on Dr. Almeroth

for his "apportionment analysis." Ex. 10, *Ugone NetScout Dep. Tr.*, 237:16-239:11; Ex. 9, *Ugone*

*Sandvine Dep. Tr.* at 12:16-18. Dr. Almeroth testified that he was not an economist, and while he

was offering a "technical importance" analysis that could be translated into an economic valuation,

---

[16] Ex. 10, *Ugone NetScout Dep. Tr.* at 164:3-165:21 (Ericsson); 210:16-19 (Cisco); 229:12-230:6 (PAN).

he was not doing that translation himself. Ex. 12, *Almeroth Rough Dep. Tr.*, 130:19-131:9. Thus, Dr. Ugone's "apportionment factor" does not reflect any economic consideration whatsoever.

In a reasonable royalty analysis, damages must be tied "to the claimed invention's footprint in the marketplace." *ResQNet.com,* 594 F.3d at 869. Thus, "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)). When the accused products have both patented and non-patented features, unless an expert is invoking the entire market value rule, the expert must perform an apportionment analysis in order to determine the value added by such features. *Id*.

An apportionment analysis is performed as part of a damages calculation. *Ericsson*, 773 F.3d at 1226. As such, "there is an inherently economic quality to an apportionment analysis: parties are attempting to 'apportion the defendant's profits and the patentee's damages between the patented features and the unpatented features.'" Ex. 13, *Realtime Data LLC v. Actian Corp.*, No. 6:15-cv-00463-RWS-JDL, Doc. No. 481, slip op. at 10 (E.D. Tex. Mar. 24, 2017) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)).  Applicable to this context, this Court explained:

> Typically, certain technical inputs are relevant to the apportionment analysis. In order to ultimately determine the economic value attributable to the infringing features, it is helpful to understand the technical aspects of an accused product and how they interact with one another. Dr. Keller, with his Ph.D. in computer science and academic and industry experience in hardware and software design and development, is qualified to review the technical information in this case and opine regarding the importance of the various features of the accused products from a technical perspective. However, due to Dr. Keller's limited experience with economic apportionment, he is not qualified to provide an ultimate opinion with respect to a damages value attributable to the infringing features of the accused products. In other words, Dr. Keller's opinions about the technical value of the infringing features may be an input into the damages expert's opinion about the proper apportionment value attributable to the infringing features, but may not be the final apportionment value itself. In turn, this means Mr. Mills cannot simply

rely on the technical value Dr. Keller ascribes to the infringing features of the accused products in determining a proper apportionment value.

*Id.* at 10-11.  Similarly, Dr. Ugone cannot simply rely on the technical value Dr. Almeroth ascribes to the infringing features of the accused products in determining a proper apportionment value. Because that is precisely what Dr. Ugone did, his "apportionment factor" is unreliable, his revenue base is unreliable, and the Court should exclude his opinions.

### 3. Dr. Ugone Improperly Constructs Two Separate Hypothetical Negotiations Per Defendant.

Dr. Ugone's hypothetical negotiation framework is contrary to law and thus unreliable. With respect to Sandvine, Dr. Ugone contends that a first hypothetical negotiation would have occurred in April 2014 (the date of first issuance of the Asserted Patents) between Implicit and Legacy Sandvine[17] covering the accused PTS products only.  Ex. 3, *Ugone Sandvine Report*, at ¶¶ 4-9.  *See also* ¶ 13 (reflecting two hypothetical negotiation outcomes). Dr. Ugone further contends that a second hypothetical negotiation would have occurred in July 2017[18] between Implicit and Sandvine covering the accused PacketLogic and NAVL product lines.  *Id.* The PacketLogic and NAVL products were on the market and sold continuously by Procera Networks, Inc. before the April 2014 issuance date of the Asserted Patents, and Implicit seeks damages on sales starting in April 2014 from Sandvine.[19]

With respect to NetScout, Dr. Ugone contends that a first hypothetical negotiation would

---

[17] Sandvine Corporation was purchased by Francisco Partners in or around July 2017, and Dr. Ugone refers to the pre-acquisition Sandvine Corporation as Legacy Sandvine. Ex. 3, *Ugone Sandvine Report*, ¶5, fn. 9.

[18] The date Francisco Partners acquired Sandvine Corporation, and approximate timeframe when Procera Networks began selling the PacketLogic and NAVL products under the Sandvine brand name.  Ex. 3, *Ugone Sandvine Report*, ¶¶ 5 (fn. 9), 25.

[19] Sandvine incorporates by reference its concurrently filed Motion for Partial Summary Judgment relating to sales of PacketLogic and NAVL prior to September 2017.

have occurred in April 2014 (date of first asserted patent issuance) between Implicit and NetScout covering only the nGeniusONE product line. Ex. 1, *Ugone NetScout Report*, at ¶¶ 4-9*; see also* ¶ 13 (reflecting two hypothetical negotiation outcomes). Dr. Ugone further contends that a second hypothetical negotiation would have occurred in July 2015 between Implicit and NetScout covering the GeoProbe and Arbor product lines that NetScout acquired from Danaher Corporation through an acquisition of Danaher's Communications Business unit. *Id.* The GeoProbe and Arbor products were on the market and sold by Danaher Corporation before the April 2014 issuance date of the Asserted Patents, and Implicit seeks damages on sales starting in April 2014 from NetScout.

The first problem with Dr. Ugone's two-hypothetical negotiations approach, applicable to both Defendants, is that there can only be one hypothetical negotiation just before the date of first infringement. *Applied Med. Res. Corp. v. United States Surgical Corp*., 435 F.3d 1356, 1361 (Fed. Cir. 2006) (emphasizing the "rule that the hypothetical negotiation relates to the date of first infringement.") (citing *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993)); *Minks v. Polaris Indus., Inc*., 546 F.3d 1364, 1372 (Fed. Cir. 2008) (confirming the date of the hypothetical negotiation occurs "at the time infringement began."). The Federal Circuit has specifically explained "that in each case there should be only a single hypothetical negotiation date, not separate dates for separate acts of infringement." *LaserDynamics, Inc.,* 694 F.3d at 76. There is no dispute that, in both the NetScout and Sandvine cases, the date of first infringement is April 2014 as to all Accused Products. Each Accused Product was on the market at this time. Because Dr. Ugone has constructed two distinct hypothetical negotiations, directly contrary to law, his opinion is unreliable and the Court should exclude it.

The second problem, in the context of the Sandvine case, is that Dr. Ugone does not have the correct parties to the hypothetical negotiation with respect to Procera's PacketLogic and NAVL

13

product lines. The hypothetical negotiation is "between the patentee and infringer (both hypothetically willing) at the time infringement began." *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed. Cir. 1996). When the wrong parties are placed in the hypothetical bargaining room, unreliable assumptions result. *See e.g., Oracle Am., Inc. v. Google Inc.*, 798 F. Supp. 2d 111, 1117 (N.D. Cal. 2011) (negotiation between Plaintiff and Defendant was misleading where Plaintiff was not the patent owner at the time of the hypothetical negotiation). The alleged infringer, with respect to the PacketLogic and NAVL products, at the time infringement began in April 2014 was Procera Networks, Inc., not Sandvine. Ex. 3, *Ugone Sandvine Report*, ¶5. Sandvine was acquired by the now common parent of these two entities; it was not Sandvine that was the acquiror. There is no basis in fact, law, or logic as to why Sandvine would have properly been in the hypothetical bargaining room in April 2014 to negotiate a license for Procera's PacketLogic and NAVL products. Sandvine had no stake in those products in April 2014, and there is zero basis for Sandvine liability as to sales of those from April 2014 to July 2017.[20] Thus, Dr. Ugone has utilized the wrong hypothetical negotiator with respect to the accused PacketLogic and NAVL products.

### 4. Dr. Ugone Improperly Includes Revenue From Non-Accused Products and Services In Royalty Base

The Court should exclude any testimony from Dr. Ugone that includes within the royalty base products that are not accused of infringement. Plaintiff's technical expert, Dr. Almeroth, has set out the universe of accused products that practice the patented invention—for NetScout, that is: (1) "GeoProbe device"; (2) InfiniStream "full product"; and (3) "Arbor [TMS, AED, and APS] product"; and, for Sandvine, that is: (1) "PTS device"; (2) "PacketLogic device"; and (3) "NAVL product." *See* Ex. 14, *Almeroth Report* at 603-638; *see also* ¶¶ 121, 123, 159, 192, 233-35, 295-

---

[20] Sandvine refers to its concurrently filed Motion for Partial Summary Judgment relating to sales of PacketLogic and NAVL prior to September 2017.

96, 344; *see also Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.,* 809 F.3d 1295, 1302 (Fed. Cir. 2015) (citing *LaserDynamics, Inc. v. Quanta Computer, Inc.,* 694 F.3d 51, 67 (Fed. Cir. 2012)). Because Dr. Ugone has not provided any analysis based on the entire market value rule or convoyed sales, there is no basis to include revenue from non-accused products and services into the royalty base here. *See* Ex. 10, *Ugone NetScout Tr.* at 56:23-57:9; Ex. 9, *Ugone Sandvine Tr.* at 7:9-19; *see also*, *e.g.*, *AstraZeneca* 782 F.3d at 1343 (Fed. Cir. 2015) (noting that "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute infringement."); *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014); *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed. Cir. 2014).  Absent a convoyed sales analysis, Dr. Ugone has no basis to include non-infringing products and services in the royalty base.

Nonetheless, Dr. Ugone includes an expansive universe of non-infringing products and services in his revenue base, including revenue relating to application software, services, support, and maintenance that are not accused of infringement.  *See* Ex. 2, *Ugone NetScout Report* at Ex. 5; Ex. 4, *Ugone Sandvine Report* at Ex. 6.  Because Dr. Ugone has not provided any analysis based on the entire market value rule or convoyed sales for Sandvine, there is no basis to include revenue from non-accused services into the royalty base here and his opinions should be excluded.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court exclude opinion testimony from Dr. Ugone that relies upon (1) the Settlement Agreements, (2) two hypothetical negotiations, (3) a royalty base that includes non-accused products, or (4) an improper apportionment analysis.  Furthermore, due to the impact of each of these points of unreliability individually and as a whole, Defendants request that this Court exclude the opinions of Dr. Ugone regarding damages in their entirety.

████████████████████████████████████████████

Dated:  September 30, 2019    Respectfully submitted,

/s/ *Eric A. Buresh*
Eric A. Buresh (KS Bar 19895)
Mark C. Lang (KS Bar 26185)
**ERISE IP, P.A.**
7015 College Blvd., Suite 700
Overland Park, Kansas 66211
Telephone: (913) 777-5600
Facsimile: (913) 777-5601
eric.buresh@eriseip.com
mark.lang@eriseip.com

Abran J. Kean (CO Bar 44660)
**ERISE IP, P.A.**
5600 Greenwood Plaza Blvd., Suite 200
Greenwood Village, CO 80111
Telephone: (913) 777-5600
abran.kean@eriseip.com

Melissa Smith
Texas State Bar No. 24001351
melissa@gillamsmithlaw.com
**GILLAM & SMITH, L.L.P.**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: 903-934-8450
Facsimile: 903-934-9257

*Counsel for Defendants*
*NetScout Systems, Inc. and*
*Sandvine Corporation*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  Plaintiff's counsel of record were served with a true and correct copy of the foregoing document by electronic mail on September 30, 2019.

*/s/ Melissa R. Smith*
Melissa R. Smith

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for Defendants has complied with the meet and confer requirement in Local Rule CV-7(h) and that the accompanying motion is opposed.  I further certify that counsel for Defendants met and conferred with counsel for Plaintiff on September 30, 2019.

*/s/ Melissa R. Smith*
Melissa R. Smith