# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| IMPLICIT, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **Civil Action No. 2:18-cv-53-JRG** |
| v. | § | **LEAD CASE** |
| | § | |
| NETSCOUT SYTEMS, INC., | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF IMPLICIT, LLC'S
RESPSONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT 142)**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................................. ii

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................ 1

        A.      Computer Networking Background ........................................................... 1

        B.      The Implicit Patents ................................................................................. 4

        C.      Accused Products ..................................................................................... 8

III.    RESPONSE TO STATEMENT OF ISSUES ...................................................... 11

IV.     RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS .................... 11

V.      APPLICABLE LAW .......................................................................................... 12

VI.     ARGUMENT ...................................................................................................... 12

        A.      The Court's Claim Construction Opinion Does Not Preclude Implicit's
                Infringement Theory ............................................................................... 13

        B.      Genuine Issues of Material Fact Preclude Summary Judgment ............... 16

VII.    CONCLUSION ................................................................................................... 23

**FILED UNDER SEAL - PURSUANT TO THE PROTECTIVE ORDER
RESTRICTED CONFIDENTIAL SOURCE CODE**

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Apple Inc. v. Samsung Elecs. Co.,*
      839 F.3d 1034, 1040 (Fed. Cir. 2016) ............................................................................. 12

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*
      521 F.3d 1351 (Fed. Cir. 2008) ...................................................................................... 16

*Realtime Data, LLC v. Actian Corp.*
      No. 6:15-CV-463 RWS-JDL, 2017 U.S. Dist. LEXIS 114457
      (E.D. Tex. May 15, 2017)........................................................................................... 12, 16

*Uniloc USA, Inc. v. Microsoft Corp.*
      632 F.3d 129 (Fed. Cir. 2011) ...................................................................................... 12

I.      **INTRODUCTION**

There are genuine issues of material fact for trial.  The parties dispute the characterization of how Defendants' Accused Products operate and whether those products infringe the asserted claims.  The parties present conflicting evidence, including expert testimony, on those issues.  That conflict in the factual record requires a trial to answer the infringement questions.

In an attempt to circumvent that trial, Defendants base their Motion on the premise that the Court's Claim Construction Opinion somehow rejects Implicit's *infringement* theory.  The Court did not reject Implicit's infringement theory, which was not before the Court during the claim construction proceedings.   Furthermore, Defendants misrepresent both Implicit's infringement theory and the function and operation of their own products in their bid to shoehorn this dispute into a legal question for summary judgment.  It is undisputed that Implicit's technical expert (Dr. Almeroth) stated in his Report that he applied the Court's claim constructions.  It is likewise undisputed that Dr. Almeroth's Report explains how the Accused Products operate and how those products infringe the claims—as construed by the Court.  Defendants ignore that testimony and ask the Court to do the same.  Defendants cannot simply ignore Dr. Almeroth's application of the Court's constructions to the Accused Products and his ultimate infringement opinions.  Whether Dr. Almeroth's opinions and the evidence supporting them are more credible than Defendants' experts and evidence are factual disputes for a jury.  For these reasons, Implicit respectfully requests that the Court deny Defendants' Motion for Summary Judgment.

II.     **FACTUAL BACKGROUND**

A.      **Computer Networking Background**

Computers communicating over networks like the Internet utilize protocols to communicate the message, such as a video, email, webpage, or other data.  Almeroth Report, at ¶¶

49–53.[1]  A protocol, in general, is a set of rules that defines how a set of functions will be performed on the data.  *Id.* at ¶ 54.  Examples of well known application-level protocols are the HyperText Transfer Protocol ("HTTP"), which is a protocol for webpages, and the Simple Mail Transport Protocol ("SMTP"), which is a protocol for email.  *Id.* at ¶¶ 50, 54.

Computers utilize multiple protocols to communicate data, and each protocol is conceptually referred to as operating on a certain "layer" of the data.  Almeroth Report, at ¶¶ 55–56.  Because multiple protocols operate on the data, each at different layers, the various protocols and their respective layers conceptually form a "stack," often referred to as a "protocol stack."  *Id.*  One such stack is the "TCP/IP"[2] stack that is used in Internet communications.  *Id.* at ¶ 57.

The conceptual framework typically contains seven layers.  The lowest layer ("layer 1") is the physical structure itself, such as coaxial cable, fiberoptic cable, or a wireless communication.  The second layer ("layer 2") is the Data Link Layer, which is typically Ethernet for Internet communications (and it Ethernet for each of the Accused Products).  Almeroth Report, at ¶¶ 68–69.  The third layer ("layer 3") is the network layer, which is Internet Protocol ("IP") for each of the Accused Products.  *Id.* at ¶ 67.  The fourth layer ("layer 4") is the transport layer, which typically is the Transport Control Protocol ("TCP") for Internet communications (and TCP is the protocol that Defendants' Motion addresses).  *Id.* at ¶¶ 63–65.  The fifth through seventh layers (layer 5 to layer 7) are the application layers that include the application-layer protocols such as HTTP for website traffic or SMTP for email.  *Id.* at ¶¶ 50, 54,58–62.  There are many application protocols, *id.* at ¶ 58;

---

[1] Citations to the "Almeroth Report" are to the Infringement Report, submitted at Dkt. 142-1.
[2] "TCP" stands for "Transmission Control Protocol."  Almeroth Report, at ¶ 64 .  "IP" stands for "Internet Protocol."  *Id.* at ¶ 66.

2

██████████████

████ , *e.g.* , *id.* at ¶¶ 174, 188, 249, 311.  Processing "up" the stack yields is the actual data itself, such as the email or the text and images from a website or application.  *Id.* at ¶ 56.

Data originating on the sending side is typically referred to by processing "down" the stack, starting with the application protocols (*e.g.*, HTTP), then TCP, then IP, and then Ethernet. Almeroth Report, at ¶ 56.  This is reflected in the computer on the left side in the example below, with the arrows pointing down from the "Application," to "TCP," to "IP," to "Ethernet" to the "Wire."



The data then goes out onto the network to be received by the receiving computer, here the computer on the right side.  The receiving computer processes the data "up" the stack, starting at Ethernet, then IP, then TCP, and then the application protocols.  Almeroth Report, at ¶ 56

Each of the Accused Products sit in networks between the sending computer and the receiving computer.  To accurately determine what traffic is flowing through the network, they act like the receiving computer and process data "up" the stack, starting at the Ethernet layer, then the

██████████████████████

IP layer, then the TCP layer, and then the application layers, ultimately classifying the application protocols, application protocol attributes, and the application that generated the data (*e.g.*, Social Media, Gaming, Skype, Facebook, or Google).

The data transmitted over the network is broken into smaller units when processed "down" the stack, usually referred to as packets.  During the transmission of the packets from the sending computer to the receiving computer, the packets travel through a number of intermediary networks and devices and may arrive out of order.  Almeroth Report, at ¶¶ 64–65.  TCP is a protocol that tracks the order of the packets and allows them to be reordered such that the data stream that the receiving computer operates on matches the data stream that the sending computer sent.  *Id.*  The order of the TCP packet is reflected in the TCP header, which contains a sequence number that identifies where the packet fits within a given TCP transmission.  *See, e.g., id.* at ¶¶ 144, 145, 148.

The receiving computer can then utilize that sequence number to reassemble the packets into the correct order to obtain the application-level data.  Almeroth Report, at ¶¶ 64–65.  The ability to reassemble the packets in the correct order ensures that ███████████████ ████████████████████████████████████████████ ████████████████.  *See, e.g., id.* at ¶¶ 323, 358.  This processing occurs "up" the stack at the TCP layer, after the receiving computer has already performed the Ethernet and IP layer processing based on the Ethernet and IP headers.  *See, e.g., id.* at ¶¶ 56–70.

### B.    The Implicit Patents

Implicit alleges infringement of 13 claims from three related patents ("the Implicit Patents").[3]  The three patents share a common disclosure and are directed to methods and systems for flexible and efficient data demultiplexing in networking.  Demultiplexing is the process by

---

[3] The Patents are U.S. Patent Nos. 8,694,683; 9,270,790; and 9,591,104.

which multiple inputs that have been combined into the same transmission medium are separated

into distinct outputs.  It is the reverse of multiplexing, in which multiple inputs are combined into

a single entity for transmission.  To demultiplex the packets of a message, a system must receive,

identify, evaluate, classify and process data traffic on a network.

Figure 4 of the Implicit Patents shows part of the demultiplexing process described in the

Patents, showing the paths for received packets from bottom to top in the figure (color added).



*Fig. 4*

Following the blue line starting at the entry, the system first receives a packet and places it

in a queue (472).  The queue then passes the packet to an Ethernet session (labeled 410) at the

entry labeled 414.  That routine processes the packet at the Ethernet level, converts the packet to

an IP packet, and passes the packet to the IP session (labeled 420) at the path entry labeled 424.

The IP session processes the packet at the IP level, converts the packet to a TCP packet, and then

passes the packet to a particular TCP session (labeled 440) at path entry 443.

The TCP session converts the packet to another format and the packet continues along the

path.  The Implicit Patents provide for the dynamic processing that is typically required above the

TCP level to process various application level protocols and applications.  The Patents achieve this

by providing a path-based architecture that can select at runtime the routines needed to further

process the packet, including conversions above TCP to determine the application protocol.  *See*

*generally*, '683 Patent, Fig. 1 (showing selecting a fourth and fifth processing routine to include

the path and adding those routines to the path).

Defendants' motion focuses on the "execute a Transmission Control Protocol (TCP) to

convert one or more packets having a TCP format into a different format" limitation that is

exemplified in claim 1 of the '683 Patent (emphasis added):

> A first apparatus for receiving data from a second apparatus, the first
> apparatus comprising:
>
> > a processing unit; and
> >
> > a memory storing instructions executable by the processing
> > unit to:
> >
> > > create, based on an identification of information in a
> > > received packet of a message, a path that includes
> > > one or more data structures that indicate a sequence
> > > of routines for processing packets in the message;
> > >
> > > store the created path; and
> > >
> > > process subsequent packets in the message using the
> > > sequence of routines indicated in the stored path,

wherein the sequence includes a routine that is used
to *execute a Transmission Control Protocol (TCP)
to convert one or more packets having a TCP
format into a different format*.

The Court construed the term as two separate phrases in the Claim Construction Opinion
and Order.[4]  The Court construed the term "execute a Transmission Control Protocol (TCP)" as
"operate on one or more packets whose outermost header is a TCP header." Dkt. 111, at 35–36.
For the "convert one or more packets having a TCP format into a different format," the Court
construed the term as "convert the outermost header structure of the packet(s) from TCP to another
type of header structure." *Id.* at 29.

During the proceedings, Implicit asserted that the construction of the "convert" term should
encompass the disclosure in the Patent specification at column 14, which discloses "a reference to
a single copy of the message can be passed to each conversion routine or demuxkey routine. These
routines can advance the reference past the header information for the protocol so that the reference
is positioned at the next header." Dkt. 111, at 25–26 (reproducing '683 Patent, at 14:4–16).  The
Court disagreed and stated that "[t]o whatever extent Plaintiff contends that the terms 'convert one
or more packets having a TCP format into a different format,' 'convert one or more packets in a
transport layer format into a different format,' and 'convert packets of the different format
into another format' encompass merely moving a reference, the Court hereby expressly rejects any
such interpretation as lacking support in the record." *Id.*  Implicit objected to the Claim
Construction Opinion, which the Court overruled.  Dkt. 120.

---

[4] The Court referred the claim-construction proceedings to Magistrate Judge Payne.  Dkt. 91.

██████████████████████████████████████████████

C.   **The Accused Products**

The Accused Products are intermediary devices that are typically deployed in system operator networks ████████████████ to identify, classify, and analyze the traffic traveling through a network.  Almeroth Report, at ¶¶ 120–121.[5]  The Products ████████████ ███████████████████████████████████████████████ ███████████████████████████.  For example, as reflected in the InfiniStream product documentation, the Accused Products ██████████████████ █████████████████████████



Almeroth Report, at ¶ 175[6]

---

[5] There are six accused product families: the Policy Traffic Switch ("PTS"); PacketLogic,; Network Application Visibility Library ("NAVL"); GeoProbe; InfiniStream; and Arbor.
[6] reproducing NETSCOUT048962, at 48967.



Defendants' Motion focuses on processing at the TCP level and above.  The processing at these levels is more complicated than at layers 2 and 3.  That is because TCP processing depends on the "state" of the protocol, such as where the packet fits in the TCP transmission, *e.g.*, setting up the connection, transferring the data, or closing the connection, as well as the ordering of the packets.  *See, e.g.*, Almeroth Report, at ¶¶ 64–65.  TCP processing in the Accused Products thus ███████████████████████████████████████.  The Accused Products perform ██████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

The parties dispute the characterization of how this functionality operates and whether it meets the "execute a Transmission Control Protocol (TCP) to convert one or more packets having a TCP format into a different format" limitation of the asserted claims, as construed.  A few items, however, are undisputed in Defendants' Motion.  Defendants do not dispute that Dr. Almeroth recited the Court's claim construction for these terms and opined that he rendered his infringement opinion applying those constructions.  Almeroth Report, at ¶¶ 375–378.  Dr. Almeroth also did not opine in his Report that the Accused Products "merely mov[e] a reference" in order to meet

████████████████████████████████████████████

the "convert" limitations of the claims, *see* Almeroth Rebuttal Report, at ¶¶ 761–762, attached as

Exhibit 1, and Defendants' Motion does not contend otherwise.

Dr. Almeroth's Report provides a detailed description of how the Accused Products operate

at the TCP and application levels and how they infringe. ████████████████████████

████████████ nowhere does Dr. Almeroth opine that "merely moving a reference" satisfies the

TCP conversion elements of the claims.  In the PTS product, for example, Dr. Almeroth explains

that, ██████████████████████████████████████████████

███████████████. *See e.g.*, Almeroth Report, at ¶ 278.  Dr. Almeroth identifies ████

██████████████████████████████████████████████

██████████████████████████ ███ █████████████████████

██████████ ██████████ ██████████████████████). *See, e.g., id.*

Dr. Almeroth then identifies how the PTS converts ████████████████████

██████████████████████████████████████████████

████. *See e.g.*, Almeroth Report, at ¶ 278.  ████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████  *See e.g., id.* ████████████████████████

██████████████████████████████████  *See e.g., id.*

Dr. Almeroth provides similar analyses and opinions for each of the Accused Products,

identifying exemplary source code modules, routines, and structures that show, in his opinion, that

the products ██████████████████████████████████████

██████████████████████████████████████████████

███████████████████.  *See, e.g.*, Almeroth Report, at ¶¶ 144–149 (GeoProbe); *id.* at

¶¶ 181, 188–89 (InfiniStream); ¶¶ 211–213 (Arbor); *id.* at ¶¶ 335–336 (PacketLogic); ¶¶ 365, 372–373 (NAVL); ¶¶ 444–456 (citing to evidence for claim limitations); Almeroth Report Corrections, ¶¶ 8–9 (correcting typos and inadvertent statements), attached as Exhibit 2; Almeroth Rebuttal Report, at ¶¶ 761–762 (describing infringement evidence and responding to characterization of infringement evidence by Defendants' expert, Dr. Jeffay).  Defendants do not dispute that the source code identified by Dr. Almeroth is the code used by the Accused Products.

## III.      RESPONSE TO STATEMENT OF ISSUES

Defendants' motion does not include the summary judgment standard: that there must be no genuine issue of material fact.  Implicit restates Defendants' statement of issues to reflect the summary judgment standard.

1.   Is there a genuine issue of material fact that NetScout's GeoProbe / InfiniStream / Arbor products operate on one more packets whose outermost header is a TCP header?

2.   Is there a genuine issue of material fact that NetScout's GeoProbe / InfiniStream / Arbor products convert the outermost header structure of the packet(s) from TCP to another type of header structure?

3.   Is there a genuine issue of material fact that Sandvine's PacketLogic / PTS / NAVL products operate on one more packets whose outermost header is a TCP header?

4.   Is there a genuine issue of material fact that Sandvine's PacketLogic / PTS / NAVL products convert the outermost header structure of the packet(s) from TCP to another type of header structure?

## IV.      RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Implicit disputes SMUFs #1–8, 10–23, and 25–35 due to how they characterize the operation of and data structures within the Accused Products.  Plaintiff admits SMUFs #9 and 24. Implicit does not dispute that the Accused Products contain data structures identified in the Defendants' Statement of Material Facts.   Implicit disputes, however, the Defendants' characterization of how the Accused Products function and operate in relation to the claims.  This

█████████████████████████████████████████

dispute is based on Dr. Almeroth's opinions (including source code analysis) regarding how those

products ████████████████████████████████████████████████████

█████████████████████████████████. *See, e.g.*, Almeroth Report,

at ¶¶ 144–149, 181, 188–89, 211–213, 268–283, 335–335 365, 372–373, 444–456; Almeroth

Report Corrections, ¶¶ 8–9; Almeroth Rebuttal Report, at ¶¶ 761–762.

## V.       APPLICABLE LAW

Summary judgment is proper if "the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

"Infringement is a question of fact," *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1040 (Fed.

Cir. 2016), including "[t]he application of claim construction to the accused device, i.e. the

determination of whether an accused product infringes a claim." *Realtime Data, LLC v. Actian

Corp.*, No. 6:15-CV-463 RWS-JDL, 2017 U.S. Dist. LEXIS 114457, at *6 (E.D. Tex. May 15,

2017) (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1302 (Fed. Cir. 2011)).

## VI.      ARGUMENT

There is a genuine issue of material fact for an infringement trial.  The parties present

conflicting evidence on how to characterize the operation of the Accused Products and conflicting

expert opinions on the ultimate issue of infringement.  It is for a jury to resolve those issues.

In asserting otherwise, Defendants' Motion contends that Implicit's infringement theory

violates the Court's *Markman* Order.  That argument is based on two flawed predicates.

Defendants first incorrectly characterize the Court's Order as rejecting Implicit's infringement

theory.  Defendants then remold the operation of their products to attempt to fit them within the

scope of what they contend the Court "rejected" in the Claim Construction Opinion, backed by

new fact witness declarations.  Each step fails, as detailed below.

### A.    The Court's Claim Construction Opinion Does Not Preclude Implicit's Infringement Theory

Implicit's infringement theory is consistent with the Court's Claim Construction Opinion. The Court construed the term "execute a Transmission Control Protocol (TCP)" as "operate on one or more packets whose outermost header is a TCP header." Dkt. 111, at 35–36. For the "convert one or more packets having a TCP format into a different format," the Court construed the term as "convert the outermost header structure of the packet(s) from TCP to another type of header structure." Id. at 29. The Court did not have before it Implicit's infringement allegations, infringement theory, or evidence of how the Accused Products operate when it construed the claims. It did not construe them to include or exclude the Accused Products. And whether the Accused Products contain routines that "operate on one or more packets whose outermost header is a TCP header" and "convert the outermost header structure of the packet(s) from TCP to another type of header structure" are questions of fact, not questions of claim construction. On that question, Implicit has submitted expert testimony that raises a genuine issue for trial.

Defendants focus on a portion of the Court's Claim Construction Opinion where the Court rejected Implicit's claim-construction position for the "convert" limitations to argue that that, even though it is not reflected in the actual construction of these terms, the Court has preordained Implicit's infringement case. Defendants do not accurately portray what the Court held or what Implicit argued. The Claim Construction Opinion and its history does not preclude Implicit's infringement allegations.

During the Claim Construction proceedings, Implicit pointed to a disclosure in column 14 of the '683 Patent "regarding advancing a reference past a header," Dkt. 111, at 27:

> Although the conversion system has been described in terms of various embodiments, the invention is not limited to these embodiments. Modification within the spirit of the invention will be apparent to those skilled in the art. For example, a conversion

> routine may be used for routing a message and may perform no
> conversion of the message. Also, a reference to a single copy of the
> message can be passed to each conversion routine or demuxkey
> routine. These routines can advance the reference past the header
> information for the protocol so that the reference is positioned at the
> next header. After the demux process, the reference can be reset to
> point to the first header for processing by the conversion routines in
> sequence.

*Id.* (quoting '683 Patent, 14:4–16). To explain the functionality taught by that disclosure, Implicit's counsel created a demonstrative to show conceptually how the disclosure advanced a reference from one header to the next in an example packet (from the Ethernet header [1], to the IP header [2], to the TCP header [3]). Using this demonstrative, counsel argued that each advancement was a format "conversion" contemplated by the claims (Dkt. 96, at 8–9):



The Court rejected Implict's reading of the Patent because "this disclosure relates to an operation that 'may perform no conversion of the message.'" Dkt. 111, at 27 (quoting '683 Patent, 14:4–16). The Court also stated that Implicit failed to demonstrate that this disclosure was inconsistent with the concept that the format of a packet is determined by its outermost header. *Id.*

The Court then concluded that the limitations of the claims did not encompass ***merely*** the disclosure in column 14 of the '683 Patent: "[t]o whatever extent Plaintiff contends that the terms 'convert one or more packets having a TCP format into a different format,' 'convert one or more packets in a transport layer format into a different format,' and 'convert packets of the different format into another format' ***encompass merely moving a reference***, the Court hereby expressly rejects any such interpretation as lacking support in the record." Dkt. 111, at 27

███████████████████████████████████████

(emphasis added).  There was no discussion or evidence relating to the Accused Products, and the Court's exclusion does not apply to them—it merely means that the disclosure of column 14 alone does not contradict the Court's ultimate construction.  Saying that column 14 does not contradict the Court's ultimate construction is neither a rejection of Implicit's infringement theory nor a wholesale exclusion of the use of ████████████████ in the conversion process.

Implicit then objected to the Court's construction to preserve the issue, and this Court overruled those objections.  Dkt. 120.  The Court did not further address any claim construction issues when it overruled Implicit's objections.  *Id.*

The Court's construction and opinion do not prohibit Implicit's infringement case as a matter of law.  Critically, Dr. Almeroth does not opine that the Accused Products "merely mov[e] a reference" to convert from a TCP format to an application format.  Nor do Defendants claim that he did.  Indeed, Defendants' Motion does not argue that the alleged TCP processing and conversion functionality in the Accused Products "merely mov[es] a reference" like the disclosure in column 14.  They instead recast the Opinion as supposedly addressing and excluding as a matter of law *any* functionality that utilizes pointers in any manner, █████████████████

████████████████████████████████████████

████████████████████████████████.  Regardless, that is not what the Court's Opinion holds, either in the construction of those terms or in the Court's analysis.

Undeterred, Defendants claim that "Implicit already admitted" that its infringement theory "was inconsistent with the Court's Markman Order."  Mot. at 18.  That is also incorrect.

Defendants do not accurately characterize Implicit's arguments during the claim construction process.  Implicit's arguments were made in the vacuum of claim construction, directed to the embodiment in column 14, how a person of skill would understand the teaching of



that embodiment, and whether Defendants' proposed constructions (later adopted by the Court) would read out that embodiment. *See, e.g.*, Dkt. 89, at 17; Dkt. 117-5, at 5.  They did not relate to the Accused Products or how they function.

. *See, e.g.*, Almeroth Rebuttal Report, at ¶¶ 761–762.  Defendants and their expert may disagree with that ultimate opinion, but it is a fact issue for the jury, not a legal question for the Court. *Realtime Data*, 2017 U.S. Dist. LEXIS 114457, at *6 ("The application of claim construction to the accused device, i.e. the determination of whether an accused product infringes a claim is a factual determination.").

Implicit's claim construction arguments do not convert the Court's Opinion and constructions into something they are not.  They are not the claim construction upon which the fact finder will determine liability in this case under the Court's Opinion.  Implicit continues to believe that the Court's construction is incorrect for the reasons in its prior briefing, and it preserves that issue.[7]  Under the Court's construction, however, summary judgment is improper.

## B.    Genuine Issues of Material Fact Preclude Summary Judgment

Defendants' Motion raises factual disputes on infringement that it cloaks as a legal question.  Dr. Almeroth explained in his Report how each of the Accused Products

. *See, e.g.*, Almeroth Report, at ¶¶ 144–149, 181,

---

[7] *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1359 (Fed. Cir. 2008). Defendants do not assert in the Motion that they would be entitled to summary judgment under Implicit's construction of the limitations relating to "execute a Transmission Control Protocol (TCP) to convert one or more packets having a TCP format into a different format."



188–89, 211–213, 268–283, 335–335 365, 372–373, 444–456; Almeroth Report Corrections, ¶¶ 8–9; Almeroth Rebuttal Report, at ¶¶ 761–762.  The evidence raises an issue for trial.

Defendants do not address that evidence.  Nor do their declarants in their recently submitted declarations—signed after Defendants received Dr. Almeroth's reports and took his deposition. The declarations do not address each of the ███████████████████████████████ ████████████████████████████████████████████████████████████████████████████. They instead reference ███████████████████████████████████████████████████ ██████████████████████████████████.  *Compare, e.g.*, Almeroth Report, at ¶ 278 (██████████████████ ██ ██ ██████████ █████████████ ████████ ████████████████████████████████████████████████████████ ████████████████) *with* Dkt. 142-2 (███████████████ ██ ██ ████████ ██████████ ████████████████████████████████████████████████).  Contrary to Defendants' assertions, Dr. Almeroth's Report does not identify ████████████████████████████████ ████████████████████████████████████ Mot. at 18.  ████████████████████ ███████████████████████████████████████████████████████████ ████████████████████.

The packets operated on are defined by ████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████.  Defendants are simply incorrect when they broadly claim that Implicit contends that "when a processing routine uses a pointer or offset to locate a particular header, that header becomes the outermost header from the perspective of that routine regardless of the fact that the header structures of the packet have not changed, including the presence of the lower layer headers (i.e., Ethernet and IP headers)."  Mot. at 18.  That is not Implicit's theory.  In any event, which

██████████████████████████████████████████

data structures in the Accused Products define the "packet" at the various processing stages (pre-TCP processing, executing TCP, and converting from TCP to an application format) is a question of fact—whether it is those identified in Dr. Almeroth's Report or the vantage point of ██████ ████ in Defendants' late-breaking declarations.

Dr. Almeroth's Report details how each of the Accused Products meet the Court's construction.  The PTS, for example, ██████████████████████████████ ███████████████████████████████████████████ *See, e.g.*, Almeroth Report, at ¶¶ 252–253.  ███████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████ *See, e.g.*, *id.* at ¶ 268.

█████████████████████████████████████████████

███████████████████████████████ *See, e.g.*, *id.* at ¶¶ 268–272.

██████████████████████████████████████████

████████████████████████████████ ████  ████

█████████ █████████████████████████ *See, e.g.*, *id.* at ¶¶ 268–278.  This functionality, per Dr. Almeroth's Report, meets the Court's construction of the "execut[ing] a Transmission Control Protocol (TCP)."  *See, e.g.*, *id.* at ¶¶ 278, 450, 454; Almeroth Report Corrections, ¶ 8.

After the PTS determines ████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████



████████████████████████████████████████.[8]   *See e.g.*, Almeroth Report, at ¶¶ 268–278 ██████████████████████████████████████████████████████). This functionality, as Dr. Almeroth opines, meets the Court's construction of "convert one or more packets having a TCP format into a different format." *E.g.*, *id.* at ¶¶ 268–278, 450, 454; Almeroth Report Corrections, ¶ 8.

Dr. Almeroth's source-code level analyses and opinions are consistent with Defendants' pre-litigation documentation.  That documentation explains that ██████████████████████ ████████████████████████████████████.  Almeroth Report, at ¶ 291 (quoting SANDVINE084993, at 85003, 85017, attached as Exhibit 3).   While the document relates to ████████████████████████, Defendants' witness testified that the PTS ████████████████████ ████████████████████████████████████████████████████████████████████████. *See*, *e.g.*, *id.* at ¶ 291 fn. 606; Faiczak Depo., 136:25–137:14, 138:18–139:1, attached as Exhibit 4). This evidence is significant because ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████.

This evidence is sufficient to raise a genuine issue of material fact. In response, Defendants' declaration from Mr. Faiczak—signed over a month after Defendants received Dr. Almeroth's Report—does not address the ██████████████████ or the analysis recited in Dr. Almeroth's report, how the PTS processes those data structures, or Defendants' internal documentation.  *See* Dkt. 142-11.  The declaration does not provide a source code functionality

---

[8] As Dr. Almeroth explains, ██████████████████████████████████████████████ ████████████████████████████████████.  Almeroth Report, at ¶¶ 276–277.

[BLACK REDACTION]

analysis or explanation of how the PTS operates at that level, including [BLACK REDACTION]

[BLACK REDACTION]. *See id.* It simply concludes, without

corroborating evidence, that [BLACK REDACTION]

[BLACK REDACTION] *Id.* at 4.

This conclusion is based on a misstatement of [BLACK REDACTION] that Dr. Almeroth relies

on for his infringement opinion.  Mr. Faizak declares that [BLACK REDACTION]

[BLACK REDACTION]" Dkt. 142-11, at 4.

This reference to the "[BLACK REDACTION]" is misleading because [BLACK REDACTION]

[BLACK REDACTION]

[BLACK REDACTION].   The  source  code  functionality [BLACK REDACTION]

[BLACK REDACTION]. *See, e.g.,*

Almeroth  Report,  at  ¶¶  270–272  ([BLACK REDACTION] [BLACK REDACTION] [BLACK]

[BLACK REDACTION] [BLACK REDACTION]).

Genuine issues of material fact also preclude summary judgment for the balance of the

Accused Products as well.  Dr. Almeroth's Report provides similar opinions for each of the

remaining Accused Products.  Each of the products [BLACK REDACTION]

[BLACK REDACTION]. *See, e.g.,* Almeroth Report, at ¶¶ 126–128 (GeoProbe),

173–175 (InfiniStream), 206–208 (Arbor), 314–315 (PacketLogic), 361–364 (NAVL). [BLACK]

[BLACK REDACTION].

[BLACK REDACTION] Dr. Almeroth identifies source code in each of

the Accused Products that [BLACK REDACTION]

[BLACK REDACTION]. *See, e.g.,* Almeroth Report, at ¶¶ 144–

149 (GeoProbe), 181, 188–89 (InfiniStream); 211–213 (Arbor); 335–336 (PacketLogic); 365,

████████████████████████████████████████████

372–373 (NAVL).  That is the functionality that Dr. Almeroth opines meets the meets the Court's

construction of the "execut[ing] a Transmission Control Protocol (TCP)." *Id.* at ¶¶ 272, 450–456;

Almeroth Report Corrections, ¶¶ 8–9.

████████████████████████████, Dr. Almeroth identifies the source code in each

of the Accused Products that ████████████████████████████████████████

████████████████████████████████████████████████████████████.

*See, e.g.*, Almeroth Report, at ¶¶ 144–149 (GeoProbe), 181, 188–89 (InfiniStream); 211–213

(Arbor); 335–336 (PacketLogic); 365, 372–373 (NAVL).   That is the functionality that Dr.

Almeroth opines meets the Court's construction of the "convert one or more packets having a TCP

format into a different format." *Id.* at ¶¶ 272, 450–456; Almeroth Report Corrections, ¶¶ 8–9.

Dr. Almeroth's opinions based on the source code functionality for these products is also

consistent with additional evidence in the case.   For example, NetScout's Chief Technology

Officer, Paul Barrett, testified that InfiniStream ████████████████████████████████

████████████████████████████████████████████████████████████

████████.  Barrett Depo. Tr., at 189:8–190:25 ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████), attached as Exhibit 5. ████████████████████████

████████████████████████████████████████████████████████████

██████████████.  *See id.* at 190:23–25 ("██████████████████████████

████████████████████████████████████████████████████████.").[9]

―――――――――――――――――――

[9] After testifying that InfiniStream *did* perform ████████████████████ at his deposition
as described (████████████████), Exhibit 5, at 35:19–38:2, Mr. Barrett then changed the

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

This testimony conflicts with Defendants' new declaration, submitted by a different NetScout witness, Ms. Jenkins.  Ms. Jenkins declares that "■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■" Dkt. 142-4, at 3.  Again, Defendants' focus on ■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ is misleading.

In total, Defendants' new declarations each suffer from the same flaws.  They do not address the analysis recited in Dr. Almeroth's Report.  They do not provide a source code functionality analysis or explain how the Accused Products operate.  They simply conclude, without corroborating evidence, that the Accused Products "■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■" Dkt. 142-13, at 2;  *see also* Dkt. 142-4, at 3; Dkt. 142-4, at 3; Dkt. 142-7, at 3; Dkt. 142-9, at 3.  And, again, those conclusions are predicated on the wrong ■■■■■■ and are insufficient to obtain summary judgment given the factual disputes in the record.

At root, Defendants believe that they do not infringe because they claim that aspects of the Accused Products ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

■■■■.  That assertion is not a fully accurate characterization of the Accused Products, as detailed above.  It also does not entitle Defendants to summary judgment of noninfringement.  The Claim Construction Opinion does not exclude from the scope of the claims ■■■■■■■■■■■■■;

it addresses "merely moving a reference" as the claimed conversion, ■■■■■■■■■■■■

---

substance of his testimony via an errata.  He now testifies the exact opposite—that ■■■■■■■■■
does not occur ■■■■■■■■ and made significant change to his testimony to "■
■■."  *See* Exhibit 6.  It is the function of the jury to assess the credibility of Mr. Barrett's testimony and these changes, given his role as NetScout's Chief Technology Officer and Defendants' only produced Rule 30(b)(6) corporate witness proffered to testify on how the InfiniStream product operates.

███████████████████████████████████████

███████████████████████████████████████

███████.

    Lastly, Defendants are also incorrect that the Claim Construction Opinion addresses, much less forecloses, that the "one or more packets having a TCP format" that are converted to another format must be ████████████████████████████████████████ ██████. The claims recite that the "packet" is what is processed and converted by the routines: the claims recite a "*routine that is used to execute a Transmission Control Protocol (TCP) to convert one or more packets* having a TCP format into a different format." '683 Patent, claim 1 (emphases added). Thus, Dr. Almeroth properly looked at ██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████. Fundamentally, Defendants' arguments boil down to a philosophical debate about what can and cannot be a "packet." Regardless, it is a factual dispute which data in the Accused Products is the "packet" of the claims. On that question, there is competing evidence that at least raises a genuine issue of material fact for trial.

### VII.    CONCLUSION

    For the foregoing reasons, Implicit respectfully requests that the Court deny Defendants' Motion.

**FILED UNDER SEAL - PURSUANT TO THE PROTECTIVE ORDER**
**RESTRICTED CONFIDENTIAL SOURCE CODE**

Dated: October 8, 2019                    Respectfully submitted,

                                          By: /s/ Christian Hurt

                                          Spencer Hosie, *pro hac vice*,
                                          (CA Bar No. 101777)
                                          Brandon C. Martin, *pro hac vice*,
                                          (CA Bar No. 269624)
                                          Darrell Rae Atkinson, *pro hac vice*,
                                          (CA Bar No. 280564)
                                          **Hosie Rice LLP**
                                          600 Montgomery St., 34th Floor
                                          San Francisco, CA 94111
                                          415.247.6000
                                          Fax: 415.247.6001
                                          shosie/bmartin@hosielaw.com

                                          William E. Davis, III (TX Bar No. 24047416)
                                          Christian J. Hurt (TX Bar No. 24059987)
                                          Edward Chin (Of Counsel)
                                          (TX Bar No. 50511688)
                                          Debra Coleman (Of Counsel)
                                          (TX Bar No. 24059595)
                                          **THE DAVIS FIRM, PC**
                                          213 N. Fredonia Street, Suite 230
                                          Longview, Texas  75601
                                          Telephone: (903) 230-9090
                                          Facsimile: (903) 230-9661
                                          Bdavis/churt/echin/dcoleman@bdavisfirm.com

                                          *Counsel for Plaintiff Implicit, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document is being filed electronically in

compliance with Local Rule CV-5(a).  As such, this document is being served on all counsel who

are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(V).  Pursuant to

Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), any counsel of record not

**FILED UNDER SEAL - PURSUANT TO THE PROTECTIVE ORDER**
**RESTRICTED CONFIDENTIAL SOURCE CODE**

deemed to have consented to electronic service will be served with a true and correct copy of the

foregoing by email on this 8th day of October, 2019.

/s/ Christian Hurt
Christian Hurt

## **CERTIFICATE OF UNDER SEAL**

I hereby certify that the foregoing document is authorized to be filed under seal pursuant

to the Protective Order entered in this case.

/s/ Christian Hurt
Christian Hurt