**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| IMPLICIT, LLC,<br>*Plaintiff*,<br><br>v.<br><br>NETSCOUT SYSTEMS, INC.<br>*Defendant.* | Civil Action No. 2:18-cv-00053-JRG<br>LEAD CASE<br><br>JURY TRIAL DEMANDED |
| v.<br><br>SANDVINE CORPORATION.<br>*Defendant.* | Civil Action No. 2:18-cv-00054-JRG<br>MEMBER CASE |

**PLAINTIFF IMPLICIT, LLC'S RESPONSE IN OPPOSITION TO DEFENDANTS
SANDVINE CORPORATION AND NETSCOUT SYSTEM, INC.'S MOTIONS *IN LIMINE***

REDACTED VERSION OF DOCUMENT

FILED UNDER SEAL

**TABLE OF CONTENTS**

Page

I. MIL No. 1: Implicit Can Put on Testimony About What the PTO Considered ..................1

II. MIL No. 2: Implicit Should Be Free to Use Evidence Timely Produced to Prove the Correct Reduction to Practice. ....................................................................................................2

III. MIL No. 3: Implicit May Reference the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Settlement Agreements ...............................................................................................................................2

IV. MIL No. 4: Dr. Ugone May Make Limited Reference to the Agreements He Did Not Find Comparable .....................................................................................................................4

V. MIL No. 5: Dr. Ugone's Royalty Base is Proper. ..............................................................5

VI. MIL No. 6: Plaintiff May Make Reference to Revenues and Financial Information for the Accused Products and Limited Reference to Defendants' Total Revenues ........................6

VII. MIL No. 7: Third-Party Correspondence is Relevant.........................................................7

VIII. MIL No. 8: Defendants Cannot Have it Both Ways on "Stealing" and "Pilfering"............8

IX. MIL No. 9: Implicit Cannot Predict Now What Portions of the Court's Future Rulings May be Appropriately Shown to the Jury ...........................................................................8

X. MIL No. 10: Implicit's Expert Can Rely on Declarations from Prior Actions Involving Defendants ..........................................................................................................................9

XI. MIL No. 11: The Reexaminations Are Not the Equivalent of the California Cases. ..........9

XII. MIL No. 12: Implicit May Solicit Testimony and Put on Evidence of the Sales of Arbor and GeoProbe Products Prior to July 2015 ......................................................................12

XIII. MIL No. 13: Whatever "Venue" Evidence is, it is Intertwined with Relevant Evidence..13

XIV. Conclusion .......................................................................................................................14

# TABLE OF AUTHORITIES

**Cases**                                                                                                           **Page**

*ActiveVideo Networks, Inc. v. Verizon Comms, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012)...................................................................................4

*Cluori v. One World Techs., Inc.*,
    CV 07-2035, 2012 WL 630246 (C.D. Cal. Feb. 27, 2012)..................................................3

*DataTreasury Corp. v. Wells Fargo & Co.*
    No. 2:06-V-72 DF, 2010 WL 11538713 (E.D. Tex. Feb. 26, 2010) .................................10

*GWTP Investments, L.P. v. SES Americom, Inc.*,
    No. 3:04-CV-1383-L, 2007 WL 7630459 (N.D. Tex. Aug. 3, 2007)..................................9

*Hilderbrand v. Levi Strauss & Co.*,
    No. 3:09cv243-DPJ-FKB, 2011 WL 2946717 (S.D. Miss. Jul 21, 2011) .........................14

*Metaswitch Networks, Ltd. v. Genband US LLC*,
    No. 2:14-cv-744-JRG-RSP, 2016 WL 874737 (E.D. Tex. Mar. 5, 2016) .........................13

*Northpeak Wireless, LLC v. 3COM Corp.*,
    674 Fed. App'x 982 (Fed. Cir. 2016)................................................................................10

*Open Text S.A. v. Box, Inc.*,
    No. 13-cv-04910, 2015 WL 393858 (N.D. Cal Jan. 2015)..................................................4

*Personalized Media Communications, LLC v. Zynga, Inc.*,
    No. 2:12-CV-00068-JRG-RSP, 2013 WL 5979627 (E.D. Tex. Nov. 8, 2013) ...................7

*Realtime Data LLC v. EchoStar Corp.*,
    17-CV-00084, 2018 WL 6266301 (E.D. Tex. Nov. 15, 2018) ............................................3

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985)...........................................................................................10

*United States v. Gresham*,
    118 F.3d 258 (5th Cir. 1997) ...............................................................................................9

*Williams v. Illinois*,
    567 U.S. 50 (2012)...............................................................................................................9

**Statutes** **Page**

Federal Rule of Evidence 703 ................................................................................................9

Plaintiff Implicit, LLC ("Implicit" or "Plaintiff") hereby responds to Defendants Sandvine Corporation ("Sandvine") and NetScout Systems, Inc.'s ("NetScout") Motions *in Limine*:[1]

## I. MIL No. 1: Implicit Can Put on Testimony About What the PTO Considered.

Defendants' MIL No. 1 is packaged as something that it is not. MIL No. 1 is titled, "Preclude Implicit From Suggesting Certain Prior Art Was Submitted To and Considered by the Patent Office When It Was Not." Yet Defendants do not merely seek to preclude Dr. Almeroth from testifying that the PTO considered prior art that it did not. Defendants also apparently seek to prevent Dr. Almeroth from testifying that the PTO considered the art it actually considered. There is no basis for such a limitation.

Implicit has no intention of soliciting testimony that references not submitted to the PTO were. To be clear, the Mosberger Thesis was considered by the PTO during the prosecution of each of the three patents. *See* Exs. A ('683 Patent) at p. 3; B ('790 Patent) at p. 3; C ('104 Patent) at p. 3. But this is not the only reference submitted to the PTO that Dr. Jeffay, Defendants' expert, is likely to address. Dr. Jeffay is also likely to address: (1) "An Extensible Protocol Architecture for Application-Specific Networking," by Marc Fiuczynski et al., *see* Ex. D (Exhibit A to Jeffay Report) at pp. 141-160 (the "1996 ATEC USENIX Paper"); (2) "Router Plugins – A Software Architecture for Next Generation Routers" by Dan Decasper et al., *see* Ex. E (Exhibit B to Jeffay Report) at pp. 91-110 (the "Router Plugins Paper"); and (3) "Crossbow—A Toolkit for Integrated Services over Cell Switched IPv6." *See id.* (the "1997 Crossbow Paper"). Each of these were disclosed to and considered by the PTO prior to issuance of the '683, '790, and '104 Patents. *See* Exs. A. at p. 2; B at pp. 2-3; and C at p. 3.

---

[1] Sandvine and NetScout are collectively referred to as "Defendants."

To the extent that Dr. Jeffay opines that any of these references are invalidating (either alone or in combination with other references), Implicit is entitled to put on evidence that the references were indeed considered. Furthermore, given the number of references at issue—four—to say that the PTO issued the Asserted Patents over "many of the same references that Dr. Jeffay relies on to opine that the same patents are invalid" is true, not confusing, and not unduly prejudicial. Defendants may not like that the PTO considered "many" of the references they will put on at trial—but it is a relevant fact.

Dr. Almeroth does not in his Report, and will not in his testimony, state that any reference not considered by the PTO was.

## II.     MIL No. 2: Implicit Should Be Free to Use Evidence Timely Produced to Prove the Correct Reduction to Practice.

Implicit should be free to use evidence produced timely to prove the correct Reduction to Practice ("RTP") date. Implicit produced numerous documents during the course of discovery proving that Implicit's RTP preceded its December 1999 parent patent filing date. These documents included numerous hard copies of code portions, technical manuals, and many internal emails describing and documenting Implicit's fully functional code base. These documents were all dated prior to December 1999. Further, Implicit's 30(b)(6) witness on RTP likewise testified in detail about an earlier RTP date.

There is no reason why Implicit should be precluded from using this evidence. Whether this evidence is sufficient to prove an earlier RTP date is a question for a different day.

To simplify matters, Implicit agrees not to cite or rely upon the code produced one day late.

## III.    MIL No. 3: Implicit May Reference the ▮▮▮▮▮▮▮▮▮▮▮▮ Settlement Agreements.

Defendants' MIL No. 3 reprises their corresponding *Daubert*. Defendants' main complaint is that there "is no evidence in the Settlement Agreement or in analysis from Dr. Ugone that isolates the value of the asserted patents." That is incorrect. As Implicit has already explained in responding to Defendants' *Daubert* motion, both Dr. Almeroth and Dr. Ugone went to great pains to isolate the value of the asserted patents, including by comparing the earlier defendant's and current defendants' use of the patented technology. *See, e.g.*, Dkt. No. 156 at 1-4; Dkt. No. 177 at 1-3. Furthermore, ▇▇▇▇ had only been accused of infringing the Demux patents at the time of settlement, so it was proper not to allocate any value to the remainder of the patents licensed. *See, e.g.*, *Cluori v. One World Techs., Inc.*, CV 07-2035, 2012 WL 630246 at *5 (C.D. Cal. Feb. 27, 2012). ▇▇▇▇ were accused of infringing additional patents when their respective cases settled, and Dr. Ugone accounted for this fact by placing relatively less weight on those agreements. *See, e.g.*, Dkt. No. 156 at 4. Dr. Ugone's reliance on Mr. Balassanian's assertion that the value of the agreements was driven by the asserted patents is a matter for cross examination, not exclusion. *See, e.g.*, *Realtime Data LLC v. EchoStar Corp.*, 17-CV-00084, 2018 WL 6266301, at *10 (E.D. Tex. Nov. 15, 2018).

But Dr. Ugone did not rely *solely* on Mr. Balassanian—for example, each of the ▇▇▇▇ Licenses contain a "Whereas" clause stating the potential impacted software revenue at issue in the litigation. *See* Exs. F (▇▇▇▇) at 1 & G (▇▇▇▇) at 1.

This recitation of the amount at issue in the lawsuit lends credence to the notion that it is the asserted patents in the lawsuit, and the specifics of the infringement read on the specific accused product, that have driven negotiations in Implicit's prior Settlement Agreements. In any event, "[t]he degree of comparability of the ▇▇▇▇] license agreements as well as any failure on the part of [Implicit's] expert to control for certain variables

are factual issues best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Comms, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (expert's reliance on two agreements not "improper" where one agreement "did not involve the patents-in-suit and did not cover any of the technologies in the case" and the other "covered [patentee's] patents *and* software services yet the entire license fee was attributed to the asserted patents without any attempt to 'disaggregate the value . . . .'"); *see also Open Text S.A. v. Box, Inc.*, No. 13-cv-04910, 2015 WL 393858, at *5 (N.D. Cal Jan. 2015) ("differences between the licensed patents and the patents-in-suit can easily be pointed out to the jury, either through cross-examination . . . or through . . . direct testimony").

### IV. MIL No. 4: Dr. Ugone May Make Limited Reference to the Agreements He Did Not Find Comparable.

It is true that Dr. Ugone did not rely on any of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Settlement Agreements (along with several other settlement agreements that go unmentioned by Defendants) because he did not find them comparable. The fact that Dr. Ugone whittled down 24 prior settlement agreements—many of which settled litigation over patents from the Demux family—to only four speaks to his selectivity and the rigor of his analysis. *See* Ex. H (Ugone NetScout Report) at ¶¶ 69-83; Ex. I (Ugone Sandvine Report) at ¶¶ 75-89. Dr. Ugone discarded many of these other settlement agreements either because they did not involve the Demux patents, or because the prior defendants' use of the patented technology was not directly comparable to NetScout's and Sandvine's use of it. *See, e.g.*, Ex. H at ¶ 79, n. 196 (▮▮▮▮▮▮▮▮ not comparable because many families of patents asserted against ▮▮▮▮ and Implicit's patented technology not critical to success of accused ▮▮▮▮▮▮), ¶ 80 ("agreements with entities most economically comparable to NetScout would be most informative").

Dr. Ugone ought to able to testify about how he conducted his winnowing process and why he is relying on certain agreements and why he is not relying on certain others. In addition, in seeking to reconstruct the hypothetical negotiation, and Implicit's negotiating position in particular, Dr. Ugone reviews many prior Implicit licenses to understand what kind of royalty rate Implicit is willing to accept. *See, e.g.*, Ex. H at ¶¶ 78-79. In doing so, Dr. Ugone evaluates the impacted revenue and the royalty payment in each agreement to understand what kind of rates Implicit finds acceptable in which kinds of situations. *See, e.g., id.* at ¶ 71. Implicit need not necessarily introduce all of the agreements for Dr. Ugone to present this analysis, but he should be allowed to present it.

### V.     MIL No. 5: Dr. Ugone's Royalty Base is Proper.

Defendants MIL No. 5 is styled as an "alternative" to Defendants' currently pending *Daubert* motion, but in reality, it is just a second bite at the *Daubert* apple. *Compare* Dkt. No. 181 at 6-8 *with* Dkt. No. 141 at 14-15. Implicit therefore incorporates the arguments made in its Opposition and Sur-Reply to Defendants' *Daubert* motion. *See* Dkt. No. 156 at 13-15 and Dkt. No. 177 at 4-5. Only two further comments are necessary.

First, Defendants assert that "Implicit seems to agree with the underlying premise of this MIL" and then cite Implicit's *Daubert* Sur-Reply for that proposition. *See* Dkt. No. 181 at 8. Defendants are incorrect. Implicit made an argument in the alternative, nothing more.

Second, Defendants ignore that Dr. Almeroth's Report makes clear that the updates provided through Defendants' maintenance contracts actually infringe. *See* Ex. J at ¶¶ 383 (█████████████████████████████████████████████████████████████ █████████"), 387 (same re InfiniStream), 393 (similar regarding Arbor), 396 (PTS █████████████████████████████████████████████████████████████ ████████"), 404 (similar regarding PacketLogic), and 406 (NAVL).

## VI. MIL No. 6: Plaintiff May Make Reference to Revenues and Financial Information for the Accused Products and Limited Reference to Defendants' Total Revenues.

Defendants contradict their prior *Daubert* motion. Defendants previously asserted that Dr. Ugone had failed to conduct a proper apportionment analysis. *See* Dkt. No. 141 at 10-12. Now, Defendants agree that "Dr. Ugone has provided an apportioned royalty base" that need only "be segregated between accused products and . . . products and services." Dkt. No. 181 at 8. Aside from Defendants' internal inconsistency, Defendants are also incorrect that overall revenue and profits should be excluded in this particular case. In many instances, it can be appropriate to exclude this sort of information. But this case is somewhat different. ▇

▇

▇

▇

▇

▇

▇

▇

▇

▇

▇

▇

▇ *Id*. at ¶¶ 110-112 & 121-124; Ex. H. at ¶¶ 100-102 & 107-110. In cases like this, where ▇

---

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████. *See, e.g., Personalized Media Communications, LLC v. Zynga, Inc.*, No. 2:12-CV-00068-JRG-RSP, 2013 WL 5979627, at *2 (E.D. Tex. Nov. 8, 2013) (*LaserDynamic*s and *Uniloc* not "analogous" where "the accused functionality is not a small, distinct feature but the entire software program").

### VII. MIL No. 7: Third-Party Correspondence is Relevant.

Defendants' Motion *in Limine* No. 7 is peculiar. With the exception of one third-party witness, David Mosberger, Defendants seek to exclude all evidence of their multitudinous contacts with these nominally independent third-party witnesses. For example, Dan Decasper is one important third-party witness. He is the author of what the Defendants characterize as a critical piece of prior art. Prior to being deposed in this case, Mr. Decasper worked closely with defense counsel to prepare them for the deposition. For example, he tracked down and produced an archive of old source code. He also did significant work tracking down articles, and the like. *See* Ex. K.

More, this allegedly independent third-party witness did not complain about being deposed repeatedly in this and prior Implicit cases. Nor did he ask to be paid. *See* Ex. K. He volunteered all of this time in helping defense counsel. Why? On this record, an inference fairly arises: this supposedly independent third-party witness was hardly independent at all. Whether this is so is a question for the jury. But this is a matter for the trier of fact, not of exclusion.

Nor do Defendants explain why they carveout one third-party witness from their motion, David Mosberger. If this sort of pre-deposition intra-witness defense counsel communication is proper for Dr. Mosberger, how could it be improper for similar situated third-party witnesses?

## VIII. MIL No. 8: Defendants Cannot Have it Both Ways on "Stealing" and "Pilfering."

Defendants open the door to Implicit establishing that Implicit did not take its inventive concept from others.

The parties agree that no party should say one party has "pilfered" or "stolen" from another party. Fair enough. The issue raised by the current MIL, however, is different. In numerous third-party depositions, Defendants directly asked the witnesses whether Edward Balassanian, Implicit's founder, had taken the ideas of others and then reformulated them as organic and original Implicit ideas. To rebut this direct examination, Implicit counsel asked the witnesses the question directly: do you believe that Mr. Balassanian took, pilfered, or stole your ideas? The witnesses, all, very bluntly said they did not so believe.

Defendants cannot have it both ways: on the one hand, arguing that Implicit took its ideas improperly from others, while on the other barring direct questions that prove this contention false.

## IX. MIL No. 9: Implicit Cannot Predict Now What Portions of the Court's Future Rulings May be Appropriately Shown to the Jury.

Defendants pretend that they do not understand the issue. But, Defendants' statement that "the parties do not know every ruling that the Court may make between now and the end of trial" is exactly Implicit's point. *See* Dkt. No. 181 at 9. Defendants ask that the Court preclude the parties "regarding any of the Court's prior and **forthcoming** rulings except for the applicable claim constructions." *See id.* (emphasis added). But the fact that evidence or argument regards a Court ruling does not make it per se improper. For example, the parties agree that, as the Court

ordered, *see* Dkt. No. 111 at 36, they may refer to the actual definitions set forth in the Claims Construction Order before the jury.[2] As of now, Implicit has no way of knowing whether future rulings will contain material that is similarly appropriate for jury presentation.

Defendants' MIL No. 9, which asks the Court to rule now on an admittedly "unknown universe ahead," Dkt. No. 181 at 9, should be denied.

### X. MIL No. 10: Implicit's Expert Can Rely on Declarations from Prior Actions Involving Defendants.

Defendants wish to exclude various declarations from prior cases. This issue is not quite as portrayed, however. Here is what happened:

Implicit's technical expert relies on declarations from current Defendant witnesses, describing their products. As the kind of information that a reasonable expert would reasonably rely upon, "it is axiomatic" that this information is proper, even though not independently admitted and admittedly hearsay. *United States v. Gresham,* 118 F.3d 258, 266 (5th Cir. 1997); *see* Federal Rules of Evidence Rule 703; *see also GWTP Investments, L.P. v. SES Americom, Inc.,* No. 3:04-CV-1383-L, 2007 WL 7630459, at *5 (N.D. Tex. Aug. 3, 2007). Implicit is not seeking to admit these declarations. Instead, it may elicit this information as basis evidence in its expert direct examination. *See Williams v. Illinois*, 567 U.S. 50, 77–78 (2012).

### XI. MIL No. 11: The Reexaminations Are Not the Equivalent of the California Cases.

Implicit agrees that the parties should be precluded from referencing findings, holdings or adjudications from the three California cases. *See* Dkt No. 185 (Pl. MIL) at 4-5. Implicit also

---

[2] Implicit obviously agrees, in line with the Court's Order, *see* Dkt. No. 111 at 36, that parties will not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury, and will refrain from mentioning any portion of the Court's claim construction order, other than the actual definitions adopted by the Court, when in the presence of the jury.

agrees that the parties should be precluded from doing the same with respect to *Packet Intelligence*.[3] Implicit does not agree that it should be precluded as to the reexaminations.

The California cases are adversarial, adjudicated proceedings. They are litigations presided over by an Article III judge. Reexaminations, on the other hand, are proceedings conducted by PTO examiners. Defendants' MIL No. 11 is based on a false equivalency.

Patent litigation is nothing like patent reexamination. Admitting the findings of an Article III judge carries the substantial risk that the jury will abdicate its responsibility, and simply, and improperly, adopt the findings of the prior judge. Administrative proceedings before agency examiners do not carry the same risk. More, prior court findings involving related, but different patents, and unrelated products, have little to no probative value with respect to jury issues. The same cannot be said for related patent reexaminations.

The prosecution histories of patents related to the patents-in-suit are obviously relevant.[4] And, that is what reexamination records are, part of a patent's prosecution history. *See Standard Oil Co. v. Am. Cyanamid Co*., 774 F.2d 448, 452 (Fed. Cir. 1985) ("[T]he prosecution history … consists of the entire record of proceedings in the [PTO]. This includes all express representations made by … the applicant to the examiner to induce a patent grant, or… to reissue a patent"); *Northpeak Wireless, LLC v. 3COM Corp*., 674 Fed. App'x 982, 986 n.1 (Fed. Cir. 2016) ("Statements made during reexamination procedures before the PTO are part of the

---

[3] This agreement does not moot Implicit's opposition to Defendants' MIL No. 10. Defendants' MIL No. 10 is much broader. *See* above.

[4] Indeed, the prosecution histories of patents-in-suit discuss their related patent's reexaminations. *See, e.g.*, Ex. L (Jun. 6, 2013 Preliminary Amendment from '683 Patent's prosecution history), p. 8 ("Three reexaminations have been filed against cases related to the present case … In that proceeding, Patent Owner amended the claims to distinguish over Mosberger, resulting in a reexamination certificate being issued for the '163 patent …").

prosecution history"); *DataTreasury Corp. v. Wells Fargo & Co.*, No. 2:06-V-72 DF, 2010 WL 11538713, at *24 (E.D. Tex. Feb. 26, 2010) (in denying an *in limine* to preclude reference to reexamination as a process that strengthened the patent-in-suit, the court characterized the reexamination record as "prosecution history"). Defendants' own technical expert characterized the '163 and '857 Patents' reexaminations as exactly that. *See* Ex. M, p. 61-88 (discussing the reexaminations in a section titled "Overview of the **Relevant** Prosecution Histories"); *see also id.*, "Material Considered" (listing the '163 "*ex parte* Reexamination File History," '163 "*inter partes* Reexamination File History," and '857 "*inter partes* Reexamination File History," under "Asserted and Related Patents and File Histories").

Further, it is not clear what "findings, holdings, or adjudications" means in the context of reexaminations. Unlike litigation, reexamination involves a back-and-forth between at least the applicant and the examiner. This is true of *inter partes* examinations and it is especially true of *ex parte* examinations. If Defendants propose admitting applicant remarks, but precluding office actions, their proposal is designed to unfairly handicap Implicit. *Cf.* Ex. N (Pl. Rebuttal Validity Rpt.), ¶ 75 ("Dr. Jeffay's 'Overview of the Relevant Prosecution Histories' … is incomplete, and—in some instances—misleading"). The actions are needed to put the remarks in context. Indeed, Defendants' own expert was unable to discuss remarks without referring to actions.[5] *See, e.g.*, Ex. M, ¶ 161 ("In response to an Office Action … rejecting the original claims of the '163 Patent as anticipated by *Mosberger Dissertation*") & ¶ 171.

In short, the California cases are not the same as the reexaminations. It is necessary to exclude the former, and fair to permit reference to the latter.

---

[5] He also referenced the outcome of the '163 *ex parte* reexamination. *See* Ex. M, ¶ 169 ("Following the amendment and remarks, the amended claims were allowed and a Reexam Certificate issued …")

XII. **MIL No. 12: Implicit May Solicit Testimony and Put on Evidence of the Sales of Arbor and GeoProbe Products Prior to July 2015.**

Defendants' twelfth motion *in limine* seeks the same relief first requested in a footnote in Defendants' Reply in support of their *Daubert* motion. *See* Dkt. No. 166 at 4, n 3. They were right then: this is a *Daubert* issue—though one Defendants failed to timely raise.

Furthermore, Defendants' damages expert agrees that all sales of the Arbor and Geoprobe products were properly included in the royalty base. Ex. O (Stuckwisch NetScout Report) at ¶ 13; Ex. P (Stuckwisch Tr.) at 46:12-47:12 & 48:14-17.

Finally, Defendants mischaracterized the facts when they assert that Implicit affirmed the "logic" of their argument. The Sandvine situation, which Defendants point to, was quite different. There, the present defendant (Sandvine) was, as explained by Defendants, acquired by an affiliate of Procera in September 2017. *See* Dkt. No. 140 at 2. Sandvine argued that it cannot be liable for sales of Procera products *before* the acquisition because Sandvine (the Defendant) did not acquire Procera. The parties so stipulated for the purposes of this case. *See* Dkt. No. 172 at 1.

In contrast, NetScout—the defendant here—bought the business unit marketing and selling the Arbor and Geoprobe products in 2015. *See*, *e.g.*, Dkt. No. 141 ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. When NetScout bought those products, it inherited liability for those products' infringement of Implicit's patents.

Furthermore, it is not just sale, but also use of the infringing GeoProbe and Arbor products that can give rise to liability for infringement. And the actions of repair, maintenance, and instruction have been included among the list of affirmative acts which may lead to liability for inducement. Indeed, Implicit argues that NetScout provides maintenance to GeoProbe

customers, including updates and that ███████████████████████████████

███████████████████████████████████████████" Ex. J (Almeroth Infringement

Report), ¶ 383.  Similarly, Implicit argues that NetScout's maintenance and support packages for

Arbor also qualify as infringing use.  *Id.* at ¶ 393.   Accordingly, it is proper for Dr. Ugone to

include sales of Arbor and GeoProbe units in the royalty base.  *See*, *e.g.*, *Metaswitch Networks,

Ltd. v. Genband US LLC*, No. 2:14-cv-744-JRG-RSP, 2016 WL 874737, at *4 (E.D. Tex. Mar. 5,

2016).

      NetScout offers no legal argument that would excuse it from this obligation and

NetScout's Motion *in Limine* No. 12 amounts to nothing more than an attempt to deprive

Implicit from the damages that it is due.

**XIII.**    **MIL No. 13: Whatever "Venue" Evidence is, it is Intertwined with Relevant Evidence.**

      It is unclear what Sandvine's MIL is intended to exclude.  What is "testimony / evidence

relating to venue?"  Sandvine's motion to dismiss related to personal jurisdiction not venue.  *See*

Dkt Nos. 18, 39, 50, 54 & 73.  It also related to Implicit's live contention that Sandvine is liable

under the doctrines of alter ego and single business enterprise for its affiliate's (Procera) sales

from September 2017 forward.  *See id.*; *see also* Dkt. No. 168, ¶ 2; *also compare* Dkt. No. 82, ¶

43-44 (complaint alleging vicarious liability) *with* Dkt. No. 87, ¶ 43-44 (answer denying

vicarious liability).  Implicit's opposition brief attaches exhibits and cites websites that go to this

issue.  *See* Dkt Nos. 39 at 4-5 & 39-1 to 39-9.

      These vicarious liability arguments are intertwined with the personal jurisdiction

arguments.  *Compare* Dkt. No. 39 at 5 ("Sandvine and Procera are a 'combined company' …

Thus, Implicit has made a *prima facie* case that NAVL subjects Sandvine to this Court's specific

personal jurisdiction") *with id.* at 6 ("As set forth above, Sandvine and Procera are a 'combined

company,' suggesting two business enterprises acting as one …"). As are Implicit's infringement contentions more generally. *See*, *e.g., id*. at 2 ("By Sandvine's own admission, the Sandvine Policy Engine—which is identified in Implicit's First Amdned Complaint—'was developed and is sold by Sandvine Corporation **in the United States**'") (emphasis added); Dkt No. 18 at 2, n. 1 ("[S]pecific personal jurisdiction likely exists against Sandvine Corporation [a Canadian corporation] as to those products i[t] actually sells in the United States and this District specifically"); Dkt. No. 54 at 3 ("Sandvine's website suggests that Sandvine makes or uses the NAVL—which also subjects Sandvine to liability").

The fact that Sandvine does not contest venue, does not change the fact that (1) related evidence is highly relevant to other issues, and (2) this relevancy is not substantially outweighed by any prejudice to Sandvine. *Cf. Hilderbrand v. Levi Strauss & Co.*, No. 3:09cv243-DPJ-FKB, 2011 WL 2946717, at *2-3 (S.D. Miss. Jul 21, 2011) (denying motion *in limine* to preclude plaintiff's use of defendant's motion to transfer venue, finding that "[a]lthough [defendant] is certainly free to explain what it means, [plaintiff's] interpretation of the Motion to Transfer Venue is plausible, and the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice or confusion").[6]

## XIV. Conclusion.

---

[6] Sandvine does not seem to have a particular piece of evidence in mind when it references "venue." Sandvine initially proposed that Implicit be precluded from "putting on testimony / evidence relating to venue, including declarations made in support of Sandvine's motion to dismiss." *See* Atkinson Dec., ¶ 2. Sandvine submitted just one declaration in support of its motion. Implicit thus assumed this declaration was Sandvine's focus and offered to agree to "not offer or otherwise use the Sandvine declaration at ECF 18-2 as part of a direct examination during its opening case", but "reserve[d] the right to offer or otherwise use the declarations … within the scope of any appropriate cross-examination or rebuttal, or to impeach." *See id*. Sandvine declined Implicit's offer.

For the reasons set forth above, Implicit respectfully requests that this Court deny Defendants' motions *in limine*.

Dated October 30, 2019                                    Respectfully submitted,

By: */s/ Spencer Hosie*

Spencer Hosie, *pro hac vice*,
(CA Bar No. 101777)
shosie@hosielaw.com
Diane S. Rice, pro hac vice,
(CA Bar No. 118303)
drice@hosielaw.com
Brandon C. Martin, *pro hac vice*,
(CA Bar No. 269624)
bmartin@hosielaw.com
Darrell Rae Atkinson, *pro hac vice*,
(CA Bar No. 280564)
datkinson@hosielaw.com
Francesca M. S. Germinario, *pro hac vice*,
(CA Bar No. 326208)
fgerminario@hosielaw.com
**HOSIE RICE LLP**
600 Montgomery St., 34th Floor
San Francisco, CA 94111
415.247.6000
Fax: 415.247.6001

William E. Davis, III
(TX Bar No. 24047416)
bdavis@bdavisfirm.com
Christian J. Hurt
(TX Bar No. 24059987)
churt@bdavisfirm.com
Edward Chin (Of Counsel)
(TX Bar No. 50511688)
echine@bdavisfirm.com
Debra Coleman (Of Counsel)
(TX Bar No. 24059595)
dcoleman@bdavisfirm.com
Ty William Wilson
(TX Bar No. 24106583)
twilson@davisfirm.com
**THE DAVIS FIRM, PC**
213 N. Fredonia Street, Suite 230

Longview, Texas  75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661

*Counsel for Plaintiff Implicit, LLC*

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  As such, this motion was served on all counsel who have consented to electronic service, Local Rule CV-5(a)(3), on this the 30th day of October, 2019. Because the foregoing document is filed under seal, counsel for Plaintiff Implicit, LLC also certifies that an unredacted copy of the foregoing document was served on counsel for Defendants NetScout Systems, Inc. and Sandvine Corporation via email.

*/s/ Spencer Hosie*
Spencer Hosie

### CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

The undersigned hereby certifies that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case (Dkt. 61).

*/s/ Spencer Hosie*
Spencer Hosie