**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **IMPLICIT, LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **Civil Action No. 2:18-cv-53-JRG** |
| **v.** | § | **LEAD CASE** |
| | § | |
| **NETSCOUT SYSTEMS, INC.,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF IMPLICIT, LLC'S
MOTION FOR JUDGMENT AS A MATTER OF LAW AND
MOTION FOR A NEW TRIAL**

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ii

I.      INTRODUCTION ................................................................................................................1

II.     FACTUAL BACKGROUND................................................................................................1

III.    APPLICABLE LAW ............................................................................................................1

IV.     ARGUMENT........................................................................................................................1

        A.      Implicit Conclusively Established Infringement at Trial, Warranting Entry of
                Judgment as a Matter of Law or At Least a New Trial ...........................................1

        B.      Implicit is Entitled to a New Trial Based on Prejudicial Error ...............................5

                1.      The Court Incorrectly Construed the Claim Terms on Which NetScout's
                        Noninfringement Defenses Hinged ................................................................5

                        a.  Sequence of Routines ................................................................6

                        b.  The Execute and Convert Terms ................................................7

                2.      NetScout Presented Improper Expert Testimony Through Its
                        Fact Witnesses ................................................................................................9

                3.      NetScout Presented Argument and Testimony That Contradicted the Court's
                        *Markman* Order ..........................................................................................12

                4.      NetScout Improperly Used the SCOUT Reference.......................................14

V.      CONCLUSION ..................................................................................................................15

████████████████████

## <u>TABLE OF AUTHORITIES</u>

**<u>Cases</u>**

*Air Turbine Tech., Inc. v. Atlas Copco AB*
    410 F.3d 701 (Fed. Cir. 2005) ........................................................................... 11

*Avid Tech., Inc. v. Harmonic, Inc.*
    812 F.3d 1040 (Fed. Cir. 2016) ............................................................................ 6

*Baxter Healthcare Corp. v. Spectramed, Inc.*
    49 F.3d 1575 (Fed. Cir. 1995) ........................................................................... 15

*CertusView Techs., LLC v. S&N Locating Servs., LLC*
    198 F. Supp. 3d 568 (E.D. Va. 2016) ................................................................ 11

*Exergen Corp. v. Wal-Mart Stores, Inc.*
    575 F.3d 1312  (Fed. Cir. 2009) ........................................................................ 13

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*
    276 F. Supp. 3d 629 (E.D. Tex. 2017).................................................................. 1

*Fresenius Med. Care Holdings v. Baxter Int'l.*, Inc.
    2006 U.S. Dist. LEXIS 102937, (N.D. Cal. May 15, 2006)............................... 11

*Gart v. Logitech, Inc.*
    254 F. Supp. 2d 1119 (C.D. Cal. 2003) ............................................................. 11

*Hitachi Consumer Elecs. Co. v. Top Victory Elecs. Taiwan Co.*
    No. 2:10-CV-260-JRG, 2013 U.S. Dist. LEXIS 133595, (E.D. Tex. Sep. 18, 2013) ......... 1

*Tate Access Floors v. Interface Architectural Res.*
    279 F.3d 1357 (Fed. Cir. 2002) ........................................................................ 15

*U.S. v. Conn*
    297 F.3d 548  (7th Cir. 2002) ............................................................................ 11

*V-Formation, Inc. v. Benetton Grp. SpA*
    401 F.3d 1307 (Fed. Cir. 2005) .......................................................................... 8

**<u>Rules</u>**

Fed. R. Civ. P. 50(b)............................................................................................... 1

Fed. R. Civ. P. 59.................................................................................................... 1

## I.       INTRODUCTION

Implicit respectfully requests that the Court enter a judgment of infringement and set this case for trial on damages and willfulness.  In the alternative, Implicit respectfully requests a new trial based on the weight of evidence presented at trial and prejudicial errors.  Those errors include the Court's construction of a number of claim terms and other errors that crept into the trial.

## II.       FACTUAL BACKGROUND

Implicit filed this case in 2018, alleging that infringement of three of Implcit's Patents. The Court construed the disputed claim terms, resolved dispositive motions, and held a trial jury on December 9–13, 2019.  Implicit asserted six claims at trial: claims 1 and 10 from U.S. Patent No. 8,694,693; claim 1 from U.S. Patent No. 9,270,790; and claims 1, 3, and 4 from U.S. Patent No. 9,591,104.  The jury returned a verdict of noninfringement, and the Court signed a judgment on December 13, 2019, which was entered on the docket on December 16, 2020.  Dkt. 225.

## III.       APPLICABLE LAW

After a jury trial, a party may move for judgment as a matter of law or for a new trial. Fed. R. Civ. P. 50(b); Fed. R. Civ. P. 59.  The Court is familiar with the standards applicable to each motion.  *See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017); *Hitachi Consumer Elecs. Co. v. Top Victory Elecs. Taiwan Co.*, No. 2:10-CV-260-JRG, 2013 U.S. Dist. LEXIS 133595, at *9 (E.D. Tex. Sep. 18, 2013).

## IV.       ARGUMENT

### A.       Implicit Conclusively Established Infringement at Trial, Warranting Entry of Judgment as a Matter of Law or At Least a New Trial

The evidence presented at trial established as matter of law that NetScout infringed the claims of the Implicit Patents asserted at trial.  Dr. Almeroth presented testimony and evidence of how the NetScout Products operated, as well as his ultimate opinions on infringement.  *See, e.g.,*

Exh. A, at presentation pages 38–169; Trial Tr. 12/10/2019 A.M., at 37:10–50:20; Trial Tr. 12/10/2019 A.M. Sealed, at 3:3–53:1; Trial Tr. 12/10/2019 P.M., at 50:14–56:7; Trial Tr. 12/10/2019 P.M. Sealed, at 17:5–25:20; Trial Tr. 12/12/2019 A.M., at 82:4–104:25; Trial Tr. 12/12/2019 A.M. Sealed, at 8:4–20. There also was unrebutted evidence of inducement. *See, e.g.*, Exh. A, at 170; Trial Tr. 12/10/2019 A.M. Sealed, at 53:2–54:24.

NetScout contested only two sets of limitations: the sequence-of-routines terms and the execute TCP and convert terms. *See, e.g.*, Exhibit B, at 5, 8; Trial Tr. 12/09/2019 P.M., at 59:18–60:16, 63:23–66:9. NetScout asserted that the "sequence of routines" within the "path" was the source code—not the flow table, which allegedly "basically maintain[s] statistics about individual flows." Trial Tr. 12/11/2019 A.M., at 39:1–6; *see also* Trial Tr. 12/11/2019 P.M., at 4:3–10.

NetScout's defense was irrelevant because the claims explain that the "path" includes "***one or more data structures*** that indicate a sequence of routines for processing packets in the message." '683 Patent, claim 1 (emphasis added). The source code is not a data structure. And the only data structure that indicates how to process packets is the flow-table entry.

NetScout's witnesses confirmed that fact on cross examination. They admitted that the flow-table entry itself actually determines the "path" in the NetScout Products, for example:

> Q.  (By Mr. Hurt)  Do you recall, Mr. Curtin, describing the GeoProbe flow table on your -- during your direct testimony?
>
> A.  Yes, I do.
>
> Q.  And you mentioned that it contains a number of statistics about the flow, right?
>
> A.  Yes.
>
> Q.  But in addition to that, it also identifies the protocol as shown here in the protocol ID, right?
>
> A.  That's correct.

Q.  And it also shows what application you have, true?

A.  Yes.

***Q.  And isn't it correct that the GeoProbe uses that information as part of processing the packets?***

***A.  The protocol ID does determine which processing path we take through our system, yes.***

Q.  And so that's just not some statistic y'all track?

A.  That's correct.

Trial Tr. 12/11/2019 P.M., at 26:6–23 (emphasis added); *see also* Ex. C, at 5.

These admissions defeated NetScout's noninfringement defense because it was undisputed that the flow-table entries are created and filled in (*e.g.*, the application identification) after the first packet of a message arrives.  NetScout's witnesses testified to that fact on cross-examination. *See, e.g.*, Trial Tr. 12/11/2019 A.M. Sealed, at 36:7–10; Trial Tr. 12/11/2019 P.M., at 26:24–28:15; Trial Tr. 12/11/2019 P.M. Sealed, at 12:22–24, 17:12–18:5, 22:6–10.  Given this record, there was insufficient evidence from which the jury could have found against Implicit on this issue.

The same result applies to the "execute" and "convert" limitations.  NetScout asserted noninfringement on the basis that the outermost header of the packets received and stored in memory in its Products is always Ethernet.  That defense was also irrelevant.  The claims focus on the packet in the TCP routines: the claims recite a "***a routine*** that is used to execute a Transmission Control Protocol (TCP) to convert one or more packets having a TCP format into a different format."  '683 Patent, claim 1 (emphasis added).

The evidence established infringement on that question.  The NetScout Products utilize a pointer structure to the TCP header within the packet.  *See, e.g.*, Exh. A, at 101, 110–111, 118; Trial Tr. 12/10/2019 A.M. Sealed, at 21:11–31:22; Trial Tr. 12/12/2019 A.M., at 93:20–94:25,

98:14–100:11; Trial Tr. 12/12/2019 A.M. Sealed, at 8:4–24.  And the first byte that the pointer

points to is the TCP header—not the Ethernet header—as admitted on cross-examination:

> Q.  And as you testified on direct, one of the things that happens in
> this routine is it creates a pointer to the TCP header, right?
>
> A.  That's correct.
>
> Q.  And that's at Line 1450 where it says *pTcpHdr?
>
> A.  Yes.
>
> Q.  And TcpHdr means TCP header, true?
>
> A.  Yes, it does.
>
> ***Q.  And the first byte that that pointer points to is the TCP header;
> isn't that right?***
>
> ***A.  Yes.***

Trial Tr. 12/11/2019 P.M., at 35:3–13 (emphases added); *see also* Exh. A, at 118.  Because the

first byte is the TCP header, the outermost header is TCP for the packet in the TCP routines.

The evidence also established that when the NetScout Products advanced from TCP to the

application level, the outermost header is an application header.  Exh. A, at 109, 114, 119–20;

Trial Tr. 12/10/2019 A.M. Sealed, at 21:11–31:22; Trial Tr. 12/12/2019 A.M., at 93:20–94:25,

98:14–100:11; Trial Tr. 12/12/2019 A.M. Sealed, at 8:4–24.  Even NetScout's demonstratives

showed that at least one copied-over packet lacked the lower headers.  Exh. C, at 9; Exh. D, at 15.

The outermost header of a packet within the converted data stream is the application

header.  NetScout's witnesses admitted that packet payload contains the application header (*e.g.*,

a SIP header).  *See, e.g.*, Trial Tr. 12/11/2019 P.M., at 32:13–22.  The payload portion is copied

over without the lower headers in the reassembly process, as admitted on cross-examination:

Q. . . . The SIP data in this third reassembly step is copied from the first received packet over here to the top right in your demonstrative, true?

A. That is true.

*Q. And it's copied over without the TCP header, right?*

*A. That's true.*

*Q. And it's copied over without the IP header?*

*A. That's correct.*

*Q. And it's copied over without the ethernet header?*

*A. That's correct.*

Trial Tr. 12/11/2019 P.M., at 33:4–14 (emphases added).  These admissions established that the outermost header of one or packets is an application protocol header (*e.g.*, SIP) during reassembly. Given this record, and the evidence of conversion in all cases cited above, there was insufficient evidence from which the jury could have found against Implicit on this issue.

Implicit respectfully requests that the Court enter judgment of direct and induced infringement and set this case for a trial on the remaining issues, including willfulness and damages.  In the alternative, Implicit respectfully requests that the Court grant a new trial.  The great weight of the evidence showed infringement.  Should the Court decline to enter judgment as a matter law, Implicit respectfully requests that the Court grant Implicit a new trial on all issues.

## B.     Implicit is Entitled to a New Trial Based on Prejudicial Error

Each ground above and below warrants a new trial individually.  Taken together,  new trial is warranted as well. Implicit respectfully requests that the Court grant it a new trial on all issues.

### 1.     The Court Incorrectly Construed the Claim Terms on Which NetScout's Noninfringement Defenses Hinged

A new trial is warranted because the Court incorrectly construed two sets of claim terms.

Those constructions formed the basis of NetScout's noninfringement positions at trial.  Under the correct construction of either of these sets of terms, a new trial is warranted.  *See, e.g.*, *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1047 (Fed. Cir. 2016) (collecting authority).

### a.  Sequence of Routines

The Court incorrectly construed the "sequence of routines" related terms, as Implicit has laid out in its prior briefing.  Dkt. 89, at 5–8; Dkt. 96, at 1–3; Dkt. 117, at 1–3.  The Court construed the term "sequence of [two or more] routines" as "an ordered arrangement of [two or more] software routines that was not selected from a set of arrangements created before receiving a first packet of the message."  Dkt. 111, at 14–15.  The Court also construed the "list of conversion routines" term as "an ordered arrangement of software conversion routines that was not selected from a set of arrangements created before receiving a first packet of the message."  *Id.*

These constructions incorrectly departed from the prior constructions entered by both this Court and Judge Illston in the Northern District of California.  Those constructions were correct and contained virtually the same language that Implicit proposed here: "an ordered arrangement of [two or more] software routines that was not identified (i.e., configured) prior to receiving a first packet of a message."  *See* Dkt. 117, at 1.  The Patents and the file history supported that construction, as found in the prior cases.  *See id.* at 1–2.  The construction in this case was in error.

These errors prejudiced Implicit.  NetScout's noninfringement argument seized on the Court's new construction, asserting that the routines in the NetScout products were "selected from a set of arrangements created before receiving a first packet of the message."  *See, e.g.*, Ex. B, at 5; Trial Tr. 12/09/2019 P.M., at 58:13–60:16.  Using this language, NetScout contended that its source code evidenced all the "set[s] of arrangements," that the code was "created" prior to receiving the first packet of a message, and that its products selected from pre-existing arrangements within the code.  *See, e.g.*, Trial Tr. 12/11/2019 A.M., at 38:5–25, 91:20–22, 98: 2–

6

4; Trial Tr. 12/11/2019 P.M., at 4:16–17, 58:19–22.  NetScout ignored the flow table.  *See id.*

The correct constructions would have combated, if not foreclosed, that position.  They only exclude ordered arrangements of routines that were "identified (i.e., configured) prior to receiving a first packet of a message."  NetScout's products do not identify the routines used to process packets within a flow until after the first packet arrives, including routines based on the identified application or protocol, as NetScout admitted.  *See, e.g.*, Trial Tr. 12/11/2019, at 26:4–21 ("The protocol ID does determine which processing path we take through our system[.]"); *id.* at 27:22–28:15 (testifying that, prior to the first packet arriving, the flow table does not contain the protocol ID or application, which are filled in as the packets are processed).  A new trial is appropriate.

### b.  The Execute and Convert Terms

The Court also incorrectly construed the "execute" and "convert" terms, requiring operating on a packet whose "outermost header" is TCP and then converting the outermost header structure from TCP to another format.  Dkt. 111, at 23–36.[1]  The Court also erred when it held that "moving a reference" would not meet the "convert" limitations.  *Id.* at 27.

Implicit submits that these terms need no construction and their plain-and-ordinary meaning should apply.  As Implicit previously argued, there is nothing in the terms "format" or "convert" that requires a certain type of "outermost header" or converting that outermost header

---

[1] The "execute" and "convert" terms include the following: "execute a Transmission Control Protocol (TCP)"; "executable to perform a Transmission Control Protocol (TCP)"; "execute a second, different protocol"; "execute a third, different protocol"; "execute a Transmission Control Protocol (TCP) to process packets having a TCP format"; "execute TCP to process at least one of the subsequent packets having a TCP format"; "execute a second protocol to process packets having a format other than the TCP format, wherein the second protocol is an application-level protocol"; "another session associated with a different protocol that is executed, wherein the different protocol corresponds to the different format"; "convert one or more packets having a TCP format into a different format"; "convert one of the packets of the message into a different format"; "convert one or more packets in a transport layer format into a different format"; and "convert packets of the different format into another format."

structure.  Dkt. 89,at 16–23; Dkt. 96, at 7–10; Dkt. 117, at 3–5.  Nor does the general concept of

an "outermost header" exclude advancing or using a reference pointer to "convert" a packet.

Indeed, the traditional way that computer operating systems  processed packets by the time

of the Implicit Patents was to use pointers to operate on packets and convert them up and down

the protocol stack (*e.g.*, from TCP up to the application layers).  *See, e.g.*, Exhibit E, at 3

("Traditional protocol implementations usually overlay a pointer to a header structure on top of a

buffer and then access that header's fields through typecasting and pointer de-referencing.");[2]

Exhibit F, at 14–17.  NetScout did not argue that Implicit disclaimed these types of systems; it

instead argued its construction simply reflected "basic packet processing," "basic networking,"

and the "basic technical meaning" of these terms.  Dkt. 93, at 11, 18.

NetScout then turned an allegedly innocuous construction into a central defense.  Even

though using pointers is a traditional way that devices convert up the protocol stack, NetScout

argued that its pointer-based products did not infringe.  *See, e.g.*, Dkt. 142; Dkt. 167; Ex. B, at 8;

Trial Tr. 12/09/2019 P.M., at 62:21–66:8.  The Court's construction provided it with that defense.

The constructions prejudiced Implicit.  Had the Court rejected NetScout's construction,

including NetScout's position that a pointer could not identify the outermost header of a packet,

NetScout would not have had this argument at trial.  It was not contested that NetScout's products

perform TCP-level and application-level processing.  *See, e.g.*, Exh. A, at 100–120.  The terms

"format" and "convert" are readily understandable terms.  And the specific way a system executes

---

[2] While Implicit did not cite to the *Implementing Protocols in Java: The Price of Portability* (1998) paper at the *Markman* stage of this case, the paper is cited on the face of the Implicit Patents, *see* Dkt. 1-1, at [56] and is therefore intrinsic evidence for claim-construction purposes.  *See V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) ("This court has established that 'prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.'").

a protocol and converts packets from TCP to the application layers—whether through using pointers, copies of the packets, other data structures, or other ways—has nothing to do with the patented inventions.  The terms should have been afforded their plain meaning and NetScout's outermost header concept, its exclusion of pointer-based systems, and its exclusion of advancing a reference pointer, should have been rejected.  Implicit respectfully requests a new trial.

## 2.   NetScout Presented Improper Expert Testimony Through Its Fact Witnesses

NetScout called three fact witnesses at trial—Mr. Paul Barrett, Mr. John Curtin, and Dr. Scott Dawson.  These witnesses were supposed to explain how the NetScout Products operate and matters within the personal knowledge of those witnesses.  NetScout instead had those witnesses provide expert testimony on the ultimate infringement issues.  NetScout then leaned heavily on that testimony to argue noninfringement—that the jury should credit their testimony over Dr. Almeroth's.  That violated a number of evidentiary and procedural rules and prejudiced Implicit.

Federal Rule of Evidence 701 expressly prohibits fact witnesses from providing opinions that are "based on scientific, technical, or other specialized knowledge" that falls within the province of experts.  Fed. R. Evid. 701.  NetScout did not designate Mr. Barrett, Mr. Curtin, and Dr. Dawson as experts—which would have required an expert report under Rule 26 and an expert deposition.  And Implicit did not receive notice or pretrial discovery of those expert opinions.

NetScout then presented improper expert testimony through those fact witnesses.  For example, an issue at trial was if casting a pointer to the TCP header in NetScout's products resulted in a packet with an outermost header of TCP, per the Court's construction.  Dkt. 111, at 29, 35–36.  NetScout elicited expert testimony from its fact witnesses on that ultimate infringement issue:

> Q. Does setting a pointer to the transport layer of a packet make that the outermost header of a packet?
>
> A. No, it doesn't.

> Q. Why not?
>
> A. Because the whole packet is there, as I mentioned the analogy.
> It's just like a bookmark.

Trial Tr. 12/11/2019 A.M., at 52:5–10; *see also e.g., id.* at 46:23–47:1, 52:25–53:7, 56:15–20;

Trial Tr. 12/11/2019 P.M., at 70:12–71:9, 72:2–8.   That was not fact testimony about how

NetScout's products operated, what headers of a packet may remain in memory or as part of a data

structure during operation, or allowable lay opinion.   It was expert testimony on the issue of

infringement based on how NetScout's witnesses viewed the "execute" and "convert" limitations.

NetScout also presented expert testimony through those fact witnesses for the "sequence

of routines" terms that are part of the claimed "create . . . a path" limitation.  The contested issue

for that limitation was if NetScout's creation of a flow table entry met this limitation or if the

source code was the "path."   Those are issues for expert witness testimony.   But NetScout

presented that testimony from its fact witnesses, exemplified below:

> Q. Sure. Does the InfiniStream create any paths after a packet is
> received while the system is in operation?
>
> A. No, it does not. . . .
>
> Q. And we heard some discussion about flow entries earlier in this
> case.  Does the fact that the InfiniStream creates a flow entry, does
> that mean that the InfiniStream is creating a path after receiving a
> packet?
>
> A. No, it doesn't.

Trial Tr. 12/11/2019 A.M., at 38:5–25; *see also e.g., id.* at 91:20–22 ("Q. . . . . When were the

paths created in the GeoProbe product? A. All paths were created at design and coding time."); *id.*

at 98: 2–4 ("Q. In any circumstances, can the GeoProbe products create a path for processing

packets of a message after the first packet of the message is received?"); Trial Tr. 12/11/2019 P.M.,

at 4:16–17 ("Q. Does creation of a flow entry create a processing path? A. No."); *id.* at 58:19–22 ("Q. When are the processing paths in the Arbor product created? A. Those are created when we write the software before we ever ship it to customers.").  This were expert opinions, further evidenced by Dr. Jeffay's use of them to bolster his own testimony.  *See, e.g.*, Trial Tr. 12/11/2019 P.M., at 123:2–8, 125:5–9 ("[A]s we heard from Dr. Dawson and as my review of the code indicates, the paths are static, they're created at the time the software was originally authored.").

The testimony was improper and should not have been presented at trial.  *See, e.g.*, *Air Turbine Tech., Inc. v. Atlas Copco AB*, 410 F.3d 701, 714 (Fed. Cir. 2005) (upholding exclusion of inventor testimony about what he found when the examined the accused product); *Gart v. Logitech, Inc.*, 254 F. Supp. 2d 1119, 1123 (C.D. Cal. 2003) (excluding testimony from fact witnesses that "compare[d] the [prior art] handpieces to the limitations" of the asserted patent, as that testimony "require[s] specialized knowledge"); *CertusView Techs., LLC v. S&N Locating Servs., LLC*, 198 F. Supp. 3d 568, 581 (E.D. Va. 2016) ("A lay witness may not normally construe and interpret patent claim limitations and compare such limitations against the prior art because such testimony requires specialized knowledge."); *Fresenius Med. Care Holdings v. Baxter Int'l.*, Inc., 2006 U.S. Dist. LEXIS 102937, at *11 (N.D. Cal. May 15, 2006) ("Lay opinion testimony is 'not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events.'") (quoting *U.S. v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002)).

The improper testimony prejudiced Implicit.  Beyond the impact of the testimony itself, NetScout leaned heavily on its fact witnesses in closing, urging the jury to credit those witnesses over Dr. Almeroth and find noninfringement.  Trial Tr. 12/13/2019 A.M., at 56:10–57:10, 63:20–64:7, 81:22–82:5.  The jury was left with the impression that each of these technical fact witnesses were in fact testifying that NetScout did not practice the claims—otherwise the testimony, using

the same words of the claims and constructions, was not probative and would be excluded per

Federal Rules of Evidence 401 and 403.   While each fact witness admitted that they were not

designated as experts, Trial Tr. 12/11/2019, A.M. Sealed, at 23:14–24:7; Trial Tr. 12/11/2019

P.M., at 16:17–17:7; Trial Tr. 12/11/2019 P.M. Sealed, at 18:25–19:20, the damage had been done.

If NetScout intended to present noninfringement testimony through its fact witnesses, it should

have provided the notice required by Rule 26 that would have allowed Implicit the ability to

discover those opinions and respond.   Because of the prejudice to Implicit flowing from NetScout

springing that improper testimony at trial, Implicit respectfully requests a new trial.

### 3.   NetScout Presented Argument and Testimony That Contradicted the Court's *Markman* Order

NetScout argued it did not infringe on the basis that its systems were not "end systems."

This was improper because the claims are not limited to "end systems," and the Court rejected

NetScout's position in the *Markman* Order.   Dkt. 111, at 29–36.   A new trial is warranted.

NetScout cloaked its end-system theme during opening statements by comparing its

products to some example products that Implicit developed:

> So that's the question on this point. What's the outermost -- what is
> the outermost header of the packet? ***If it's not TCP in our products,***
> ***there's no infringement because we are not doing the conversion***
> ***that is necessary on the type of products that Mr. Balassanian is***
> ***building***.

Trial Tr. 12/09/2019 P.M., at 63:1–15, 66:4–8 (emphasis added); *see also e.g.*, Trial Tr. 12/11/2019

A.M, at 71:5–11 ("[C]an a customer of the GeoProbe . . . play videos on the GeoProbe?  A. No.").

NetScout then married its improper product-to-product comparison to an "end system"

noninfringement position through Dr. Jeffay's direct testimony.   Dr. Jeffay repeatedly testified that

Implicit's Patents "describe[] the invention as running on end systems."  Trial Tr. 12/11/2019 P.M.,

at 103:23–104:16; *see also id.* at 109:14–20 (explaining impression of Implicit's Patents was that

"I understood, I think, where [Mr. Balassanian] was coming from in 1999 and *for the types of end system devices that were described in the patent*") (emphasis added); *id.* at 138:4–22 ("*So the invention is described in the patent in terms of end systems* . . . .") (emphasis added).  That testimony was not accurate and NetScout should not have presented it.  It conflicted with the *Markman* Order: "[N]o 'endpoint' limitation is recited or implied in the claim language, [and] *no disclosure in this regard appears in the specification*, . . . ."  Dkt. 111, at 34 (emphasis added).

Dr. Jeffay then went further in his testimony.  He contrasted his incorrect view of the scope of the Implicit Patents with products like NetScout's that sit "in the middle of the network":

> Q. And why are these computers, depicted on Slide 43, why are they doing this conversion process?
>
> A. They're doing this conversion process because, again, *as described in the specification of the patents, this is technology that's targeted towards end systems* . . . .
>
> *Q. Now, do the NetScout products do this conversion process?*
>
> *A. No.*
>
> Q. Why not?
>
> A. So the NetScout products, remember *they're – they're not senders and receivers, they're in the middle of the network*. . . .

Trial Tr. 12/11/2019 P.M., at 140:22–142:3 (emphases added).  Immediately after this testimony, Dr. Jeffay began to provide his ultimate noninfringement opinion.  *See, e.g.*, *id.* at 142:4–150:9.

NetScout and its witnesses should not have made these statements.  The claims are not limited to "end systems" or require an "end system" device to infringe.  And raising that argument at trial contradicted the Court's *Markman* Order, justifying exclusion.  *See, e.g.*, *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination

governs for purposes of trial.  No party may contradict the court's construction to a jury.").

During the *Markman* phase of this case, NetScout tried to limit the claims to devices that "operate . . . at the endpoint of a connection."  Dkt. 111, at 29–31.  The Court rejected that construction because it lacked support in the record:

> Defendants have failed to persuasively support their proposal of referring to an "endpoint of a connection." . . .  [N]o "endpoint" limitation is recited or implied in the claim language, no disclosure in this regard appears in the specification, and Defendants have not demonstrated that Transmission Control Protocol (TCP) is relevant only at endpoints of a connection. . . .

Dkt. 111, at 34.  NetScout, undeterred, presented that same "endpoint" theory at trial.  While Implicit was able to cross-examine Dr. Jeffay to some degree, Trial Tr. 12/11/2019 P.M., at 165:10–166:11, the examination could not un-ring the bell or undo the prejudice.  Implicit was unable to show the jury that the Court had rejected NetScout's endpoint position.  Dkt. 111, at 36. It could not show them that Dr. Jeffay's testimony that the Implicit Patents "describe[] the invention as running on end systems," *e.g.*, Trial Tr. 12/11/2019 P.M., at 103:23–104:16, contradicted the Court's conclusion that "no disclosure in this regard appears in the specification," Dkt. 111, at 34.  Implicit respectfully requests a new trial on this ground.

### 4.    NetScout Improperly Used the SCOUT Reference

Right before trial, NetScout dropped its invalidity defenses and entered into a stipulation regarding the use of prior art: NetScout would "not affirmatively offer any argument, testimony, or evidence relating to any alleged prior art referenced in Dr. Jeffay's invalidity report, including SCOUT (Mosberger) . . . . [or] compare the functionality of the Accused Products to the functionality in any alleged prior art, including SCOUT (Mosberger) . . . ."  Dkt. 211, at 1.

Despite that, NetScout published to the jury Figure 3.6 from SCOUT as a "demonstrative" in the final moments of the evidence portion of the trial:



**Figure 3.6 From SCOUT**          **NetScout's Trial Demonstrative**

Figure 3.6: Paths Versus Classifiers

Exh. G, at 87.                     Exh. H, at 1.

NetScout raised this "demonstrative" during the last part of its examination of Dr. Almeroth during Implicit's rebuttal case.  Trial Tr. 12/12/2019 A.M., at 110:10–116:11.  NetScout then argued to the jury in closing that Dr. Almeroth lacked credibility because he allegedly evaded NetScout's SCOUT-related questions.  Trial. Tr. 12/13/2019 A.M., at 59:8–16.  NetScout even presented the SCOUT "demonstrative" as a "static system like we've been talking about the entire case," *Id.*, even though NetScout had not presented evidence to support that assertion.

This improper trial conduct prejudiced Implicit.  SCOUT was not relevant or fair game after the stipulation.  *See, e.g.*, *Tate Access Floors v. Interface Architectural Res.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002) ("This court made unequivocally clear in *Baxter* that there is no 'practicing the prior art' defense to literal infringement."); *Baxter Healthcare Corp. v. Spectramed, Inc.*, 49 F.3d 1575, 1583 (Fed. Cir. 1995).  Implicit relied on the stipulation when it prepared and presented its case.  NetScout did not seek prior leave of Court or provide any prior notice to Implicit of its intent to use SCOUT.  *See* Dkt. 211, at 1–2.  By the time NetScout sprung SCOUT at trial, right at the close of the evidence, Implicit had no real chance to respond.  Implicit respectfully requests a new trial on this ground.

## V.        CONCLUSION

For the foregoing reasons, Implicit respectfully requests that the Court grant these Motions.

Dated: January 10, 2020

Respectfully submitted,

By: /s/ Christian Hurt

William E. Davis, III (TX Bar No. 24047416)
Christian J. Hurt (TX Bar No. 24059987)
Edward Chin (Of Counsel)
(TX Bar No. 50511688)
Debra Coleman (Of Counsel)
(TX Bar No. 24059595)
**THE DAVIS FIRM, PC**
213 N. Fredonia Street, Suite 230
Longview, Texas  75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661
Bdavis/churt/echin/dcoleman@bdavisfirm.com

*Counsel for Plaintiff Implicit, LLC*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document is being filed electronically in compliance with Local Rule CV-5(a).  As such, this document is being served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(V).  Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), any counsel of record not deemed to have consented to electronic service will be served with a true and correct copy of the foregoing by email on this 10th day of January, 2020.

/s/ Christian Hurt
Christian Hurt

