IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| IMPLICIT, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 2:18-cv-53-JRG |
| v. | § | LEAD CASE |
| | § | |
| NETSCOUT SYSTEMS, INC., | § | JURY TRIAL DEMANDED |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF IMPLICIT, LLC'S
REPLY IN SUPPORT OF MOTION FOR JUDGMENT
AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL**

Implicit submits that its Motion should be granted, including for the following reasons.

## I.      Implicit Established Infringement

Implicit established infringement. NetScout focuses on the construction of "sequence of [two or more] routines," but NetScout's defense did not follow the claims. The "path" is a data structure, and that structure "indicate[s] a sequence of routines for processing packets in the message." '683 Patent, claim 1. The "sequence of routines" is "an ordered arrangement of [two or more] software routines that was not selected from a set of arrangements created before receiving a first packet of the message." Dkt. 111, at 14. An "ordered arrangement" is not the source code itself; it is the arrangement reflected in the "path" structure. The "set of arrangements" is also not the source code itself; it is what is reflected in any pre-created "paths."

The Court's *Markman* Order recognized this distinction between the "arrangements" and the source code itself: "The patentee did not disclaim the *existence* of software routines prior to receiving a first packet of the message. The patentee explained that the claimed invention uses software routine arrangements that *were not created prior* to receiving a first packet of the message." *Id.* at 13 (emphasis in original); *see also* Ex. I, at 29:9–12 ("But I'm -- I also don't want to say that the patentee disclaimed all possible paths because it doesn't make a lot of sense to me and I'm not sure where it goes.").

NetScout still ignores that distinction. NetScout asserted noninfringement because its software routines, and the ways they *might* be arranged for a particular flow, existed when NetScout's programmers wrote the software. That is, of course, how all software works. But noninfringement under the Court's construction required that the sets of arrangements, *i.e.*, all the indicated paths, were *actually* created for a flow before it arrived, *e.g.*, if the products had pre-filled the flow table and selected a pre-created entry. NetScout did not address that question. And the evidence established that NetScout's products created the flow-table entry, and the ordered

arrangement of routines indicated by the entry, after the first packet arrived. *See* Mot. at 1–3.

NetScout also did not follow the claims for its second noninfringement position. The claim focuses on what happens in the TCP routines, *e.g.*, '683 Patent, claim 1, and that was the issue for trial on these limitations: "Counsel, I am persuaded that there is a live factual dispute as to how these products function, what's the role of the ethernet header, if any, when the TCP header is being processed." Dkt. 258-1, at 60:22–25. And, on that question, the evidence established infringement. When the TCP header is being processed in the TCP routines, there is no role for the Ethernet header. *See, e.g.*, Mot. at 3–5. NetScout does not contend otherwise. Its defense was to avoid that issue and instead focus that the Ethernet header is still stored in memory (and unused). That was not a relevant defense and does not provide sufficient evidence to support the verdict.

## II.     Prejudicial Error Warrants a New Trial

### A.     The Court's Claim Construction

NetScout incorrectly characterizes Implicit's Motion as one for reconsideration of the *Markman* Order. Resp. at 9–10. But, in order to obtain a new trial, Implicit had to show (1) that the construction was in error and (2) that it was prejudiced by the error. *See, e.g.*, *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1325 (Fed. Cir. 2012) ("A district court's incorrect claim construction may require a new trial, but only where the party seeking a new trial shows that they were prejudiced by the error.") (internal citations omitted); *see also Chrimar Holding Co., LLC v. ALE USA Inc.*, 732 F. App'x 876, 886 (Fed. Cir. 2018) (non-precedential) (holding that adopting a new construction of the term "adapted" did not require a new damages trial because the appellant did not "ask for a new trial on damages based on our adoption of its construction of 'adapted.'"). The Motion addressed both issues. NetScout does not contest Implicit's allegations of prejudice.

NetScout relies on the *OPTi v. VIA* case, which arose in a much different context. There, the defendant sought judgment as a matter of law on indefiniteness—a legal question, not a jury

question. 65 F. Supp. 3d 465, 475 (E.D. Tex. 2014). That motion was not a proper motion under Rule 50 because indefiniteness is not a jury issue; thus, the Court treated the motion as seeking reconsideration of the Court's earlier ruling. *Id.* In contrast, Implicit is asking for a new trial so a jury can resolve the infringement, willfulness, and damages fact questions under the claim constructions Implicit proposes. Implicit respectfully requests that the Court afford that relief.

### B. NetScout's Expert Testimony From Fact Witnesses

NetScout's fact witnesses were not providing testimony about how their products operate. They provided expert opinions on the ultimate issue of infringement—if the Accused Products met the claim language. Their repeated usage of the key claim terms of the Patents-in-Suit in their testimony, such as "path" and "outermost header," was for that exact purpose. NetScout emphasized its fact-witness testimony in closing to argue for noninfringement.

Having secured the verdict, NetScout now takes the opposite position. It asserts that its witnesses were not using those claim terms as it related to infringement, but as "an attribute of the operation of the products" and how they understood those terms "in the nature of computer programming." Resp. at 11, 12. That is not an accurate portrayal of what happened. And NetScout's shift underscores that its fact-witness testimony infected the record with prejudicial error—if NetScout's witnesses were not providing opinion testimony on the ultimate infringement issues, then their claim-term-laden testimony had no relevance to any issue in the case; it was only there to unduly prejudice Implicit and confuse the jury.

NetScout primarily argues waiver. But Implicit objected to the testimony of each of NetScout's witnesses on the basis that they were providing improper expert testimony. Trial Tr. 12/11/2019 A.M., at 49:22–51:16 (Mr. Barrett); *id.* at 98:5–99:21 (Mr. Curtin); Trial Tr. 12/11/2019 P.M., at 49:25–51:25 (Dr. Dawson). NetScout argues that Implicit should have objected to each of the dozen or so questions that NetScout asked that solicited expert testimony.

3

But Implicit did raise objections to each witness at the time, and the Court overruled those objections. In any event, this type of repeated opinion testimony infected the trial record with plain error such that a new trial is warranted in these circumstances. FED. R. EVID. 103(e).

### C. NetScout's "End System" Defense

NetScout's comparison of its products to "end systems" was not relevant to any issue before the jury because—as NetScout admits in its Response—the Patents are not limited to "end systems." Resp. at 13–15. NetScout's (incorrect) claim that the Patents teach the invention as an end system does not fix the problem: comparing the specification to the Accused Products was not proper . *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("Infringement . . . is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit."). NetScout's "end system" argument had no place at trial.

NetScout argues that Implicit waived its objection to the testimony because Implicit did not raise it immediately at trial. But Implicit did object to the testimony that evening and provided notice of its position and its requested relief. Regardless, NetScout's introduction of an irrelevant "end system" defense that contradicted the *Markman* Order infected the record with the type of plain error that warrants a new trial. FED. R. EVID. 103(e).

### D. NetScout's SCOUT (Mosberger) Defense

NetScout stipulated that it would not raise SCOUT at trial: (1) NetScout would not offer any argument, testimony, or evidence "relating to" SCOUT; (2) NetScout would not "compare the functionality of the Accused Products" to "the functionality in any alleged prior art, including SCOUT (Mosberger)"; and (3) NetScout would approach the Court if it believed that Implicit had opened the door (which did not happen, and NetScout does not allege happened). *Id.* at 1–2.

NetScout avoids the stipulation in its Response, but it does not dispute that its

4

demonstrative was Figure 3.6 from SCOUT. NetScout's defense is that it did not call the demonstrative "prior art." But the stipulation covered any discussion *relating to* SCOUT, whether it was called prior art or not. And the demonstrative is Figure 3.6 from SCOUT. NetScout also asserts that it did not "in any way compare the demonstrative to the functionality of the Accused Products." Resp. at 14. But that is what NetScout did in closing. It argued that its demonstrative was a "static system like we've been talking about the entire case." Trial. Tr. 12/13/2019 A.M., at 59:8–16. The "static system[s]" that NetScout was talking about the whole case were its products. *See, e.g.*, *id.* at 72:13–16 ("NetScout's products are built at the factory, and they can only process what they can process because they're *static and pre-created*.") (emphasis added).

NetScout argues that its use of SCOUT did not prejudice Implicit. But Implicit relied on NetScout's stipulation. And NetScout's use of SCOUT, at the close of the evidence, was prejudicial. NetScout omitted from its demonstrative that the green lines are the "paths" in SCOUT—not the solid gray lines or the boxes. *See, e.g.*, Mot. at 15 (comparing Figure 3.6 from SCOUT, entitled "Paths Versus Classifiers," with NetScout's demonstrative, which omits the Figure title). NetScout then mixed up the concepts, which Dr. Almeroth attempted to un-tangle in his testimony. *See, e.g.*, Trial Tr. 12/12/2019 A.M., at 115:12–15 ("You've used the word 'paths' to refer to the solid lines, as well as the green lines."); *id.* at 116:9–11 ("My understanding was the if/then statements refer to the gray connection lines, not to the green P-labeled lines."). NetScout then argued in closing that Dr. Almeroth lacked credibility because of his answers to NetScout's questions, urging the jury to credit its witnesses over Dr. Almeroth. That was prejudicial.

### III.   CONCLUSION

For the foregoing reasons, Implicit respectfully requests that the Court grant these Motions.

| | |
|---|---|
| Dated: January 31, 2020 | Respectfully submitted,<br><br>By: /s/ Christian Hurt<br><br>William E. Davis, III (TX Bar No. 24047416)<br>Christian J. Hurt (TX Bar No. 24059987)<br>Edward Chin (Of Counsel)<br>(TX Bar No. 50511688)<br>Debra Coleman (Of Counsel)<br>(TX Bar No. 24059595)<br>**THE DAVIS FIRM, PC**<br>213 N. Fredonia Street, Suite 230<br>Longview, Texas  75601<br>Telephone: (903) 230-9090<br>Facsimile: (903) 230-9661<br>Bdavis/churt/echin/dcoleman@bdavisfirm.com<br><br>*Counsel for Plaintiff Implicit, LLC* |

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document is being filed electronically in compliance with Local Rule CV-5(a).  As such, this document is being served on all counsel who are deemed to have consented to electronic service.  Local Rule CV-5(a)(3)(V).  Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), any counsel of record not deemed to have consented to electronic service will be served with a true and correct copy of the foregoing by email on this 31st day of January, 2020.

/s/ Christian Hurt
Christian Hurt