**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| IMPLICIT, LLC, § | |
| § | |
| *Plaintiff,* § | |
| § | |
| v. § | CIVIL ACTION NO. 2:18-CV-00053-JRG |
| § | |
| NETSCOUT SYSTEMS, INC., § | |
| § | **FILED UNDER SEAL** |
| *Defendant.* § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Plaintiff Implicit, LLC's ("Implicit") Motion for Judgment as a Matter of Law and Motion for New Trial (the "Motion"). (Dkt. No. 249.) Having considered the briefing, case record, and relevant authorities, the Court is of the opinion that the Motion should be **DENIED** for the reasons set forth herein.

**I.    BACKGROUND**

Implicit brought suit against Defendant NetScout Systems, Inc. ("NetScout") for patent infringement on March 8, 2018. (Dkt. No. 1.) Implicit alleged that NetScout infringed U.S. Patent Nos. 8,694,683 (the "'683 Patent"); 9,270,790 (the "'790 Patent"); and 9,591,104 (the "'104 Patent") (collectively, the "Asserted Patents"). (*Id.* ¶ 8.) Specifically, Implicit accused the InfiniStream/nGeniusOne Services Assurance Platform ("InfiniStream"), Geoprobe/Iris ("Geoprobe"), and Arbor (AED, TMS, APS) ("Arbor") products (collectively, the "Accused Products") of infringement. (Dkt. No. 204 at 9.)

The Asserted Patents relate to a "method and system for data demultiplexing." (Dkt. No. 1 ¶¶ 9, 11, 13.) More specifically, the Asserted Patents teach a "method and system for converting a message that may contain multiple packets from an [sic] source format into a target format." '683

Patent at 2:42–44; *see also* '790 Patent at 2:43–45; '104 Patent at 2:47–49. Implicit's counsel described the invention taught by the Asserted Patents as "deep packet inspection" which allows looking into a packet to quickly determine how that packet should be processed and putting together a path for those packets. (Dkt. No. 228 at 37:8–17.)

The case proceeded to trial before a jury on Claims 1 and 10 of the '683 Patent; Claim 1 of the '790 Patent; and Claims 1, 3, and 4 of the '104 Patent (collectively, the "Asserted Claims"). (*See* Dkt. No. 225.) The jury returned a verdict in favor of NetScout, finding that Implicit failed to prove that NetScout infringed any of the Asserted Claims. (Dkt. No. 222.) The Court entered final judgment in accordance with the verdict on December 13, 2019, designating NetScout as the prevailing party. (Dkt. No. 225.)

Implicit now moves pursuant to Federal Rule of Civil Procedure 50(b) for an order that (1) enters a judgment of infringement as to the asserted claims of the Asserted Patents and (2) set this case for trial on damages and willfulness or, in the alternative, Implicit moves for a new trial on all aspects of the case pursuant to Federal Rule of Civil Procedure 59. (Dkt. No. 249 at 1.)

## II.   LEGAL STANDARD

### A.  Federal Rule of Civil Procedure 50(b)

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, "a jury

verdict must be upheld unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Id.* at 700 (quoting Fed. R. Civ. P. 50(a)(1)). The jury's verdict must be supported by "substantial evidence" for each claim. *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).

Under Fifth Circuit law, the court is to be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless they are not supported by substantial evidence. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men [and women] in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). The moving party is not entitled to judgment as a matter of law unless "the evidence points so strongly and so overwhelmingly in favor of the [moving] party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005) (citing *Cousin v. Tran Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001)). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion under Rule 50, the court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Const. Co., L.L.C.*, 731 F.3d 444, 451 (5th Cir. 2013) (internal citation omitted). "[T]he court must give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *See Ellis v. Weasler Eng'g Inc.*, 258 F.3d 326, 337 (5th Cir. 2001) (quoting 9A WRIGHT & MILLER

3

§ 2529). However, in doing so, the court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury. *See id. (*quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)).

### B. Federal Rule of Civil Procedure 59

Under Federal Rule of Civil Procedure 59(a), a new trial can be granted to any party after a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). In considering a motion for a new trial, the Federal Circuit applies the law of the regional circuit. *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1347 (Fed. Cir. 2007). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985). "The decision to grant or deny a motion for a new trial is within the discretion of the trial court and will not be disturbed absent an abuse of discretion or a misapprehension of the law." *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 173 (5th Cir. 1999).

### C. Infringement

To prove infringement under 35 U.S.C. § 271, a plaintiff must show the presence of every element, or its equivalent, in the accused product or service. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). First, the claim must be construed to determine its scope and meaning; and second, the construed claim must be compared to the accused device or service. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of

4

infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

### III.   DISCUSSION

#### A.  Implicit did not Establish Infringement as a Matter of Law.

Implicit asserts that it is entitled to judgment as a matter of law because it conclusively established infringement. (Dkt. No. 249 at 1.) More specifically, Implicit contends that NetScout only contested two sets of limitations—(1) the "sequence-of-routines" terms and (2) the "execute TCP" and "convert terms"—and its defense as to both were irrelevant. (*Id.* at 2–3.) All of the Asserted Claims contain or are dependent on claims which contain one (or both) of these limitations. (*See* Dkt. No. 111; Dkt. No. 120.)

##### 1.    The "Sequence-of-Routines" Terms

The term "sequence of [two or more] routines" can be found in the following Asserted Claims: Claim 1 of the '683 Patent; Claim 1 of the '790 Patent; and Claims 1 and 3 of the '104 Patent. The Court construed this term to mean "an ordered arrangement of [two or more] software routines that was not selected from a set of arrangements created before receiving a first packet of the message." (Dkt. No. 111 at 14; Dkt. No. 120.)

Implicit argues that during the trial it established that the Accused Products use a "sequence of routines" that were not selected from a set of arrangements created prior to receiving the first packet of a message. (Dkt. No. 249 at 1–2.) Specifically, Dr. Almeroth—Implicit's technical expert—testified that the Accused Products contain a flow table containing flow entries that "contains information about what processing unit -- units, what processing modules need to be used to convert, process packets that come in from that flow." (Dkt. No. 229 at 43:6–24.) Dr. Almeroth further testified that these flow entries are not created until after the first packet is received by the Accused Products. (*Id.* at 43:25–44:45–2.; *see also* Dkt. No. 230 at 3:3–16:14.)

5

Implicit also contends that NetScout's defense as to these claim limitations was irrelevant. (Dkt. No. 249 at 2.) Implicit argues that NetScout asserted that the "sequence of routines" within the "path" was the source code instead of the flow table. (*Id.*) Implicit contends that NetScout's assertion is irrelevant because the claims explain that the "path" includes "**one or more data structures** that indicate a sequence of routines for processing packets in the message." (*Id.* (citing the '683 Patent, Claim 1) (emphasis in original).) Implicit argues that the source code is not a data structure that determines the path of the packets. (*Id.*) Further, Implicit argues that NetScout's witnesses admitted that the flow-table entries in the Accused Products determine the "path" of the packets and those entries are not created until after the first packet of a message arrives. (*Id.* at 2–3 (citing Dkt. No. 235 at 26:6–23; Dkt. No. 234 at 36:7–10; Dkt. No. 235 at 26:24–28:15; Dkt. No. 236 at 12:22–24, 17:12–18:5, 22:6–10).) Accordingly, Implicit argues there was insufficient evidence from which the jury could have found against Implicit on this issue. (*Id.* at 3.)

NetScout responds that Implicit failed to present evidence that addressed the Court's construction of "sequence of routines" and instead focused its evidence on whether a "path" is created after receiving a packet. (Dkt. No. 256 at 2–3.) More specifically, NetScout contends that Implicit failed to present any evidence that the Accused Products select from a set of arrangements that were created *after* the first packet of the message is received. (*Id.* at 3.)

NetScout argues that it offered sufficient evidence at trial that the Accused Products do not use a "sequence of routines" as construed by the Court. (*Id.*) NetScout asserts that the jury heard plenty of evidence "that placing an entry in a flow table after receiving the first packet of a message has nothing to do with when the arrangement of software routines in the Accused Products are created." (*Id.* (citing Dkt. No. 233 at 38:22–39:6, 40:15–41:1; Dkt. No. 235 at 4:16–17; Dkt. No. 236 at 6:25–7:11, 9:16–20).) NetScout contends that it presented unrebutted evidence from both

6

its expert witness—Dr. Jeffay—and several fact witnesses involved with the Accused Products for many years, that each of the Accused Products only "select from a set of arrangements created *before* receiving a first packet of the message." (*Id.* at 4 (emphasis added).) In other words, NetScout argues that all arrangements of software routines in the Accused Products are created by coders before the product is ever sold and are not created after the first packet is received by the Accused Products. (*Id.*)

Having conducted a careful review of the trial record, the Court finds that substantial evidence supports the jury's finding that the Accused Products did not meet the "sequence of routines" limitation. Again, the Court's claim construction of the term "sequence of routines" required that the accused product use software routine arrangements that were created after receiving a first packet of the message. (*See* Dkt. No. 111 at 13–14.) Accordingly, evidence supporting noninfringement would include evidence that such software routine arrangements were created before the first packet arrived, and NetScout presented such evidence from several sources to the jury.

NetScout offered testimony from three employees who worked on the Accused Products who testified that the set of arrangements of software routines are created at the time the Accused Product is coded—well before any packet is received. (Dkt. No. 233 at 29:20–30:6, 32:1–34:10, 82:10–86:19, 89:6–90:19, 91:9–22, 93:21–95:2; *see also* Dkt. No. 235 at 49:20–24, 52:1–10; 54:18–55:17, 55:24–58:22, 61:18–62:3, 64:20–22.) Further, Dr. Jeffay offered testimony which supported the testimony offered by the NetScout employees:

> [The Accused Products] don't create processing paths. The -- based on my analysis of the code, they're constructed using very traditional conventional programming practices where you create the programming routines when you design the product, and you arrange them however you want to arrange them to perform whatever function you need, and they're connected together. And that's all done at the time

7

> the product is -- is designed. . . [T]here's no code in the NetScout products to do any dynamic creation -- of processing paths.

(Dkt. No. 235 at 119:20–120:9.) Dr. Jeffay explained to the jury how these paths operate and that they are created prior to the first packet being received:

> They're connected together using, as I say, conventional programming practices. They are programming languages, statements that are used to go from one module -- in this case, they're all called parsers -- to go from one parser to another parser. . . [T]he paths are what the paths are, and they're created when the product is designed, and that's all the product can do.

(*Id.* at 120:21–122:8.) Dr. Jeffay provided similar testimony for all of the Accused Products. (*See Id.* at 123:6–8, 125:7–11, 126:23–25 (" [T]hey're hard-coded, pre-created, and they all are existing prior to the receipt of any -- of any packet.").)

Further, the Court is not convinced by Implicit's argument that the source code is not a data structure and that only the flow-table entry indicates how to process packets. First, Implicit does not cite to any evidence in the record that the source code cannot constitute a data structure, nor did the Court construe data structure to be so limited. Second, the "admissions" by NetScout witnesses that flow-table entries are created and filled in after the first packet of a message arrives do not conclusively establish infringement. For example:

> **Q:** Yes. You said NetScout doesn't create anything after the first packet. That remains your testimony?
>
> **A:** We've established that we create things like flow entries.
>
> **Q:** You do not create any processing path after the flow?
>
> **A:** We do not create any processing paths after the first packet, that is correct.
>
> **Q:** And in saying that, you're not just referring to programming logic pre-existing but an actual processing path actually capable of processing traffic?
>
> **A:** Yes.

8

> **Q:** You're denying that that actual processing path was built at NetScout after the first packet?
>
> . . .
>
> **A:** We are not creating a path after receiving the first packet.

(Dkt. No. 234 at 36:7–37:3.) Thus, despite that a NetScout witness admitted flow entries are created after a packet arrives, that admission did not extend to creating a path after receiving the first packet, and the witness explained as much on re-direct. (*See* Dkt. No. 233 at 65:19–24 ("[Q:] When are the paths created that process packets in the InfiniStream product? [A:] They're created by our programmers at their cubicles. [Q:] And is that software that they write, is that a real path? [A:] Yes, it is.").) Accordingly, as to limitations including this term, the Court finds that the jury's verdict is supported by the evidence in the record and should be upheld.

### 2. The "Execute" and "Convert" Terms[1]

The "execute" and "convert" terms can be found in the following Asserted Claims: Claims 1 and 10 of the '683 Patent; Claim 1 of the '790 Patent; and Claims 1 and 3 of the '104 Patent. (*See* Dkt. No. 111.) The Court construed "convert packets having a TCP format into a different format" as "convert the outermost header structure of the packet(s) from TCP to another type of header structure." (*Id.* at 29.) The Court similarly construed the "execute" term to require operation on the outermost header of the packet. (*See id.* at 35–36.) For example, the court construed

---

[1] The "execute" and "convert" terms include the following: "execute a Transmission Control Protocol (TCP)"; "executable to perform a Transmission Control Protocol (TCP)"; "execute a second, different protocol"; "execute a third, different protocol"; "execute a Transmission Control Protocol (TCP) to process packets having a TCP format"; "execute TCP to process at least one of the subsequent packets having a TCP format"; "execute a second protocol to process packets having a format other than the TCP format, wherein the second protocol is an application-level protocol"; "another session associated with a different protocol that is executed, wherein the different protocol corresponds to the different format"; "convert one or more packets having a TCP format into a different format"; "convert one of the packets of the message into a different format"; "convert one or more packets in a transport layer format into a different format"; and "convert packets of the different format into another format." (Dkt. No. 111.)

9

"execute a Transmission Control Protocol (TCP)" to mean "operate on one or more packets whose outermost header is a TCP header." (*Id.* at 35.)

Implicit argues that it established infringement of these claims by showing that the Accused Products utilize a pointer structure to the TCP header within the packet. (Dkt. No. 249 at 3 (citing Dkt. No. 230 at 21:11–31:22; Dkt. No. 238 at 93:20–94:25, 98:14–100:11; Dkt. No. 238 at 8:4–24).) More specifically, Implicit contends that it elicited testimony that the first byte that the pointer points to in the TCP routines is the TCP header, and as such, TCP is the outermost header for the packet at that time. (*Id.* at 3–4 (citing Dkt. No. 235 at 35:3–13).) Also, Implicit contends that the evidence established that when the Accused Products advanced from TCP to the application level, the outermost header is an application header (*Id.* at 4 (citing Dkt. No. 230 at 21:11–31:22; Dkt. No. 237 at 93:20–94:25, 98:14–100:11; Dkt. No. 238 at 8:4–24).) Based on such, Implicit contends that it conclusively established infringement on these issues. (*Id.* at 5.)

NetScout responds that its evidence demonstrated that the Accused Products do not operate on or convert packets whose outermost header is TCP because all of the Accused Products receive and operate on packets with its outermost header being Ethernet. (Dkt. No. 256 at 6 (citing Dkt. No. 233 at 26:6–11, 42:25–43:25, 93:5–9; Dkt. No. 235 at 5:21–60, 11:17–24; 65:19–21, 66:15-25, 70:2–14).) NetScout further argues that it presented evidence that its products do not convert the outermost header structure of the packet from TCP to a different header structure and provided an explanation for why this would not be beneficial in the Accused Products: "In the case of Infinistream and GeoProbe, users would not be able to troubleshoot their networks or accurately track statistics. For Arbor, the network traffic would not get to its destination if headers were changed." (*Id.* (citing Dkt. No. 233 at 41:23–42:11; Dkt. No. 235 at 6:14–7:6, 65:22–66:4) (citations omitted).) Finally, NetScout contends that Dr. Jeffay provided testimony that "confirmed

that at no point in any of the [Accused] [P]roducts is there a packet that has an outermost header of TCP, nor does the outermost header of a received packet ever change from TCP to some other header structure." (*Id.* at 7 (citing Dkt. No. 235 at 133:12–136:9, 144:7–150:9, 156:23–158:11).) Accordingly, NetScout contends that the parties offered conflicting testimony on this issue, the jury weighed this testimony, and the jury relied on adequate evidence in finding noninfringement. (*Id.* at 8.)

Having reviewed the trial record, the Court finds that sufficient evidence supports the jury's finding of noninfringement on the "convert" and "execute" limitations. The Court's claim construction of these terms centered on an understanding that the outermost header of a packet determines the format of a packet. (Dkt. No. 111 at 26 ("Plaintiff thus evidently understood that the relevant 'format' of a packet is determined by its outermost header.").) Further, the Court found that the format of a packet could not be altered by moving a reference within the packet. (*Id.* at 27 ("To whatever extent Plaintiff contends that the terms 'convert one or more packets having a TCP format into a different format' . . . encompass merely moving a reference, the Court hereby expressly rejects any such interpretation as lacking support in the record.").)

Here, NetScout offered evidence consistent with the Court's construction that the jury obviously relied upon in finding noninfringement. First, NetScout offered evidence that the Accused Products only operate on packets with an ethernet header as its outermost header. (Dkt. No. 235 at 136:8–9 ("All the routines I've seen operate on packets, and specifically ethernet packets.").) Second, NetScout offered evidence refuting Implicit's infringement theory that pointers create representations of a packet. (*See* Dkt. No. 230 at 22:9–23:2.) In fact, Mr. Barrett offered testimony that pointers do not perform any sort of conversion:

> **Q:** Do these pointers that we're looking at here, do they change or convert the packet in any way?

11

> **A:** No, they do not.
>
> **Q:** What do they do?
>
> **A:** Maybe I could use an analogy. If you were to sort of think of the ethernet packet as -- as a book, then if I asked you to read Chapter 3 to me, you'd kind of have to flip through the book and find Chapter 3. But if I give you a copy of the book with a bookmark at Chapter 3, it's much easier for you. You can just say, oh, there's a bookmark. You can open up the book and start reading.
>
> And that's – that's exactly what a pointer does. It's like a bookmark. It's – it's kind of there for convenience. And it doesn't change in any way the book that you have.
>
> And, you know, if -- if I gave someone a book with a -- with a bookmark at Chapter 3 and said, what are you holding, they would say, I'm holding a book. And if I said, what's that bookmark for, they would say, well, I'm about to read Chapter 3, so it means that I know where Chapter 3 is. I have to say I do not believe they would say I'm holding a representation of Chapter 3.
>
> So, really, so when you think -- when you hear us talk about ethernet packets maybe and pointers, think of a book, think of each pointer as a bookmark with a different chapter in the book. And like I say, it's just a convenient way of us getting to the part of the packet that we want to read quickly and efficiently.

(Dkt. No. 233 at 45:5–46:6.) Dr. Jeffay testified in support of this analogy:

> **Q:** Prior to Dr. Almeroth's testimony, have you ever heard anyone saying a pointer in a packet creates a representation of a packet?
>
> **A:** No. No. A pointer in a packet is just -- we heard the book and bookmark example, which I think is a great example. A pointer is just like a bookmark in a book. It's just a way to get to some part of the book very quickly.
>
> **Q:** Does a bookmark change the book?
>
> **A:** It does not. And a pointer does not change a packet.

(Dkt. No. 235 at 135:21–136:5.)

Accordingly, as to limitations including the "execute" and "convert" terms, the Court finds that the jury's verdict is supported by sufficient evidence in the record and should be upheld and respected.

12

### B. Motion for New Trial

In addition to the grounds listed for judgment as a matter of law, Implicit argues that a new trial is warranted because (1) the Court incorrectly construed the claim terms on which NetScout's noninfringement defenses hinged; (2) NetScout presented improper expert testimony through its fact witnesses; (3) NetScout presented argument and testimony that contradicted the Court's Claim Construction Order; and (4) NetScout improperly used a prior art reference. (Dkt. No. 249 at 5–15.)

#### 1. The Court's Claim Construction Order is not Grounds for a New Trial.

As its first ground for a new trial, Implicit argues that the Court's construction of the "sequence of routines" and the "convert" and "execute" terms was incorrect. (Dkt. No. 249 at 5–6.) Implicit argues that this incorrect construction was prejudicial, and as such, Implicit is entitled to a new trial. (*Id.*)

First, Implicit argues that the Court should have construed the "sequence of routines" terms as Implicit proposed: "an ordered arrangement of [two or more] software routines that was not identified (i.e., configured) prior to receiving a first packet of a message." (Dkt. No. 249 at 6 (quoting Dkt. No. 117 at 1).) Implicit contends that NetScout seized on the Court's erroneous construction when NetScout argued that its source code was the routine which existed prior to the first packet's arrival. (*Id.*) Implicit further argues that if its proposed construction had been adopted, NetScout's defense at trial would have been foreclosed. (*Id.* at 7.)

Second, Implicit argues that the Court incorrectly construed the "execute" and "convert" terms to require operation on a packet whose outermost header was TCP. (*Id.*) Implicit goes on to argue that the Court erred in finding that moving a reference did not constitute converting a packet. (*Id.*) Implicit contends that this construction gave NetScout an unwarranted defense because its

13

products are pointer based. (*Id.* at 8.) Had the Court adopted Implicit's proposed plain-and-ordinary meaning, Implicit contends such a defense would have been rejected. As such, Implicit contends that the Court's failure to adopt Implicit's proposed claim construction for these terms was prejudicial and a new trial is warranted. (*Id.* at 9.)

In support of its arguments on these grounds, Implicit relies on the same arguments it made at the claim construction stage, earlier in this case. (*See id.* at 6–8; *see also* Dkt. No. 117 at 1, 3–5.) Implicit offers no new evidence for the Court to consider. Accordingly, having considered Implicit's same arguments as to these terms at claim construction, and again at this post-verdict stage, the Court is not convinced that Implicit's proposed constructions are proper for the same reasons contained in this Court's Claim Construction Order. (*See* Dkt. No. 111; Dkt. No. 120.) Accordingly, a new trial is not warranted on this basis.

### 2. NetScout did not Present Improper Expert Testimony Through Fact Witnesses.

Implicit contends that three NetScout witnesses—Mr. Paul Barrett, Mr. John Curtin, and Dr. Scott Dawson—provided improper expert testimony. (Dkt. No. 249 at 9.) Implicit represents that NetScout did not designate any of these witnesses as experts in this case, nor was an expert report filed for these witnesses. (*Id.*) Implicit argues that, despite this fact, these witnesses offered testimony on the issue of infringement based on how these witnesses viewed the limitations. (*Id.* at 10.)

NetScout responds that the testimony from these fact witnesses was properly directed to the operation of NetScout's products. (Dkt. No. 256 at 10.) NetScout contends that Implicit knew these witnesses would testify in this manner because they had previously done so in declarations and depositions and that there is nothing improper about presenting factual testimony about the operation of products using plain language to understand how the Accused Products operate. (*Id.*

at 12–13.) NetScout further contends that Implicit has waived any objection to such testimony because it failed to contemporaneously object to such testimony at trial. (*Id.* at 10.)

Having reviewed the aforementioned testimony, the Court finds no error, and further, to the extent there was any error Implicit has waived any objection on this point. Federal Rule of Evidence 103 requires a timely and specific objection to the introduction of improper testimony and the failure to do so results in waiver. Fed. R. Evid. 103(a); *see also Bianco v. Globus Med., Inc.*, No. 2:12-cv-00147-WCB, 2014 WL 5462388, at *16 (E.D. Tex. Oct. 27, 2014), *aff'd*, 618 Fed. App'x. 1032 (Fed. Cir. 2015). Furthermore, a failure to raise such an objection upon each introduction of improper testimony results in waiver. *CP Interests, Inc. v. Cal. Pools, Inc.*, 238 F.3d 690, 696–97 (5th Cir. 2001) (holding that a failure to object to the challenged testimony on four out of six occasions meant that the issue was waived on appeal).

As an initial matter, the Court does not find that it was error to admit such testimony in this instance because it was proper fact witness testimony. Testimony from a fact witness premised on personal knowledge concerning how a product operates does not cross the line into expert testimony. *Fresenius Med. Care Holdings, Inc. v. Baxter Intern., Inc.*, No. C 03-1431 SBA, 2006 WL 1330002, at *3 (N.D. Cal May 15, 2006); *see also 523 IP LLC v. CureMD.com*, 48 F. Supp. 3d 600, 635 (S.D.N.Y. 2014) (holding that a person that assisted in the conception, design, and writing of source code could have a personal knowledge of the subject system's functionality and could testify to such as a fact witness).

The testimony identified by Implicit in the instant Motion addresses the "execute" and "convert" limitations[2], as well as the "sequence of routines" terms.[3] For the testimony regarding the "execute" and "convert" limitations, the witnesses simply testified regarding their personal

---

[2] (Dkt. No. 233 at 52:5–10, 46:23–47:1, 52:25–53:7, 56:15–20; Dkt. No. 235 at 70:12–71:9, 72:2–8.)
[3] (Dkt. No. 233 at 38:5–25, 91:20–22, 98:2–4; Dkt. No. 235 at 4:16–17, 58:19–22.)

knowledge of how their products operate. (*See* Dkt. No. 233 at 52:25–53:2 ("[Q:] Does this code that we're looking at here . . . does that convert packets in any way? [A:] No, it doesn't."); *see also* Dkt. No. 235 at 70:7–11 ("[Q:] To what extent do the Arbor Products convert packets in any way? [A:] They don't convert anything. They simply leave the packet there in memory and look across that packet and process what -- when they need to.").)

For the testimony regarding the "sequence of routines" terms, the aforementioned witnesses again testified regarding their personal knowledge of how the Accused Products operate. For example, Mr. Barrett testified to the following:

> Q: Does the InfiniStream have any ability to modify the path or change the order of the path after a packet is received and while the system is in operation?
>
> A: No, it doesn't.
>
> Q: If I give you a combination of protocols in a packet and it's supported, can you tell me with certainty the path that will be used to process that packet?
>
> A: Yes, I can.
>
> Q: What happens in an InfiniStream in operation when a packet is received that is not supported by the existing code?
>
> A: We mark it as unknown.

(Dkt. No. 233 at 38:8–19.) This testimony, along with the other portions identified by Implicit, explain to the jury based off of the witnesses' personal knowledge, how the Accused Products operate.

Furthermore, when asked on cross-examination, the witnesses explained to the jury that they were not opining on noninfringement, but were using their own plain language understanding to explain how the Accused Products operate. (Dkt. No. 236 at 19:17–20 ("I'm not using processing path in the -- in the nature of the claims . . . I'm using it in the nature of computer programming."); Dkt. No. 233 at 16:20–23 ("[Q:] And so you're not telling the jury one way or

16

the other about whether NetScout infringes Implicit's patents, are you? [A:] No. I'm just here to explain our product.").) Accordingly, to the extent that Implicit did not waive its objection, the Court finds no error in permitting these witnesses' testimony as to how the Accused Products operate.

Separately and as to the issue of waiver, addressing Mr. Barrett's testimony, Implicit first objected when Mr. Barrett was asked about Dr. Almeroth's testimony concerning "representations of the packet." (*See* Dkt. No. 233 at 49:11–50:1.) At that time, the Court stated that the witness had not "gotten into specific questions and answers yet," and as such, the issue would have to be considered on "a question-by-question basis." (*Id.* at 50:24–51:3.) When the Court informed Implicit's counsel that it would have to wait and hear what testimony Mr. Barrett actually offered, counsel responded with "[f]air enough, Your Honor." (*Id.* at 51:12–13.) However, Implicit's counsel did not object on this basis again concerning Mr. Barrett's testimony.

As to Mr. Curtin's testimony, Implicit first objected on the basis that NetScout's counsel through Mr. Curtin was "reading right out of the claim as to whether GeoProbe does that or not" arguing that Mr. Curtin's testimony was "into the realm of -- expert testimony is to render an opinion on what the ultimate claim language is." (Dkt. No. 233 at 98:10–16.) The Court overruled the objection finding that while the questions posed to Mr. Curtin were improperly leading, they did not call for expert testimony. (*Id.* at 99:11–16.) As Implicit admits, it did not renew its objection to Mr. Curtin's testimony as it continued throughout the remainder of his direct examination despite Mr. Curtin's ongoing use of claim terms. (*See* Dkt. No. 262 at 3; *see also* Dkt. No. 235 at 5:3–6 ("[Q:] When along the processing *path* is the flow table updated? [A:] The flow table is updated at many points during the processing *paths* that we've coded.") (emphasis added).)

17

Finally, addressing Dr. Dawson's testimony, Implicit objected arguing that "[h]e's using claim language now of processing paths. *And I know maybe there was no objections to the other witnesses*, but I'm going to object to this witness testifying as an expert, testifying as to whether or not there are processing paths in the accused products." (Dkt. No. 235 at 50:5–13 (emphasis added).) The Court overruled the objection stating that Dr. Dawson was entitled to testify from his own personal knowledge concerning the products he was familiar with and what is contained in the products his company sells. (*Id.* at 51:6–9.) However, the Court cautioned counsel stating that "if it goes beyond that where [Dr. Dawson] starts to explain what language like path means, that's a different matter . . . ." (*Id.* at 51:10–12.) Again, Implicit failed to raise any further objection despite subsequent testimony from Dr. Dawson concerning processing paths. (*Id.* at 58:19–22 ("[Q:] When are the processing paths in the Arbor product created? [A:] Those are created when we write the software before we ever ship it to customers.").) The record makes it clear that, Implicit failed to raise a timely objection at each instance when testimony was offered by each of the aforementioned witnesses, and as such, waived any objection to this testimony.

### 3. NetScout did not Contradict the Court's Claim Construction Order.

Implicit next argues that a new trial is warranted because NetScout presented testimony that the claims were limited to an "end system," which contradicts this Court's Claim Construction Order. (Dkt. No. 249 at 12 (citing Dkt. No. 111 at 29–36).) Specifically, Implicit complains about statements made during NetScout's opening statement as well as testimony by NetScout's technical expert—Dr. Jeffay—in which he described the invention as running on end systems. (*Id.* (citing Dkt. No. 235 at 103:23–104:16).)

Implicit has waived this objection because it raises it now for the first time. Implicit does not cite anywhere in the record where it objected to argument or testimony concerning "end

systems," nor can the Court find any such objection. Accordingly, such argument on this point is untimely and is waived. Moreover, this is not one of those exceptional cases in which plain error warrants a new trial, nor has Implicit argued that such substantial interests of justice are at stake. *See Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1327 (Fed. Cir. 2013) (citing *Shipman v. Cent. Gulf Lines, Inc.*, 709 F.2d 383, 388 (5th Cir. 1983)).

### 4. NetScout did not Improperly use a Prior Art Reference.

Finally, Implicit contends that NetScout violated a stipulation entered into prior to trial (the "Stipulation Regarding Invalidity") when NetScout published to the jury Figure 3.6 from the prior art reference SCOUT as a demonstrative or jury aid. (Dkt. No. 249 at 14 (citing Dkt. No. 211 at 1).) Implicit argues that the use of this demonstrative was not relevant or "fair game," and its use resulted in prejudice to Implicit necessitating a new trial. (*Id.* at 15.) The Stipulation Regarding Invalidity entered into by Implicit and NetScout provided in relevant part that:

> Defendants will not affirmatively offer any argument, testimony, or evidence relating to any alleged prior art referenced in Dr. Jeffay's invalidity report, including SCOUT (Mosberger), PacketShaper, Decapser, or SPIN/Plexus, or any other invalidity basis (e.g., lack of written description, on sale bar, etc.).
>
> Defendants will not offer any argument, evidence, or testimony that they do not infringe based upon their products allegedly "practicing the prior art." Defendants will not compare the functionality of the Accused Products to the functionality in any alleged prior art, including SCOUT (Mosberger), PacketShaper, Decapser, SPIN/Plexus or any other alleged prior art referenced in Dr. Jeffay's invalidity report.

(Dkt. No. 211 at 1.)

NetScout's counsel used the demonstrative during the cross-examination of Dr. Almeroth—Implicit's technical expert. (Dkt. No. 237 at 110:8–16.) The demonstrative itself did not refer to SCOUT or any other prior art, but it was a reproduction of a figure from SCOUT. (*See* Dkt. No. 249 at 15.) The Court allowed the publication of the demonstrative on the basis that the jury did not know the figure was from prior art and was used as a hypothetical example on the

19

issue of infringement. (Dkt. No. 237 at 112:6–14.) NetScout did not use the figure to elicit testimony directed to the issue of invalidity. (*Id.* at 112:18–118:15.) Having reviewed the Stipulation Regarding Invalidity and the testimony at trial regarding this demonstrative, the Court is of the opinion that NetScout's use of the demonstrative complied with the spirit of the Stipulation Regarding Invalidity. As such, the use of this single demonstrative in the limited manner undertaken by NetScout's counsel does not warrant a new trial.

## IV. CONCLUSION

For the reasons set forth above, Implicit's Motion for Judgment as a Matter of Law and Motion for New Trial (Dkt. No. 249) is **DENIED**.

It is **ORDERED** that this ruling is **PROVISIONALLY SEALED**. The parties shall file joint proposed redactions, with explanations for the necessity of such redactions, within seven (7) days hereof, after which the Court will enter a redacted and public version hereof.

**So ORDERED and SIGNED this 3rd day of June, 2020.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE